**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq. (steele@sillscummis.com)
Daniel J. Harris, Esq. (dharris@sillscummis.com)
Gregory A. Kopacz, Esq. (gkopacz@sillscummis.com)
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 (Telephone)
(973) 643-6500 (Facsimile)

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 22-14539 - (JKS)<br><br>(Joint Administration Requested) |

<div align="center">

**DECLARATION IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY PLEADINGS**

</div>

I, Brian J. Casey, hereby declare under penalty of perjury as follows:

1.  I am the Independent Manager of National Realty Investment Advisors, LLC ("**NRIA**" or the "**Manager**"). I am familiar with the day-to-day operations, affairs, and books and records of NRIA, NRIA Partners Portfolio Fund I, LLC ("**NRIA Partners Portfolio Fund**" or the "**Fund**"), and each of the above-captioned debtors and debtors-in-possession (each, a "**Debtor**," and collectively, the "**Debtors**").

2.  On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA. The location of the Debtors' service address is: 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

3.      The Debtors are currently operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.  No official committee of unsecured creditors has been appointed.

4.      On the date hereof or shortly thereafter, the Debtors intend to file numerous motions and applications (the "**First Day Motions**") to allow the Debtors to continue operating while under the protection of this Court with minimum disruption or loss of value.  I am familiar with the contents of the First Day Motions, and believe the relief sought in each such motion is necessary to maximize the value of the Debtors' estates.

5.      I submit this declaration (the "**First Day Declaration**") in support of the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by the Debtors and their professionals, were learned from my review of relevant documents, or are my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

6.      This First Day Declaration is presented in four parts: Part I describes the background and business of the Debtors; Part II describes the Debtors' prepetition capital structure and indebtedness; Part III describes the circumstances leading to the commencement of these chapter 11 cases; and Part IV sets forth the relevant facts in support of each of the First Day Motions.

## PART I:
## BACKGROUND AND BUSINESS OF THE DEBTORS

7.      NRIA and its affiliated Debtors are a real estate development firm with dedicated

fund management specializing in luxury home sales and apartment rental divisions.  A copy of

the Debtors' corporate organizational structure is annexed hereto as **Exhibit A**.

**(i)      NRIA**

8.      NRIA is a Delaware limited liability company formed on November 27, 2006.

NRIA owns 100% of the common interests of NRIA Partners Portfolio Fund.  As detailed below,

I am the Independent Manager of NRIA pursuant to and in accordance with the Independent

Manager Agreement (as defined herein).

**(ii)      NRIA Partners Portfolio Fund**

9.      NRIA Partners Portfolio Fund is a Delaware limited liability company formed on

February 5, 2018, which historically offered limited liability company interests, as well as a

handful of convertible promissory notes, as investments in the Fund.  The overall investment

objective of the Fund, in accordance with its various Private Placement Memoranda, is to

achieve superior risk-adjusted returns, while seeking to preserve, protect and return invested

capital through stable distributions and proactive asset management.  Specifically, the Fund

seeks to (i) preserve capital, (ii) create an investment vehicle to allow investors to participate

alongside NRIA, and (iii) build a collection of institutional-quality assets with a long-term view

to provide the potential for capital gains through appreciation. The Fund accepted its last

accredited investor in January 2022, when it was determined that ceasing the solicitation of

additional investors was in the best interest of protecting the Fund's investors and other creditors.

10.     The Fund seeks to achieve its investment objectives by investing substantially all

of its total assets (less amounts withheld for fees, expenses, reserves, and contingencies) in

property development, including but not limited to, the development of multifamily, townhome, condominium, and mixed-use properties ("**Real Estate Assets**"),

11.     The Fund indirectly invests in Real Estate Assets through various limited liability companies (collectively, the "**Real Estate Asset LLCs**"), for which NRIA serves as the manager.  With respect to certain Real Estate Asset LLCs, the Fund holds an eighty percent (80%) beneficial ownership interest and NRIA holds the remaining twenty percent (20%) interest, which NRIA receives in return for providing management services to such Real Estate Asset LLCs, subject to the terms of the applicable operating agreement.  The Fund also has beneficial interests through an assignment by NRIA in various Real Estate Asset LLCs that were formed prior to the formation of the Fund.  Certain of these Real Estate Asset LLCs are wholly-owned by the Fund, while others are owned by the Fund alongside other investors. Certain of these Real Estate Asset LLCs, in turn, each wholly-own an underlying operating limited liability company (collectively, the "**Operating LLCs**") that directly own the corresponding Real Estate Asset (together, the "**Properties**").  NRIA also serves as the manager of each Operating LLC. Each Operating LLC is involved in one or more real estate investment strategies, which leverage NRIA's property sourcing resources and the Fund's platform for middle market opportunities.

