UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
David Gerardi, Esq.
Fran B. Steele, Esq.
Alexandria Nikolinos, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
David.Gerardi@usdoj.gov
Fran.B.Steele@usdoj.gov
Alexandria.Nikolinos@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| National Realty Investment | | |
| Advisors, LLC, *et al.* [1] | : | Case No. 22-14539 |
| | : | |
| | : | Hearing Date: July 19, 2022, at 2:00 p.m. |
| Debtors. | : | |
| | : | The Honorable John K. Sherwood |
| | : | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO
DEBTORS' APPLICATION FOR RETENTION OF PROFESSIONAL
TO RETAIN SILLS CUMMIS & GROSS, P.C., AS ATTORNEY FOR
THE DEBTORS-IN-POSSESSION**

The United States Trustee ("UST"), by and through his counsel, and in furtherance of his

duties pursuant to 28 U.S.C. §§ 586(a)(3) and (5), respectfully submits this objection ("Objection")

to the *Application for Retention of Professional* ("Application") (ECF No. 48) to retain Sills

---

[1] A Complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://omniagentsolutions.com/NRIA.

Cummis & Gross P.C. ("Sills"), as attorney for the debtors-in-possession, and respectfully represents as follows:

**BACKGROUND**

*Bankruptcy Filing*

1.      On June 7, 2022 ("Petition Date"), National Realty Investment Advisors, LLC, *et al*. ("Debtors") filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code.  ECF No. 1.

2.      The Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Debtors' missing schedules are due July 22, 2022, which is 44 days after their petition was filed. ECF No. 23.

4.      On June 8, 2022, Brian J. Casey, ("Casey") the Independent Manager of National Realty Investment, Advisors, LLC ("NRIA") filed a *Declaration in Support of Chapter 11 Petitions and First Day Pleadings* ("Declaration"). ECF No. 16.

5.      On June 15, 2022, the Debtors filed a Motion to Sell Property Free and Clear of Liens. ECF No. 36. A limited objection to the motion to sell was filed by a group of investors, ECF No. 59, and a response supporting the investors' limited objection was filed by the Acting Attorney General of New Jersey. ECF No. 60. The Court heard the arguments on June 21, 2022, and an Order was entered the same day granting the motion. ECF No. 62.

6.      On June 20, 2022, Sills filed the Application. ECF No. 48.

7.      On June 30, 2022, the UST's Office filed a Notice of Appointment of Official Committee of Unsecured Creditors. ECF No. 94.

*The Debtors' Management*

8.      NRIA was formed on November 27, 2006 and owns 100% of the common interests of NRIA Partners Portfolio Fund ("Fund"). ECF No.16, p. 3.

9.      Previously, NRIA was owned by Rey E. Grabato, II, ("Grabato") and NRIA Capital Partners Inc. (wholly owned by D. Coley O'Brien). *Id.* at 5.

10.      Grabato was the sole manager of NRIA and acted as its president and CEO and Coley O'Brien was NRIA's managing director. *Id.*

11.      Effective November 1, 2021, the Casey Group was appointed as an *additional* manager of the Fund purportedly to address allegations of mismanagement and ensure that NRIA used the Fund's assets appropriately. *Id.* The manager needed prior written consent of the Casey Group to take certain actions. *Id.*

12.      On November 23, 2021, NRIA's operating agreement was modified to add the Casey Group as an additional manager. *Id.* at 6.

13.      On April 29, 2022, Casey entered into an independent manager agreement with NRIA pursuant to which (a) Casey was appointed as the sole manager of NRIA; (b) the Casey Group resigned as the "Additional Manager" of the Fund; and (c) Grabato resigned as the Member, President, and CEO of NRIA. *Id.* at 7.

*Investigations*

14.      Upon information and belief, NRIA is under investigation by, or has received subpoenas or requests for information from, the United States Attorney's Office for the District of New Jersey, the United States Securities and Exchange Commission ("SEC"), the New Jersey Bureau of Securities, the Illinois Securities Department and the Alabama Securities Commission. *Id.* at 10.

15.     On March 4, 2021, Thomas Nicholas Salzano, ("Salzano") an independently contracted portfolio manager and advisor to NRIA,[2] was charged by the United States Attorney's Office of the District of New Jersey with one count of wire fraud violation of 18 U.S.C. section 1343, and one count of aggravated identity theft in violation of 18 U.S.C. section 1028A, in connection with an offer to sell an interest in the Fund. *Id.* at 11.