12.     As of the date hereof, thirty-one (31) Properties are completed (inclusive of those which were assigned by NRIA to the Fund), three (3) Properties are near completion, and sixteen (16) Properties remain to be completed or are otherwise in the planning stage.  The Debtors estimate that the aggregate current value of the Properties is at least $225 million, based on property appraisals with valuation dates as of December 31, 2021 (or proxies thereof) authored by industry leaders such as CBRE, Newmark Knight Frank, Colliers, and others.  The future stabilized values of the respective Properties exceed $1 billion.

      **(iii)**      **The Debtors' Management**

13.    Historically, NRIA was wholly-owned by Rey E. Grabato, II and D. Coley O'Brien through his wholly owned-entity, NRIA Capital Partners Inc. Mr. Grabato was previously the sole Manager and sole Member of NRIA and acted as NRIA's President and CEO. Coley O'Brien was previously NRIA's Managing Director.

14.    Effective as of November 1, 2021, Casey Group, Ltd. ("**Casey Group**"), a Maryland corporation, was appointed as an additional "manager" (as such term is defined under the Delaware Limited Liability Company Act) of the Fund pursuant to that certain *Appointment and Acceptance of an Additional Manager of NRIA Partners Portfolio Fund I, LLC dated October 20, 2021* (the "**Appointment and Acceptance**"). The Casey Group was engaged to address issues related to the management of the Debtors (including as addressed below, allegations of mismanagement) by, among other things, ensuring that the Fund and/or the Initial Manager—at the time, NRIA—used the Fund's assets appropriately. The Appointment and Acceptance also ensured that the Initial Manager could only take certain actions with the prior written consent of Casey Group.

15.    In addition, the consent of Casey Group was required before the Fund could: (a) approve the compensation and benefit packages for the Chief Executive Officer, President, Chief Operating Officer, Chief Compliance Officer, Chief Financial Officer, and similar persons; (b) approve the budget and business plan of the Fund and its subsidiaries; (c) purchase, approve, publish, distribute or otherwise disseminate advertising, sales, and marketing materials on behalf of the Fund; (d) issue, incur, assume, or guaranty any indebtedness in excess of $100,000; (e) make any capital expenditure in excess of $250,000; (f) authorize or incur expenses by an amount in excess of ten percent (10%) of the corresponding amounts set forth in the then-current

budget; (g) establish any employee awards or benefits; (h) accept any loan or enter into any other transaction with any Member, officer, employee or any of their respective Affiliates; (i) make a material investment in, or enter into a joint venture with, any person other than an ordinary investment of the Fund; (j) approve filings with any governmental authority that relate to tax or financial audit; (k) sell, assign, convey or otherwise dispose of all or any part of the Fund's assets; or (l) settle or compromise with any debtor or creditor of the Fund, including any taxing authority.

16.     On November 23, 2021, the Company's Limited Liability Company Operating Agreement was also modified to add the Casey Group as an "Additional Manager" and incorporate the terms of the Appointment and Acceptance.

17.     Following the execution and implementation of the Appointment and Acceptance in October 2021, Casey Group stabilized the company by undertaking the following matters, among others:

- Conducted an in-depth review of staffing, resulting in the termination of sixty (60) employees, salary reductions for eight (8) remaining employees, entered into a Separation Agreement with Mr. O'Brien and his entities and ceased all compensation to Mr. Grabato resulting in a total annual salary reduction of nearly $14 million, which reflects a total reduction of 76%;

- Prohibited discretionary employee bonuses for calendar year 2021;

- Retained legal professionals to advise on management decisions and conduct investigations;

- Retained a reputable accounting firm to assist the internal staff with an extensive historical reconstruction of the companies' books and records, which will result in financial statements that are prepared in accordance with Generally Accepted Accounting Principles, which is inconsistent with historical practices[2];

---

[2]     Prior to the Petition Date, all members of the accounting department who were involved with the preparation of the Debtors' financial statements were terminated.  The department is now led by a newly appointed Chief Financial Officer and two additional Certified Public Accountants with substantial relevant experience.

- Analyzed and prepared cash-flow forecasts for the Fund for an 18-month period;

- Investigated over 1,200 alleged "joint venture" and other agreements and assessed their impact on future operations; and

- Reviewed and analyzed numerous operational matters with the goal of right-sizing and improving operations.

18.     On April 29, 2022, I entered into that certain *Independent Manager Agreement* with NRIA (the "**Independent Manager Agreement**").  Pursuant to the Independent Manager Agreement: (a) I was appointed as the sole manager of NRIA, (b) Casey Group resigned as the "Additional Manager" of the Fund, and (c) Mr. Grabato resigned as the Member, President, and CEO of NRIA.

19.     I believe that the foregoing actions – taken by NRIA, the Fund, the Casey Group, and myself over the past eight (8) months – has remediated any potential management conflicts and alleviated any concerns that the Debtors are not being run in the best interests of their stakeholders.  As Additional Manager for the Fund since November 2021 and now as the Independent Manager of NRIA, I have and will continue to focus my attention and the attention of the Debtors' officers and employees on maximizing the value of the Debtors' estates.  I believe that the management structure now in place will allow me to manage the Chapter 11 process without undue influence and will allow the Debtors to achieve their goals in these Chapter 11 cases.