16.     "On March 6, 2021, the United States Attorney's Office for the District of New Jersey issued a warrant authorizing the (i) search of NRIA's premises located at 1325 Paterson Plank Road, Secaucus, New Jersey 07094, and (ii) seizure of certain records and tangible items." *Id.*

17.     "On June 7, 2021, the SEC filed a Complaint against Mr. Salzano in the United States District Court for the District of New Jersey, alleging that Mr. Salzano violated Sections 17(a)(1) and (3) of the Securities Act of 1933 and seeking a final judgment: (a) permanently enjoining Mr. Salzano from violating the federal securities laws; (b) ordering Mr. Salzano to pay civil money penalties pursuant to Securities Act Section 20(d)[15 U.S.C. § 77t(d); and (c) permanently prohibiting Mr. Salzano from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 [15 U.S.C. § 78l] ('Exchange Act') or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)]." *Id.*

18.     As a result of these allegations/charges, NRIA terminated Salzano. *Id.*

19.     On June 21, 2022, the Acting Attorney General of New Jersey, as representative of the Acting Chief of the New Jersey Bureau of Securities, filed a response to the Debtor's motion

---

[2] The Cease and Desist Order attached to the objection filed by the Acting Attorney General of New Jersey, states that "Although Salzano was described in the PPMs as a 'Senior Independent Executive Advisor and Portfolio Manager,' he was actually the mastermind of the NRIA offerings. Salzano also controlled the day-to-day activities at the NRIA Fund[.]". ECF No. 60-1, p. 12.

to sell. ECF No. 60. The response alleges that NRIA, the Fund, NRIA Capital Partners, Inc., NRIA

Structures Credit Strategies, LLC, Thomas Nicholas Salzano, Rey Grabato, D. Coley O'Brien, and

Arthur Scuttaro violated antifraud provisions of the New Jersey Uniform Securities Law. *Id.* at 2.

They did so by:

> First, they misrepresented and failed to disclose that the NRIA Fund and NRIA concealed their poor performance by using investors' own money (rather than actual cash flow) to fund annual distributions, by using straw purchasers to create nonexistent sales of certain residential units, and by inflating NRIA's performance by improperly recognizing certain revenues in violation of Generally Accepted Accounting Principles. Second, they engaged in systemic self-dealing by steering lucrative contracts and business opportunities to members of Grabato's and Salzano's families, even paying Salzano's wife for a no-show position. Third, they concealed Salzano's attempt to use a forged term sheet to defraud one investor and to induce a bank to pay $20 million through another forged document. Respondents went to great lengths to actively conceal and mislead investors about the prior fraudulent conduct of those who were exercising management authority over the Fund, NRIA and affiliated companies.

*Id.*

20.     Attached to the Acting Attorney General of New Jersey's response was a *Summary*

*Cease and Desist and Revocation Order ("Cease and Desist Order")* against National Realty

Investment Advisors, LLC, NRIA Partners Portfolio Fund I, LLC, NRIA Capital Partners, Inc.,

NRIA Structured Credit Strategies, LLC, Rey Grabato, D. Coley O'Brien, Thomas Nicholas

Salzano, and Arthur Scuttaro,[3] (collectively, "Respondents"). ECF No. 60-1.

21.     The Acting Chief of the New Jersey Bureau of Securities alleges that the

Respondents were involved in a nationwide securities fraud. *Id.* at 2. Respondents achieved this

by employing a nationwide advertising campaign which guaranteed returns of 12% and the

possibility of obtaining up to 21% in returns. *Id.*

---

[3] The Application filed by Sills spells Scuttaro's name with two "t"s. ECF No. 48-3, p. 9. The Cease and Desist Order names Arthur Scutaro, with one "t", as a respondent and explains that "Scutaro, who was also involved with NorVergence, even changed the spelling of his last name from Scuttaro (with two "t"s) to Scutaro (with one "t") to disassociate himself from NorVergence's history." ECF No. 60-1, p. 33. Throughout this Objection, he will be referred to as Scuttaro, with two "t"s.

22.     The private placement memorandums, used in the offers to investors, stated that the fund would be managed by NRIA, when in reality, the Fund was controlled by Salzano and Arthur Scuttaro ("Scuttaro") who was the Fund's Vice President and Advisor. *Id.* at 3. Scuttaro had also been the Executive Vice President of Project Management at NRIA since joining the company in 2007. *Id.* at 12.

23.     The Cease and Desist Order explains that Salzano, Scuttaro, Salzano's wife (Olena Budinska), Salzano's brother (Peter Salzano), and upon information and belief, Ivel Turner (NRIA Fund's Vice President of Project Management) were involved in a previous company together, NorVergence Inc., which company perpetrated a scheme. *Id.* at 3, 10, 13.

24.     In September of 2001, NorVergence was incorporated by Peter Salzano, Salzano's brother, with Peter acting as the Chief Executive Officer and major shareholder. *Id.* at 13. Although Salzano was labeled as a consultant, he managed NorVergence and functioned as the Chief Operating Officer. *Id.* Scutaro was the Senior Vice President of Application Screening at and upon information and belief, Ivel Turner, was the Vice President of Training at NorVergence. *Id.* Budinska was appointed president of an "imposter" entity "created to obscure the true NorVergence's Ponzi-type history." *Id.* at 10.

25.     The scheme "was a combination of a Ponzi scheme, which involved paying existing investors with the money of new investors, and a 'bust-out' scheme, where a business places orders with vendors on credit before reselling the products to customers at a reduced price, shuts down the business, and takes the profits without paying the vendors." *Id.* at 14–15.