## PART II:

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

### (i)      Mortgage Obligations

20.     As of the Petition Date, three (3) of the Debtor entities are obligated on mortgages that are secured by the applicable properties:

    (a) <u>Bergenline Capital 4901 LLC</u>: On or about July 17, 2018, S3 RE Bergenline Funding, LLC loaned Debtor Bergenline Capital 4901 LLC up to $39,000,000 relating to the property located at 4901 Bergenline, West New York, New Jersey. As of the Petition Date, the Debtors estimate that $28,096,629 remains outstanding on this loan.

    (b) <u>Manhattan Avenue Capital 1300 LLC</u>: On or about November 15, 2019, S3 RE 1300 Manhattan Funding LLC loaned Debtor Manhattan Avenue Capital 1300 LLC up to $44,000,000 relating to the property located at 1300 Manhattan Avenue, Union City, New Jersey. As of the Petition Date, the Debtors estimate that $6,161,042 remains outstanding on this loan.

    (c) <u>Henry Street Capital 506, LLC</u>: On or about May 11, 2018, LendingOne LLC loaned Debtor Henry Street Capital 506, LLC up to $3,069,000.00 relating to the property located at 506 Henry Street, Brooklyn, New York 11231. As of the Petition Date, the Debtors estimate that $3,644,212 remains outstanding on this loan.

**(ii)  Unsecured Obligations**

21.     As of the Petition Date, the Debtors broadly estimate that they have approximately $10 million in outstanding obligations to trade vendors and other creditors, which estimate will be refined in connection with the preparation of the Debtors' schedules of assets and liabilities and statements of financial affairs.

**(iii)  Holders of Preferred Interests**

22.     As of the Petition Date, the Debtors estimate that approximately 2,000 unique investors hold approximately $540 million worth of preferred limited liability company interests (the "**Preferred Interests**") of the Fund (the "**Subscribers**"). Historically, through May 2022, Subscribers received monthly distributions, which typically ranged from six percent (6%) to ten percent (10%) of their original principal investment on an annual basis. Several Subscribers have recently submitted redemption requests to redeem such party's Preferred Interests which, pursuant to the Fund's September 1, 2021 Confidential Private Placement Memorandum would only be considered in the event of an explained hardship and only approved at the discretion of

management.  Details with respect to the redemption requests will be refined in connection with

the preparation of the Debtors' schedules and statements of financial affairs.

<div align="center">

**PART III:**
**CIRCUMSTANCES LEADING TO THE COMMENCEMENT**
**OF THE CHAPTER 11 CASES**

</div>

23.    Historically, the company was a mid-sized real estate development company with

properties located in New York, New Jersey, Florida and Pennsylvania.  After the Casey Group

was appointed as "additional" manager of the Fund as of November 1, 2021, I quickly

determined that the Debtors' explosive growth over the past several years was unsustainable and

that actions needed to be taken to bring the company's operations into line with its financial

performance.  Among other things, the company's employee headcount was too large, its

compensation levels were above market, and its internal process for the selection of contractors

was irregular and reflected a preference for entities associated with former insiders and their

affiliates.  As a result, within the first thirty (30) days of the Casey Group's appointment, Casey

Group prioritized tightening up formal and now industry standard accounting practices to ensure

the accuracy of the books and records, oversaw reductions in compensation and workforce, and

streamlined the contractor selection process.  Other similar steps, including a further reduction in

workforce on May 27, 2022, and a detailed review of the Debtors' contracts and "joint venture"

and other agreements were put into place prior to the Chapter 11 filings and will continue during

the course of these chapter 11 cases.

24.    It was also apparent that the Debtors obtained unnecessary off-market project

financing that strained the Debtors' liquidity.  Beginning in 2016, the Debtors expanded

operations by obtaining project financing debt of almost $300 million in the aggregate.  In

consultation with the Debtors' employees, I concluded that the underlying Properties had

significant value in excess of the outstanding project financing indebtedness. As a result, I oversaw the repayment of the outstanding loans, which significantly reduced the Debtors' monthly interest payments. In total, the Debtors paid off more than $50 million of indebtedness since November 1, 2021.

25.    The goal of these chapter 11 cases is to provide the Debtors with a breathing-spell to prevent a disorderly liquidation of their estates through Subscriber redemption requests and to reject and/or terminate disadvantageous contracts and other arrangements. By filing these chapter 11 cases, the Debtors will benefit by gaining additional time needed to sell completed Properties, complete construction on unfinished Properties, terminate or otherwise cease construction on other Properties, and right-size operations. I believe that the vast majority of the Properties have significant value that, in some cases, can be realized with project-level debtor-in-possession financing. At the conclusion of the process, the Debtors intend to propose a plan of reorganization that will provide a substantial, if not full, recovery to all stakeholders and position the Debtors to continue operating as a profitable mid-sized real estate investment firm.