26.     Within two years, an involuntary bankruptcy was filed for NorVergence. *Id.* at 15. The Federal Trade Commission filed a complaint for the above-described conduct. *Id.* A complaint was later filed in 2006 against Salzano and his brother Peter. *Id.* This resulted "in a permanent

injunction barring Salzano from similar fraudulent conduct in the future, and imposing a $50 million consent judgment against him." *Id.* at 3.

27.    The Cease and Desist Order alleges that through NRIA:

i.    Respondents "misused investors' money, in part for their own personal benefit, including: (a) retaining companies to sanitize Salzano's and Scutaro's sordid past by creating imposter entities and websites to minimize negative internet search results that would actually reveal Salzano's and Scutaro's true history with NorVergence; (b) making lavish payments to members of Salzano's family, including to Salzano's wife for a no-show job,[4] and to companies that Respondents controlled and of which they acted as officers; and (c) spending investors' money on personal expenses, and by extending undisclosed loans to family-run entities." *Id.* at 4.

ii.    Respondents' failed to disclose that: "(a) Salzano's son Dustin was the CFO and joint owner of U.S. Construction, one of NRIA  Fund's general contractors;[5] (b) Dustin Salzano was also the co-founder of one of the main residential marketing and leasing company used by NRIA, Premier Access Property Management; (c) the NRIA Fund paid over $200,000 to Link N' Log, Design & Website Consultants owned by Salzano's son in-law, Kyle Stafirny, who was also NRIA's Vice President of Information Technology, and who was married to Salzano's daughter, Bethany Salzano; (d) Web

---

[4] Budinska received over $2.1 million from the Fund, $1 million of which was paid after Salzano's arrest. ECF No. 60-1, p. 30 & n. 3.
[5] Salzano caused "concessions to be made in favor of his son's construction company by, for example, deciding that the NRIA Fund would reimburse U.S.  Construction for U.S. Construction's $500,000 investment in a project known as 12 Palm Trail, telling Dustin 'please invoice as stated we will take the hit'" ECF No. 60-1, p. 16–17.

Marketing was run by Nathania Lutero, Grabato's cousin and a corporation for which Grabato paid the "Business Entity Formation" fee ; (e) Salzano's Brother Peter owned Network  Digital, a company that NRIA purchased and leased equipment from; and (f) Salzano's relative, Thomas John Salzano, received commissions for the sale of NRIA properties as a real estate agent for a company named Compass." *Id.* at 29. The Fund was also "paying Bethany Salzano at least $1.8 million from 2018 through 2021, through her company Referral Marketing Associates, LLC, for her to work in a series of office jobs for which she had no experience or credentials. *Id.* at 30.

iii. The Fund purported to provide investors an annual distribution of 6% during the initial years of their investment, without disclosing that these returns were not from profit, but were instead of a return of the investors' money in the form of their capital contributions to the fund. *Id.* at 2–3.

iv. Respondents charged the Fund an annual development fee and recognized that fee at the outset of the development projects, which flew in the face of standard business practices in violation of Generally Accepted Accounting Principles. *Id.* at 4.

v. Respondents used fictitious "straw" purchasers "to buy certain residential units, giving the appearance that there was greater demand for the NRIA Fund's projects than was in fact the case." *Id.* at 5.

    vi.   Respondents invested up to a quarter of all investor funds in junk bonds, in an effort to generate the returns Respondents promised but could not deliver through the Fund's real estate projects. *Id.*

    vii.  In January of 2019, Salzano forged a term sheet to induce an investor to increase her investment in one of the Fund's real estate investments. NRIA's management were aware of the forgery in early 2019 but allowed Salzano to continue wielding control over the Fund without firing him or disclosing his conduct to investors. *Id.* at 5–6.

    viii.  Approximately six months after Salzano forged the term sheet, he provided TD Bank with a forged document to induce the bank to pay $20 million in connection with a real estate project. *Id.* at 6. TD Bank informed Salzano and Grabato of the fraudulent document, to which Salzano responded, hackers were responsible. *Id.*

    ix.  In March of 2021, Salzano was arrested for his actions involving the forged term sheet. *Id.* at 5. After his arrest, Respondents informed investors of Salzano's conduct and that the Fund had severed ties with Salzano. *Id.* at 6. However, a June 2021 document revealed that the Fund had not truly severed ties with Salzano but had continued to consult with him for what it claimed to be "historical" purposes. *Id.* It is believed that Salzano was not actually terminated until October 2021. *Id.*

28.    The Fund accepted its last "accredited investor" in January of 2022. ECF. No. 16, p. 3.

*Sills's Representation of NRIA and Its Officers/Employees*

29.     Sills has been representing NRIA since at least 2019. ECF No. 48-3, p. 9. The

Declaration of S. Jason Teele, in support of the Application ("Teele's Declaration") states that Sills

has represented NRIA:

  i.  October 31, 2019 to February 5, 2021—in a civil action brought by Tammy
      Hileman in the Superior Court of New Jersey, Law Division, Union County.
      *Id.* at 9.