**(i)    Recent Investigations**

26.    NRIA, to its knowledge, is presently under investigation by and/or has received subpoenas and/or requests for information from the United States Attorney's Office for the District of New Jersey, the United States Securities and Exchange Commission (the "**SEC**"), the New Jersey Bureau of Securities, the Illinois Securities Department and the Alabama Securities Commission.

27.    In addition, on or around March 4, 2021, the United States Attorney's Office for the District of New Jersey charged the now terminated, independently-contracted portfolio manager and advisor to NRIA, Thomas Nicholas Salzano, with one count of wire fraud in

violation of 18 U.S.C. section 1343, and one count of aggravated identity theft in violation of 18

U.S.C. section 1028A, in connection with an offer to sell an interest in the Fund.  On March 6,

2021, the United States Attorney's Office for the District of New Jersey issued a warrant

authorizing the (i) search of NRIA's premises located at 1325 Paterson Plank Road, Secaucus,

New Jersey 07094, and (ii) seizure of certain records and tangible items. In addition, on or

around June 7, 2021, the SEC filed a Complaint against Mr. Salzano in the United States District

Court for the District of New Jersey, alleging that Mr. Salzano violated Sections 17(a)(1) and (3)

of the Securities Act of 1933 and seeking a final judgment: (a) permanently enjoining Mr.

Salzano from violating the federal securities laws; (b) ordering Mr. Salzano to pay civil money

penalties pursuant to Securities Act Section 20(d)[15 U.S.C. § 77t(d); and (c) permanently

prohibiting Mr. Salzano from serving as an officer or director of any company that has a class of

securities registered under Section 12 of the Securities Exchange Act of 1934 [15 U.S.C. § 78l]

("**Exchange Act**") or that is required to file reports under Exchange Act Section 15(d) [15

U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)].  As a

consequence, NRIA has terminated Mr. Salzano.

28.    NRIA has and continues to fully cooperate with the investigating authorities.

## PART IV:
## FIRST DAY MOTIONS

29.    The Debtors have filed or will file the First Day Motions, seeking various forms

of relief designed to maximize the value of their estates for the benefit of creditors and other

stakeholders.  I have reviewed each of the First Day Motions and believe that the Debtors have

satisfied the applicable standards for the relief requested and that the Court's grant of the

requested relief is in the best interests of the Debtors, their estates, as well as that of their

creditors and other parties in interest.  Each of the First Day Motions is summarized below.

Capitalized terms used in this section have the meanings ascribed to such terms in the applicable motion.

30.    **Joint Administration Motion**. The Debtors seek entry of an order directing the joint administration and procedural consolidation of the Debtors' related chapter 11 cases (the "**Joint Administration Motion**"). Specifically, the Debtors request that the Court maintain one file and docket for the Debtors' jointly administered cases under the case of National Realty Investment Advisors, LLC and that the cases be administered under a consolidated caption. Further, the Debtors request that an entry be made on the docket of National Realty Investment Advisors, LLC's case to reflect the joint administration of these chapter 11 cases.

31.    Many of the motions, hearings, and orders in these chapter 11 cases will affect all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Further, joint administration will allow the Office of the United States Trustee for the District of New Jersey and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Parties in interest will not be harmed by the relief requested, but instead, will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

32.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruptions. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Joint Administration Motion.

33.     **Cash Management Motion**. The Debtors seek entry of an order authorizing the Debtors to (i) continue and maintain their existing cash management system and bank accounts, and (b) continue using their existing business forms, checks and records.

34.     As of the Petition Date, the Debtors maintain forty-six (46) checking accounts and one (1) money market account with four banks, including: (a) three (3) checking accounts with Haven Savings Bank; (b) five (5) checking accounts with Signature Bank; (c) thirty (30) checking accounts with Bank of America; and (d) eight (8) checking accounts and one (1) money market account with PNC Bank.  As of the Petition Date, the Debtors have approximately $72 million in cash in the Bank Accounts.  The Bank Accounts are maintained with financially stable banking institutions and insured by the Federal Deposit Insurance Corporation.

35.     In the ordinary course of business, the Debtors maintain a cash management system to receive and disburse funds.  The majority of the Debtors' funds are held in Signature Bank account ending 9587, which makes transfers to PNC account ending 4997 to pay operating expenses.  Prior to each bi-weekly payroll, funds are transferred to a payroll account at Haven Savings Bank ending 0767 to satisfy the Debtors' payroll obligations.  Payments made with respect to real estate development construction are paid from PNC account ending 4997 on behalf of the various entities which are treated for accounting purposes as equity contributions by NRIA Partners Portfolio Fund I LLC into the respective subsidiary entities.  To the extent an individual entity possesses its own operating account, the use is primarily limited to the receipt of unit sales proceeds (to the extent the buyer/attorneys are unable to make the payment directly to NRIA Partners Portfolio Fund I LLC) and small refunds.  Money received from the subsidiary entities gets transferred to NRIA Partners Portfolio Fund I LLC upon receipt.  All transfers in, out and between the Bank Accounts are recorded and traceable.