  ii. Commencing June 2020—Sills represents and/or has represented NRIA in
      connection with various employment matters. *Id.* at 9.

  iii. May 2021—In a civil action commenced by Rakhi Sharma in the Superior
       Court of New Jersey, Law Division, Union County. *Id.* at 8.

  iv. In connection with an internal investigation into potential employee
      misconduct relating to certain transactions involving alleged participation
      by several employees, including but not limited to former employees Arthur
      Scuttaro, AJ Scuttaro and Nicholas Salzano. *Id.* at 9.

  v.  Commencing May 2021, in connection with certain tax matters related to
      an investigation commenced by the United States Attorneys' Office. *Id.*

  vi. In connection with a dispute with Coley O'Brien, a former minority member
      of Debtor National Realty Investment Advisors, LLC. *Id.* at 10.

30.     Sills represented the Debtors before and after the Casey Group was brought into

NRIA, as the Casey Group was not brought on as an additional manager of the Fund until

November 1, 2021, ECF No. 16, p. 5.

31.     Teele's Declaration further sets forth that Sills has previously represented Rey

Grabato, president and CEO of NRIA:

  i.  In connection with a tax matter, which the representation ended in 2014.
      ECF No. 48-3, p. 9.

  ii. From May 2021 to on or around April 26, 2022—In a civil action
      commenced by Rakhi Sharma in the Superior Court of New Jersey, Law
      Division, Union County. In connection with such representations, Sills' fees

were paid by the Debtors, consistent with their obligation to indemnify employees. None of Sills' fees, costs, or expenses were paid by the individually named defendants. *Id.* at 8–9.

    iii. Commencing July 1, 2021, and terminating "such that prior to the commencement of these cases [they] were former clients of Sills."— In connection with certain tax matters related to an investigation commenced by the United States Attorneys' Office. *Id.* at 9.

32.    Teele's Declaration explains that Sills has previously represented Nicholas Salzano, portfolio manager and advisor to NRIA until his termination in 2021 (ECF No. 72, p. 3):

    i. October 31, 2019 to February 5, 2021—in a civil action brought by Tammy Hileman in the Superior Court of New Jersey, Law Division, Union County. Sills' fees were paid by the Debtors, consistent with their obligation to indemnify employees. ECF No. 48-3, p. 9.

    ii. From May 2021 to on or around April 26, 2022—In a civil action commenced by Rakhi Sharma in the Superior Court of New Jersey, Law Division, Union County. In connection with such representations, Sills' fees were paid by the Debtors, consistent with their obligation to indemnify employees. None of Sills' fees, costs or expenses were paid by the individually named defendants. *Id.* at 8–9.

    iii. Commencing July 1, 2021 and terminating "such that prior to the commencement of these cases [they] were former clients of Sills."— In connection with certain tax matters related to an investigation commenced by the United States Attorneys' Office. *Id.* at 9.

33.    Teele's Declaration also shows that Sills has previously represented Arthur Scuttaro, the Fund's former Vice President and Advisor (ECF No. 60-1, p. 3):

    i. Commencing July 1, 2021 and terminating "such that prior to the commencement of these cases [they] were former clients of Sills."— In connection with certain tax matters related to an investigation commenced by the United States Attorneys' Office. ECF No. 48-3, p. 9.

34.    On February 10, 2022, as president of NRIA, Rey Grabato retained Sills as restructuring counsel for NRIA. ECF No. 48-1, p. 6 & 48-5, p. 2–6.

35.     Teele's Declaration states that: "Except as disclosed herein, to the best of my knowledge and information: (a) Sills is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates, and (b) Sills has no connection to the Debtors, their creditors, or other parties in interest." ECF No. 48-3, p. 6.

36.     Teele's Declaration explains that "[i]f any contested matter, adversary proceeding, other litigation, or other matter arising in the Debtors' Chapter 11 Cases presents a conflict of interest such that Sills cannot represent the Debtors based on the connections identified above, the Debtors will be represented by other counsel with respect to such matter unless the Debtors and the other relevant party or parties consent to Sills' representation of the Debtors in such matter consistent with the Rules of Professional Responsivity." *Id.* at 21.

### *Pre-Petition Debt Owed to Sills*

37.     The Application states that as of the Petition Date, the Debtors did not owe Sills any amounts for legal services rendered before the Petition Date. ECF No. 48-1, p. 7.

38.     However, on account of services rendered, Sills received $531,944 from the Debtors on May 6, 2022. ECF No. 48-3, p. 22. Sills is holding that money in escrow and will only draw down funds in accordance with a Court order. *Id.* at 23.

39.     Attached is a Retainer Agreement dated February 10, 2022 between NRIA and Sills, signed by Grabato, as president of NRIA. ECF No. 48-5, p. 2.