36.    The Cash Management System was designed to meet the Debtors' operating needs by enabling the Debtors to centrally control and monitor their funds, ensure cash availability and liquidity, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and presentment information.  The procedures employed in the use of the Cash Management System constitute the Debtors' ordinary, usual and essential business practices, and are similar to those used by other similar corporate enterprises.

37.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

38.    **Insurance Motion**. The Debtors seek authorization to: (i) pay pre-petition insurance premiums, (ii) continue pre-petition insurance programs, and (iii) pay all pre-petition obligations in respect thereof (the "**Insurance Motion**").

39.    In connection with the day-to-day operation of their businesses, the Debtors maintain insurance programs and related insurance policies through several different insurance providers.  In the aggregate, the annual premiums for such policies approximate $3,170,842.  As of the Petition Date, the Debtors believe they are current in their payment obligations under their Insurance Policies, but estimate that approximately $268,119 will come due in the ordinary course within the first thirty (30) days of these Chapter 11 Cases.

40.    Maintaining the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets. Moreover, in many cases, coverage provided by

the Insurance Policies is required by the laws, regulations and contracts that govern the Debtors'
commercial activities. It is, therefore, critical that the Debtors continue to carry the necessary
coverage to operate their businesses.

41.    Disruption of the Debtors' insurance coverage would expose the Debtors to
serious risks, including: (a) the incurrence of direct liability for the payment of claims that
otherwise would have been payable by the insurance carriers; (b) the occurrence of material costs
and other losses that would have otherwise been reimbursed by the insurance carriers; (c) the
potential loss of good-standing status to conduct business in jurisdictions that require the Debtors
to maintain certain levels of third-party coverage; (d) the inability to obtain similar types of
insurance coverage; and (e) the incurrence of higher costs for obtaining new coverage.

42.    Thus, I believe that the relief requested in the Insurance Motion is in the best
interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable
the Debtors to continue to operate in the ordinary course without unnecessary disruption.
Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the
Insurance Motion.

43.    **Schedules Extension Motion**. The Debtors seek entry of an order (a) extending
the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of
current income and expenditures, schedules of executory contracts and unexpired leases, and
statements of financial affairs by thirty (30) days, for a total of forty-four (44) days after the
Petition Date, without prejudice to the Debtors' right to request additional extensions.

44.    I believe that the relief requested in the Schedules Extension Motion is
appropriate because it (a) will not prejudice or adversely affect the rights of any creditor or other
party in interest, and (b) will relieve the Debtors of a significant administrative burden. The

Debtors' focus should be on seamlessly transitioning into chapter 11 and maximizing the value of their estates for the benefit of their various stakeholders.

45.     **Wage and Benefits Motion**. The Debtors seek authorization to (i) pay all pre-petition employee claims for wages, salaries and other accrued compensation; (ii) make all payments for which employee payroll deductions were withheld prepetition; (iii) reimburse all prepetition employee business and other expenses; (iv) make prepetition contributions and pay benefits under certain employee benefit plans; (v) honor worker compensation programs; (vi) pay other miscellaneous employee-related costs including processing costs and fees; and (vii) continue certain health, welfare and benefit programs.

46.     As of the Petition Date, the Debtors believe they are current with respect to their employee wages.  However, out of an abundance of caution, they request authority to pay such wages, along with any other prepetition Employee Obligations, in an amount not to exceed the statutory cap of $15,150 per employee.

47.     I believe the relief requested in the Wage and Benefits Motion is warranted, necessary and appropriate.  In short, any delay in honoring the Employee Obligations could severely disrupt the Debtors' relationships with their employees and irreparably impair the employees' morale at the very time that their dedication, confidence and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the relief requested in this Motion is not granted.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Obligations in the ordinary course of business during the pendency of these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the Wage and Benefits Motion.

48.    **Motion to Seal Individual Creditor Information**.  The Debtors request entry of

an order authorizing portions of the Matrix to be filed under seal to protect the Debtors' investors

from being exposed to potential identity theft as a result of making public certain personally

identifiable information required or suggested by the Bankruptcy Code and the Bankruptcy

Rules.

49.    The benefit of public access to the home addresses and email addresses of the

Debtors' investors is limited, if existent at all, in the context of a bankruptcy case, when the

Debtors' addresses are readily available and the claims and noticing agent in these Chapter 11

Cases will maintain a separate, confidential mailing list for service to the Debtors' investors at

their residences for the benefit of all parties in interest desiring to serve them with pleadings or

notices in these Chapter 11 Cases.  To publicly disclose each individual investor's home and

email address would create an undue risk of identity theft.  Accordingly, I respectfully submit

that the Court should grant the Motion to Seal Individual Creditor Information.