40.     The retainer provides that in connection with the firm's representation of NRIA, it requires an initial "evergreen" retainer in the amount of $250,000. *Id.* at 3. The retainer further states that Sills would provide NRIA with "monthly periodic statements summarizing the time

devoted to the matter and disbursements incurred. Should the retainer balance fall below $100,000 after crediting outstanding billing to [NRIA], [NRIA] will replenish the retainer within ten (10) days of the notice so that it is restored to the sum of $250,000." *Id.*

41.     The attached Escrow Agreement, dated May 5, 2022, explains that as "of the execution of this Escrow Agreement, Sills has billed fees and incurred expenses under the Initial Engagement Letter in an amount equal to $531,944 more than the Evergreen Retainer available for payment of those fees and expenses (the "Excess Receivable")[.]" *Id.* at 19.

42.     The Escrow Agreement provided that "NRIA will place an amount equal to the Excess Receivable into escrow (the "Escrow Amount") for distribution consistent with the terms of this Escrow Agreement. The Escrow Amount will be held in trust in Sills's client trust account pending such distribution." *Id.*

43.     "In the event that a court of competent jurisdiction (i) determines that payment of the Excess Receivable by NRIA as of the date of this Escrow Agreement (a) would have been consistent with title 11 of the United States Code (the "Bankruptcy Code"), (b) would not have constituted a transfer avoidable under the Bankruptcy Code, and/or (c) would not have precluded Sills from being retained as counsel to NRIA in a case under the Bankruptcy Code; or (ii) otherwise orders the Escrow Amount to be released and distributed to Sills, the Escrow Amount shall be released and distributed to Sills." ECF No. 48-5, p. 19.

44.     Contrarily, "[i]n the event that a court of competent jurisdiction (i) determines that payment of the Excess Receivable by NRIA as of the date of this Letter Agreement (a) would not have been consistent with title 11 of the Bankruptcy Code, (b) would have constituted a transfer avoidable under the Bankruptcy Code, and/or (c) would have precluded Sills from being retained as counsel to NRJA in a case under the Bankruptcy Code; or (ii) otherwise orders the Escrow

Amount to be released and distributed to a party other than Sills, the Escrow Amount shall be released and distributed to NRIA or such other party as ordered by the court." *Id.* at 19-20.

*NRIA Complaint*

45.    On June 23, 2022, the Debtors brought a complaint against Rey E. Grabato, II, Thomas "Nick" Salzano, and Salzano's wife, Olena Budinska ("Budinska").  ECF No. 72.

46.    The complaint was filed by Riker Danzig LLP as Proposed Special Litigation Counsel to the Debtors. *Id.* at p. 8.

47.    Through the Complaint, NRIA seeks to avoid and recover $420,000 which NRIA claims was fraudulently transferred from the Debtors by NRIA's former president and CEO, Rey Grabato, to himself. *Id.* at p. 2. The Debtors claim Grabato subsequently transferred the money to Salzano and Salzano's wife, Budinska. *Id.*

48.    The complaint alleges that the defendants provided no consideration to NRIA in exchange for the funds. *Id.* at p. 4.

49.    These wrongdoings were just recently discovered by the Debtors' Chief Financial Officer, Thomas Fierro. *Id.* at 3. The Debtors reserved their rights to amend the complaint as Casey is still in the process of conducting an investigation against Grabato and Salzano and additional facts may come to light. *Id.* at 2.

*Failure to Disclose*

50.    On June 15, 2022, the Debtors filed a Motion to Sell Property Free and Clear of Liens. ECF No. 36.

51.     The sale motion provided that "[a]ll of the Properties were marketed for sale by independent third-party brokers/realtors who are unaffiliated with the Debtors." *Id.* at p. 3. The motion was signed by attorney S. Jason Teele of Sills. *Id.* at p. 20.

52.     The attached proposed order to the sale motion provided that the "Debtors are authorized to pay any applicable broker/sales commissions in connection with the sales to the Purchasers." ECF No. 36-1, p. 5.

53.     The sale motion provided that a debtor would pay commission due to Compass for 285 7th Street Condominium Unit No. 1, ECF No. 36, p. 3, 285 7th Street Condominium, Unit No. 2, *Id.* at 5, 285 7th Street Condominium, Unit No. 3, *Id.* at 6, 494 Seventh Street Condominium, Unit No. 1, *Id.* at 8, and 494 Seventh Street Condominium, Unit No. 2, *Id.* at 9.

54.     A limited objection to the motion to sell was filed by a group of investors, ECF No. 59, and a response supporting the investors' limited objection was filed by the Acting Attorney General of New Jersey. ECF No. 60.

55.     Attached to the Acting Attorney Generals' response was a Cease and Desist Order that explained that through a company called Compass, Salzano's relative, Thomas John Salzano, received commissions for the sale of NRIA properties as a real estate agent. ECF No. 60-1, p. 29.

56.     At the hearing on June 21, 2022, it was revealed for the first time by Casey that Compass was related to Salzano.

## **ARGUMENT**

57.     Professionals for a bankruptcy estate must be committed to protecting the estate's interest and be free of the "interests of any other person" so that their "basic judgment and responsibility to the estate" is not affected.  *See In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 337 (E.D. Pa. 1982).  A professional "should not place himself in a position where he may be

required to choose between conflicting interests or duties." *See id.*; *see also*, *In re 765 Assoc.*, 14

B.R. 449, 451 (Bankr. D. Haw. 1981) ("[a]n attorney should not place himself in a position where

he may be required to choose between conflicting duties.").