50.    **Motion to Extend Time to File List of Creditors, For Authority to Prepare a**

**Consolidated List of Creditors and Interest Holders and Authority to Mail and Serve**

**Initial Notice Through Omni Agent Solutions**.  In light of the size and complexity of the

Debtors' operations, and the extent information necessary to prepare the Creditor List, I believe

that an extension of time to allow the Debtors to file the Creditor List will not materially hinder

or delay the process of these Chapter 11 Cases, nor will it prejudice any creditor or grant any

unfair advantage to the Debtors.  Further, I am advised that the Debtors cannot easily comply

with the mandates of Bankruptcy Rule 1007 and Local Rule 1007-1, and that compiling the

information contained in books, records and documents relating to numerous creditors and a

multitude of transactions into the form of a mailing list required by Local Rule 1007-1 would

impose an unnecessary administrative and economic burden on the Debtors' estates. Finally, the Notice and Claims Agent will work closely with the Debtors, the authorization to mail initial notices will facilitate notice in the event of any amendments to the Creditor List and will ensure that all creditors and parties-in-interest receive timely and proper notice of hearings, bar dates and other deadlines. Accordingly, I respectfully submit that the Court should grant the relief requested in this motion.

51. Finally, a copy of the Debtors' budget (the "**Budget**") for the 12 weeks ended August 30, 2022, is attached hereto as **Exhibit B**. As demonstrated by the Budget, I believe the Debtors will have sufficient capital to satisfy all ordinary course operating expenses and bankruptcy administrative expenses that will come due after the Petition Date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 7, 2022

_____
Brian Casey
Independent Manager

## EXHIBIT A

National Realty Investment Advisors LLC, et al
Estimate of Twelve Weeks Sources and Uses of Cash
Subject to Change

Rev. 6/7/22

| | 0 Actual 6/7/2022 | 1 Projected 6/14/2022 | 2 Projected 6/21/2022 | 3 Projected 6/28/2022 | 4 Projected 7/5/2022 | 5 Projected 7/12/2022 | 6 Projected 7/19/2022 | 7 Projected 7/26/2022 | 8 Projected 8/2/2022 | 9 Projected 8/9/2022 | 10 Projected 8/16/2022 | 11 Projected 8/23/2022 | 12 Projected 8/30/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $ 72,330,870 | $ 72,330,870 | $ 70,096,609 | $ 70,041,662 | $ 68,147,401 | $ 66,303,507 | $ 64,434,246 | $ 62,729,299 | $ 61,233,371 | $ 59,787,811 | $ 58,316,883 | $ 57,010,270 | $ 55,539,341 | |
| Sources | | | | | | | | | | | | | | |
| 116 N Croksey St, Philadelphia, PA | - | - | 1,650,000 | - | - | - | - | - | - | - | - | - | - | 1,650,000 |
| Subtotal | 72,330,870 | 72,330,870 | 71,746,609 | 70,041,662 | 68,147,401 | 66,303,507 | 64,434,246 | 62,729,299 | 61,233,371 | 59,787,811 | 58,316,883 | 57,010,270 | 55,539,341 | |
| Uses | | | | | | | | | | | | | | |
| Administrative and Overhead | | | | | | | | | | | | | | |
| Employee Wages | | 164,315 | - | 164,315 | - | 164,315 | - | 164,315 | - | 164,315 | - | 164,315 | - | 985,890 |
| Reimbursable Auto Travel | | - | - | - | 1,250 | - | - | - | 1,250 | - | - | - | - | 2,500 |
| Employee Healthcare | | - | - | 25,000 | - | - | - | 25,000 | - | - | - | - | 25,000 | 75,000 |
| Insurance | | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 67,030 | 804,358 |
| Office Rent | | - | - | - | 37,697 | - | - | - | 37,697 | - | - | - | - | 75,394 |
| Total Administrative and Overhead | - | 231,345 | 67,030 | 256,345 | 105,977 | 231,345 | 67,030 | 256,345 | 105,977 | 231,345 | 67,030 | 231,345 | 92,030 | 1,943,142 |
| Construction | | | | | | | | | | | | | | |
| ODR Condos | | 183,333 | 183,333 | 183,333 | 183,333 | 183,333 | 183,333 | - | - | - | - | - | - | 1,100,000 |
| Estates of Delray | | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 2,000,000 |
| Philadelphia | | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 75,000 |
| Philadelphia | | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 100,000 |
| 4901 | | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 333,333 | 4,000,000 |
| Grand Metro | | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 6,000,000 |
| GSV | | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | - | - | - | - | - | - | 200,000 |
| Greenroof | | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | - | - | - | - | - | - | 500,000 |
| Afton | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | - | - | - | - | - | - | 15,000 |
| 1300 | | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | - | - | - | - | - | - | 500,000 |
| 1300 | | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | - | - | - | - | - | - | 75,000 |
| 1300 | | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 2,000,000 |
| Approval Professional | | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 200,000 |
| Total Construction | | 1,596,250 | 1,596,250 | 1,596,250 | 1,596,250 | 1,596,250 | 1,596,250 | 1,197,917 | 1,197,917 | 1,197,917 | 1,197,917 | 1,197,917 | 1,197,917 | 16,765,000 |
| Bankruptcy Fees | | | | | | | | | | | | | | |
| Bankruptcy Professional Fees: Sills Cummis & Gross | | - | - | - | - | - | - | - | - | - | - | - | 300,000 | 300,000 |
| US Trustee Fees | | - | - | - | - | - | - | - | - | - | - | - | 250,000 | 250,000 |
| Claims/Noticing Agent | | - | - | - | 100,000 | - | - | - | 100,000 | - | - | - | 75,000 | 275,000 |
| Total Bankruptcy Fees | - | - | - | - | 100,000 | - | - | - | 100,000 | - | - | - | 625,000 | 825,000 |
| Other | | | | | | | | | | | | | | |
| Accounts Payable as of June 6th | | 365,000 | - | - | - | - | - | - | - | - | - | - | - | 365,000 |
| Other Expected Invoices | | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 500,000 |
| Total Other | - | 406,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 865,000 |
| Total Uses | - | 2,234,262 | 1,704,947 | 1,894,262 | 1,843,894 | 1,869,262 | 1,704,947 | 1,495,928 | 1,445,560 | 1,470,928 | 1,306,613 | 1,470,928 | 1,956,613 | 20,398,142 |
| Net Cash Flow | - | (2,234,262) | (54,946) | (1,894,262) | (1,843,894) | (1,869,262) | (1,704,947) | (1,495,928) | (1,445,560) | (1,470,928) | (1,306,613) | (1,470,928) | (1,956,613) | (18,748,142) |
| Ending Cash Balance | $ 72,330,870 | $ 70,096,609 | $ 70,041,662 | $ 68,147,401 | $ 66,303,507 | $ 64,434,246 | $ 62,729,299 | $ 61,233,371 | $ 59,787,811 | $ 58,316,883 | $ 57,010,270 | $ 55,539,341 | $ 53,582,728 | |