58.     Under the clear language of Section 327, any professional employed by a debtor-

in-possession must be "disinterested" and neither hold nor represent an interest adverse to the

estate. *See* 11 U.S.C. § 327(a).  Section 327(a) is described as "a prophylactic provision designed

to insure that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in

bankruptcy is not compromised or eroded."  *In re Prudent Holding Corp.*, 153 B.R. 629, 631

(Bankr. E.D.N.Y. 1993).

59.     The phrase "disinterested person" is defined in Section 101(14) as a person who:

> (A) is not a creditor, an equity security holder, or an insider; …; and

> (C) does not have an interest materially adverse to the interest of the estate
> or of any class of creditors or equity security holders, by reason of any
> direct or indirect relationship to, connection with, or interest in, the
> debtor, or for any other reason;

11 U.S.C. § 101(14)(A).

### (1)    *Sills Is Not Disinterested*

60.     Sills cannot meet the disinterested requirement of section 327(a) due to its pre-

petition claim.

61.     The Third Circuit considered the language of Section 327(a) and the definition of

"disinterested person" in Section 101(14), in particular subsection (A), and concluded that the

language is clear and unambiguous and does not leave room for a "flexible approach." *See United*

*States Trustee v. Price Waterhouse* (*In re Sharon Steel*), 19 F.3d 138, 141 (3d Cir. 1994).  In *Price*

*Waterhouse*, the debtor moved to retain its pre-petition accountant despite the accountant's pre-

petition claim against the debtor.  19 F.3d at 139.  Both lower courts recognized that a literal

reading of Section 327(a) would disqualify the accountant from retention as a professional because

its status as a creditor meant it was not disinterested.  *See id*. at 140.  Nevertheless, the lower courts

approved the retention, reasoning it was practical to hire the accountant familiar with the debtor's

affairs.  *See id.*  The Third Circuit reversed, stating: "[a]s the Supreme Court and our court have

repeated many times in recent years, when statutory language is clear and unambiguous it

ordinarily must be followed . . . Here, the relevant statutory provisions are clear and unambiguous."

*Id*. at 141 (internal citations omitted).

62.    Third Circuit went on to analyze the exact subsection at issue here, Section

101(14)(A).  *Id*.  The Third Circuit stated:

> [u]nder Section 101(14), a "disinterested person" must be a person who "is
> not a creditor."  The Code defines the term "creditor" as meaning any
> "entity that has a claim against the debtor that arose at the time of or before
> the order for relief concerning the debtor," . . . These provisions, taken
> together, unambiguously forbid a debtor in possession from retaining a
> prepetition creditor to assist it in the execution of its Title 11 duties.

*Id*.

63.    Claim is defined as a "right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

64.    Sills's Application states that as of the Petition Date, the Debtors did not owe Sills

any amounts for legal services rendered before the Petition Date. However, this fails to take into

account the $531,944 for fees NRIA placed in an escrow account the day after it retained Sills as

bankruptcy counsel, per the Escrow Agreement entered the same day it retained Sills.

65.    The Escrow Agreement explains that as of the day Sills was retained as bankruptcy

counsel, NRIA owed Sills $531,944 for fees and incurred expenses under their previous

engagement letter.

66.     Sills does not have an unequivocal right to the money in escrow.

67.     The Escrow Agreement provides that the money will only be released to Sills "[i]n the event that a court of competent jurisdiction (i) determines that payment of the Excess Receivable by NRIA as of the date of this Escrow Agreement (a) would have been consistent with title 11 of the United States Code (the "Bankruptcy Code"), (b) would not have constituted a transfer avoidable under the Bankruptcy Code, and/or (c) would not have precluded Sills from being retained as counsel to NRIA in a case under the Bankruptcy Code; or (ii) otherwise orders the Escrow Amount to be released and distributed to Sills, the Escrow Amount shall be released and distributed to Sills." ECF No. 48-5, p. 19.

68.     Per the agreement, Sills's right to payment is contingent on a court finding it is appropriate.

69.     Contrarily, the agreement provides that the money will be released to NRIA, or such other party as ordered by the Court, "[i]n the event that a court of competent jurisdiction (i) determines that payment of the Excess Receivable by NRIA as of the date of this Letter Agreement (a) would not have been consistent with title 11 of the Bankruptcy Code, (b) would have constituted a transfer avoidable under the Bankruptcy Code, and/or (c) would have precluded Sills from being retained as counsel to NRJA in a case under the Bankruptcy Code; or (ii) otherwise orders the Escrow Amount to be released and distributed to a party other than Sills." *Id.* at 19-20.

70.     Therefore, Sills has a right to payment that is contingent on a court ruling. The Bankruptcy Code defines Sills as a creditor, based on its right.

71.     Thus, Sills's Application should be denied given that it is a creditor of the Debtors and, therefore, not disinterested as required under section 327(a).