**<u>EXHIBIT B</u>**

# NRIA ORGANIZATIONAL CHART

FOR ILLUSTRATIVE PURPOSES ONLY

AS OF 6/8/22

| | Subsidiary Entity | Ownership |
|---|---|---|
| 1 | Web Marketing Associates, LLC | 98% |
| 2 | Lender Prime 1, LLC | 100% |
| 3 | 143 Adagio Investments, LLC | 100% |
| 4 | 184 Lincoln Place LP | 100% |
| 5 | Land Net LLC | 100% |
| 6 | NRIA Exchange LLC | 100% |

**National Realty Investment Advisors, LLC ("NRIA")**

**NRIA Partners Portfolio Fund I, LLC ("NPPF1")**
100% Voting/Common Interests: NRIA
100% Preferred Non-Voting Interests: NPPF1 Investors

**100% Owner**

**NRIA Structured Credit Strategies, LLC**
100% Owned by NPPF1

**20% Owner (Unless Otherwise Noted)**

**80 % Owner (Unless Otherwise Noted)**

**100% Owner**

| OPERATING LLC: |
|---|
| HENRY STREET CAPITAL 506 LLC |
| GULF STREAM VIEWS II LLC |
| 1ST AVENUE CAPITAL 301 LLC |
| WRIGHT BY THE SEA 1901 LLC |
| GUTTENBERG CAPITAL 6269 LLC |
| MAIN ST. CAPITAL 360 LLC |
| GUTTENBERG CAPITAL 416-22 69TH ST LLC |
| 51ST STREET CAPITAL 508 LLC |
| 52ND STREET CAPITAL 511-513 LLC |
| NEWARK STREET CAPITAL 511-521 LLC |
| MADISON STREET CAPITAL 931 LLC |
| MANHATTAN AVENUE CAPITAL 1300 LLC |
| BERGENLINE CAPITAL 4901 LLC |
| ADAM ST CAPITAL 6903 LLC |
| NORTH BERGEN CAPITAL 8709 LLC |
| CHERRY STREET CAPITAL 113-27 LLC |
| SOUTH CHRISTOPHER COLUMBUS CAPITAL 1499 LLC |
| 3RD STREET CAPITAL 200-210 LLC |
| 3RD STREET CAPITAL 203-215 LLC |
| BRINY CAPITAL 305 LLC |
| 2044 WEST FIRST CAPITAL LLC |
| FTM PARTNERS PORTFOLIO HOTEL RETAIL LLC |
| FTM PARTNERS PORTFOLIO MARINA LLC |
| FTM PARTNERS PORTFOLIO RESTAURANT LLC |
| OLD RIVER ROAD CAPITAL 460-510, LLC |