*(2)*    ***Sills Has an Adverse Interest***

72.    Even if the Court were to find that Sills was not a pre-petition creditor because its claim was satisfied when NRIA placed the $531,944 in escrow, Sills's Application should be denied due to its adverse interest.

73.    Section 101(14)(C), referred to as the "catch-all clause," has been characterized as "broad enough to include anyone who in the slightest degree might have some interest or relationship that would distract from the independent and impartial attitude which is required by the [Bankruptcy] Code." *In re Glenn Elec. Sales Corp.*, 89 B.R. 410, 413 (Bankr. D.N.J.), *aff'd*, 99 B.R. 596 (D.N.J. 1988); *see also In re Black Hills Greyhound Racing Ass'n*, 154 B.R. 285, 292 (Bankr. D.S.D. 1993).

74.    Although not defined in the Bankruptcy Code, "adverse interest" has been interpreted in this District to mean:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankrupt estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or
>
> (2) to possess a predisposition under circumstances that render such a bias against the estate.

*See In re Glenn Elec. Sales Corp.*, 89 B.R. at 413 (quoting *In re Star Broadcasting, Inc.*, 81 B.R. 835, 838 (Bankr. D.N.J. 1988)).  In applying this definition, the court in *In re Glenn Elec. Sales Corp.* relied upon a trilogy of cases published from the District of Hawaii dealing with conflict of interests between debtors and counsel in bankruptcy proceedings.

75.    Third Circuit in *In re Marvel Entertainment Group, Inc*., 140 F.3d 463 (3rd Cir. 1998), determined that the District Court applied the wrong legal standard in not disqualifying trustee's counsel under Sections 327(a) and 101(14)(E).  The Third Circuit held that:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion — pursuant to § 327(a) and consistent with § 327(c) — disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.

*See id.* at 476.  Any professional person that does not meet both the "no adverse interest" and "disinterested person" tests is disqualified from employment under Section 327(a).  *See In re BH&P Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991) (Section 327(a) "creates a two-part requirement").  Thus, a professional that holds or represents an adverse interest is *per se* disqualified, and a professional that does not hold or represent an adverse interest is nevertheless disqualified unless it falls within the definition of "disinterested person" set forth in 11 U.S.C. § 101(14).  *See e.g. United States Trustee v. Price Waterhouse*, 19 F.3d 138, 141 (3d Cir. 1994) (disqualified because not disinterested); *Michel v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 999 F.2d 969, 972 (6th Cir. 1993) (can lack disinterestedness without having adverse interest).[6]

### *a. Actual Conflict*

76.    Sills's Application should be denied due to its actual conflict of interest, stemming from its former relationship with Grabato, through his role as CEO and president of NRIA, and its former representation of Grabato and Salzano, individually. As well as due to its potential conflicts stemming from its individual representation of Scuttaro, individually.

77.    Sills has been representing NRIA since at least 2019. The Casey Group was not

---

[6] Multiple representations that may be allowed in commercial settings, especially with the informed consent of the clients, may not be acceptable in bankruptcy.  The Bankruptcy Code provisions dealing with conflicts of interest are generally much stricter that the comparable rules of professional conduct.  *See Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434 (D. Utah 1998) citing *In re Amdura Corp.*, 121 B.R. 862, 866 (Bankr. D. Colo. 1990).  Consent by a Chapter 11 debtor to waive conflicts is insufficient to cure any actual or potential conflicts because the ultimate parties in interest are the bankruptcy estate's creditors.  *See In re Jeep Eagle 17*, 2009 Bankr. LEXIS 3614 * 5 (Bankr. D.N.J. 2009).  *See also In re Git-N-Go, Inc.*, 321 B.R. 54, 60 (Bankr. N.D. Okla. 2004) (finding that debtor may not waive conflicts on behalf of the estate).

appointed additional manager of NRIA until November 1, 2021, and Grabato did not step down as president and CEO of NRIA until April 29, 2022. Thus, Sills was likely reporting directly to Grabato for most of its time representing NRIA. In fact, it was Grabato, through his role as president, who hired Sills as NRIA's restructuring counsel on February 10, 2022.

78.    As discussed in more detail above, Sills represented NRIA in civil actions (commencing in October 2019 and May 2021), employment matters (commencing June 2020), in connection with tax matters (commencing May 2021), in connection with a dispute with its former minority member, and in an internal investigation of employees.

79.    In addition to Sills's work with Grabato through his role as president and CEO of NRIA, Sills has also represented Grabato personally numerous times. As discussed in more detail above, Sills represented Grabato in connection with a tax matter (terminated 2014), civil action brought by Rakhi Sharma (terminated April 26, 2022), and another tax matter related to an investigation commenced by the United States Attorney's Office (terminated "such that prior to the commencement of these cases [Grabato] [was a] former client[] of Sills.").

80.    Sills also represented  Salzano personally in connection with a civil action brought by Tammy Hileman (terminated February 5, 2021), civil action brought by Rakhi Sharma (terminated April 26, 2022), and a tax matter related to an investigation commenced by the United States Attorneys' Office (terminated "such that prior to the commencement of these cases [Salzano] [was a] former client[] of Sills.")