**100% Owner**

| REAL ESTATE ASSET LLC: |
|---|
| NRIA HENRY STREET 506 MANAGER LLC |
| GULF STREAM VIEWS LLC |
| NRIA 1ST AVENUE 301 MANAGER LLC |
| NRIA WRIGHT BY THE SEA 1901 MEMBER LLC |
| NRIA GUTTENBERG CAPITAL 6269 MANAGER LLC |
| MAIN ST. CAPITAL 360 MEMBER LLC |
| NRIA GUTTENBERG CAPITAL 416-22 69TH ST MEMBER LLC |
| NRIA 51ST STREET 508 MEMBER LLC |
| NRIA 52ND STREET 511-513 MEMBER LLC |
| NRIA NEWARK STREET CAPITAL 511 MEMBER LLC |
| NRIA MADISON STREET CAPITAL 931 MEMBER LLC |
| NRIA MANHATTAN AVENUE 1300 MEMBER LLC / NRIA EB5 1300 MANHATTAN FUND LLC **(6% NON-VOTING)** |
| NRIA BERGENLINE 4901 MANAGER LLC |
| ADAM ST CAPITAL 6903 MEMBER LLC |
| NRIA NORTH BERGEN 8709 MEMBER LLC |
| NRIA CHERRY STREET 113-27 MANAGER LLC |
| NRIA SOUTH CHRISTOPHER COLUMBUS 1499 MANAGER LLC / OTHER INVESTORS **(6% NON-VOTING)** |
| NRIA 3RD STREET CAPITAL 200-210 MEMBER, LLC |
| NRIA 3RD STREET CAPITAL 203-215 MEMBER, LLC |
| NRIA BRINY CAPITAL 305 MEMBER, LLC |
| NRIA 2044 WEST FIRST CAPITAL MEMBER, LLC |
| NRIA PARTNERS PORTFOLIO FUND I LLC |
| NRIA PARTNERS PORTFOLIO FUND I LLC |
| NRIA PARTNERS PORTFOLIO FUND I LLC |
| NRIA OLD RIVER RD CAPITAL 460-510 MEMBER, LLC |

| REAL ESTATE ASSET LLC: |
|---|
| NRIA NE 7TH MANAGER LLC |
| NRIA DELRAY 1 MANAGER LLC |
| NRIA FEDERAL HIGHWAY 318 MANAGER LLC |
| NRIA DENERY LANE CAPITAL 837 MANAGER LLC |
| NRIA DENERY LANE CAPITAL 843 MANAGER LLC |
| NRIA 140 LUQUER MANAGER LLC |
| NRIA BROOKLYN II LLC |
| NRIA BROOKLYN II LLC |
| NRIA 227 BERKELEY MANAGER LLC |
| NRIA 279 SACKETT MANAGER LLC |
| NRIA 7TH STREET CAPITAL MANAGER LLC |
| NRIA BROOKLYN 1 LLC |
| NRIA 423 THIRD MANAGER LLC |
| NRIA 434 UNION MANAGER LLC |
| NRIA 494 SEVENTH MANAGER LLC |
| NRIA BROOKLYN 1 LLC |
| NRIA II LLC |
| NRIA N. OCEAN 344 MANAGER LLC |
| NRIA N. OCEAN 707 MANAGER LLC |
| NRIA BOND WAY CAPITAL MANAGER LLC |
| NRIA N. OCEAN 2929 MANAGER LLC |
| NRIA N. OCEAN 3565 MANAGER LLC |
| NRIA ELDEN DRIVE 1 MANAGER LLC |
| NRIA HANOVER ROAD MANAGER LLC |
| NRIA KENWOOD RD 8 MANAGER LLC |
| NRIA OLD WOODS ROAD MANAGER LLC |
| NRIA 2031 LOMBARD MANAGER LLC |

**100% Owner**

| OPERATING LLC: |
|---|
| 142 NE 7TH CAPITAL LLC |
| DELRAY CAPITAL 1 LLC |
| FEDERAL HIGHWAY CAPITAL 318 LLC |
| DENERY LANE CAPITAL 837 LLC |
| DENERY LANE CAPITAL 843 LLC |
| LUQUER STREET CAPITAL 140 LLC |
| SUMMIT STREET CAPITAL 143 LLC |
| CARROLL STREET CAPITAL 160 LLC |
| BERKELEY PLACE CAPITAL 227 LLC |
| SACKETT STREET CAPITAL 279 LLC |
| 7TH STREET CAPITAL 285 LLC |
| DEGRAW ST CAPITAL 377 LLC |
| THIRD STREET CAPITAL 423 LLC |
| UNION STREET CAPITAL 434 LLC |
| SEVENTH STREET CAPITAL 494 LLC |
| BALTIC STREET CAPITAL 640 LLC |
| BERGEN ST CAPITAL 1070 LLC |
| N. OCEAN CAPITAL 344 LLC |
| N. OCEAN CAPITAL 707 LLC |
| BOND WAY CAPITAL 915 LLC |
| N. OCEAN CAPITAL 2929 LLC |
| N. OCEAN CAPITAL 3565 LLC |
| ELDEN DRIVE CAPITAL 1 LLC |
| HANOVER ROAD CAPITAL 2 LLC |
| KENWOOD RD CAPITAL 8 LLC |
| OLD WOODS ROAD CAPITAL 36 LLC |
| 2031 LOMBARD PARTNERS LLC |