81.    Finally, Sills also represented Scuttaro in the tax matter related to an investigation commenced by the United States Attorney's Office (terminated "such that prior to the commencement of these cases [Scuttaro] [was a] former client[] of Sills.")

82.    It is unclear from the Application how recently Sills stopped representing Grabato,

Salzano, and Scuttaro personally. The Application explains that regarding Sills's personal representation of Grabato, Salzano, and Scuttaro in the United States Attorney's tax investigation, it ended "such that prior to the commencement of these cases Rey Grabato, Arthur Scuttaro, and Nicholas Salzano were former clients of Sills." Additionally, Sills represented Grabato and Salzano as recently as April 26, 2022, in the civil action brought by Sharma.

83.    Part of Sills's former representation of NRIA involved an internal investigation into potential employee misconduct relating to certain transactions involving alleged participation by several employees, including Salzano and Scuttaro. It is unclear from the Application, if Sills was assisting in NIRA's internal investigation of the two while personally representing them in the matters discussed above.

84.    On June 23, 2022, the Debtors brought a complaint against Rey E. Grabato, II, Thomas "Nick" Salzano, and Salzano's wife, Olena Budinska alleging fraudulent transfers by Grabato of money from the Debtors to Grabato, and subsequently to Salzano and his wife, Budinska.

85.    As the complaint makes clear, the interests of the Debtors are not aligned with Grabato and Salzano. Due to Sills's former representation of Grabato and Salzano, an actual conflict exists. Through its role as counsel to the Debtors, Sills would need to take a position adverse to its former clients, in order to evaluate the claims the Debtors have against Grabato and Salzano. Merely severing the representation of Grabato and Salzano before the filing was not enough to cure the conflict.

86.    Sills should not place itself in a position where it may be required to choose between conflicting interests or duties.

87.     Sills mentioned in its Application that "[i]f any contested matter, adversary proceeding, other litigation, or other matter arising in the Debtors' Chapter 11 Cases presents a conflict of interest such that Sills cannot represent the Debtors based on the connections identified above, the Debtors will be represented by other counsel with respect to such matter unless the Debtors and the other relevant party or parties consent to Sills' representation of the Debtors in such matter consistent with the Rules of Professional Responsivity." ECF No. 48-3, p. 21.

88.     However, it is Sills's responsibility, as bankruptcy counsel, to assess the Debtors' situation and determine if an adversary is needed that would require special counsel to be retained. Given its conflict, Sills cannot objectively assess the conduct of Grabato, Salzano, and Scuttaro to determine if further adversary proceedings are needed.

89.     Therefore, the Application should be denied due to Sills's actual conflict.

### b. Potential Conflict

90.     In addition to the actual conflict that exists, there exists the possibility for additional potential conflicts of interest.

91.     Potential conflicts of interest are disfavored, and courts should "generally disapprove employment of a professional with a potential conflict, with certain possible exceptions" which include when the potential for a conflict to become actual is remote, and if the reasons for employing the professional are particularly compelling.   *In re Marvel Entertainment Group, Inc.*, 140 F.3d at 476.

92.     Upon information and belief, NRIA is under investigation by, or has received subpoena or requests for information from, the United States Attorney's Office for the District of New Jersey, the United States Securities and Exchange Commission, the New Jersey Bureau of Securities, the Illinois Securities Department and the Alabama Securities Commission. There is

more than a remote possibility that if these agencies move forward with their investigations, a conflict will arise due to Sills's previous representation of the Debtor and the individuals, Grabato, Salzano, and Scuttaro.

93.    Accordingly, Sills is not in a position to properly evaluate the Debtor's potential actions against Grabato, Salzano, and Scuttaro given its former representation of both NRIA and the individuals while the actions were occurring.

94.    As discussed above, the Debtors' motion to sell proposed to pay Compass's commission, but it failed to disclose that Compass had relations with Salzano.

95.    Given these potential conflicts, Sills's application should be denied.

### c. Rules of Professional Conduct

96.    In addition to being an actual conflict and a potential conflict, Sills's representation of the Debtors might be a violation of the professional rules of conduct. Under the New Jersey Rules of Professional Conduct, an attorney has a duty to former clients: "A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." RPC 1.9(a). Here, Sills has represented Grabato, Salzano, and Scuttaro, individually. The Debtors have already brought an adversary against Grabato and Salzano. It is unclear at this point what actions could be brought against Scuttaro. However, it is clear that Sills has a professional conflict if it represents the Debtors' adverse interest.

## **CONCLUSION**

For the reasons set forth above, the UST respectfully requests that the Court deny the Application. The UST reserves its right to object to any motion Sills filed by requesting the court rule on its right to the money in escrow. Additionally, the UST reserves the right to supplement this objection after the Debtors' missing documents are filed.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9


*/s/ David Gerardi*
David Gerardi
Trial Attorney

DATED: July 11, 2022