LAW OFFICE OF RACHEL S. BLUMENFELD PLLC
26 Court Street, Suite 2220
Brooklyn, New York 11242
Tel: (718) 858-9600
rblmnf@aol.com

*Attorneys for Elegran Real Estate*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, et al.,[1]<br><br>Debtor-in-Possession. | Chapter 11<br><br>Case No. 22-14539- (JKS)<br><br>(Jointly Administered) |

**ELEGRAN REAL ESTATE'S MOTION TO COMPEL PAYMENT OF CO-BROKERAGE COMMISSION AT CLOSING OF SALE OF DEBTOR PROPERTY AT 285 7TH STREET CONDOMINIUM, UNIT NO. 2, BROOKLYN, NY 11215**

TO THE HONORABLE JOHN K. SHERWOOD
UNITED STATES BANKRUPTCY JUDGE:

Elegran Real Estate ("Elegran"), by its attorneys[2], hereby moves (the "Motion"), pursuant to §§ 105 of title 11 of the United States Code (the "Bankruptcy Code") for the entry of an order directing the above-captioned debtor (the "Debtor") to pay *at closing* Elegran's broker commission on the sale of the Debtor's condominium property located at 285 7th Street, Unit No. 2, Brooklyn, NY 11215 (the "7th Street Property"), which is scheduled to close next Friday, July 29, 2022.

In furtherance hereof, Elegran relies on and incorporates herewith the declaration of

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA. The location of the Debtors' service address is: 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

1

Alexis Carpinello (the "Declarant"), dated July 21, 2022 (the "Carpinello Declaration") filed contemporaneously herewith. As set forth in greater detail in the Carpinello Declaration, Declarant is a Licensed Real Estate Salesperson for Elegran, with person knowledge of the 7th Street Property sale.

In further support of the Motion, Elegran respectfully states as follows:

## BACKGROUND

1. As this Court is aware, the Debtor entered into multiple real estate sales contracts prepetition following extensive marketing efforts by certain realtors including Movant Elegran. One of those properties is the 7th Street Property that is the subject of this Motion. In late June, this Court entered an order authorizing the sale and closing of the properties pursuant to those prepetition contracts. Elegran has commission rights that are entitled to be protected under the 7th Street Property contract. The 7th Street Property is scheduled to close next Friday, July 29, 2022. Accordingly, this Motion is accompanied by a motion to shorten notice given the short period of time to the 7th Street Property closing.

2. Elegran rendered valuable services in connection with the marketing and sale of the 7th Street Property. Elegran is owed broker's commissions on that sale and such commissions were agreed upon to be paid at the 7th Street Closing. The commissions owed to Elegran total $41,250.00. In fact, the contract of sale between the Debtor and the Purchaser makes it a condition of closing that Elegran's brokerage commission be paid at closing. Further, the Debtor specifically named Elegran as a party to whom a commission is owed. (*See* Sale Motion at ¶10 [Docket No. 36]; Carpinello Decl. at 3, Ex. C. ¶22.). Now, Elegran has been forced to hire an attorney to protect its contractual right to be paid and paid timely. (Carpinello Decl. at 3.)

---

[2] Undersigned counsel is in the process of hiring local counsel and moving for admission pro hac vice.

2

3. Prior to the execution of the contract to sell the 7th Street Property, Elegran worked with the purchasers Sofian Rami and Yasmine Belkacemi (i.e., the contract vendees and Elegran's clients) (collectively, the "7th Street Purchasers") for nearly a year and a half. At all times Elegran rendered the best service possible to the Purchasers while being available to them at nearly all times of the day, including weekends. Elegran's services included, but were not limited to, going on showings, connecting them with various professionals in the industry for financing quotes, and providing data charts and market information, which information took an extensive number of hours to assemble. As the Debtor admits, the Debtor wants the 7th Street Closing to occur because such Closing is beneficial to this estate. Indeed, it is the Declarant's firm belief that this transaction relied so heavily on her services - more so than the standard real estate transaction - that it would absolutely not have closed without her assistance. Having benefited from Elegran's services, Elegran should be paid and should be paid its commissions at the Closing. (Carpinello Decl. at 4.)

4. Further, Elegran rendered numerous other services that benefited the Debtor. For example, Elegran prepared and submitted to the Debtor the Purchasers' offer on the 7th Street Property and such offer was accepted by the Debtor for this sale. Elegran worked on the deal sheet. Elegran reviewed the attorney's due diligence. Elegran reviewed the contract with the Purchasers. And, finally, Elegran communicated with the Debtor-seller's broker regarding various issues like timeline of certificate of occupancy and closing. Indeed, the signing of the contract between Debtor and Purchasers was only the first of many steps of this process. Some of the various services that followed included, among other things, Elegran helping its clients receive quotes for both a contractor and an inspector, accompanying them on the inspection, accompanying them on the punch list walk-through, and assembling and

3

submitting the punch list, all while taking meetings to discuss with the clients every step of the way. All these services facilitated the 7th Street Closing actually happening. There is simply no valid basis for withholding compensation from Elegran especially after it rendered such valuable services. (Carpinello Decl. at 5.)

5.    The Debtor's lack of responsiveness only made Elegran work harder to get this deal to the closing table. The Debtor filed this chapter 11 bankruptcy case on June 7, 2022 (the "Petition Date"), 3 or 4 business days prior to the original scheduled close. After that, the Debtor's real estate attorneys became repeatedly unresponsive. Therefore, all major discussions and decisions in this sale post-bankruptcy filing surrounded information and communication provided by the Debtor's broker and Elegran, not the Debtor. For example, Elegran had multiple phone meetings with the Purchasers' lender to provide the information Elegran had surrounding the Chapter 11 filing and to find out the circumstances and conditions under which they would still lend. The lender stated that such information was necessary in order to get its credit committee's approval for a rate lock extension. Such rate lock extension was a material concern to the Purchasers. In fact, the rate lock was so important that the Purchasers sent a letter of termination of the contract hoping the Debtor would cure so as to avoid losing the rate the Purchasers locked in. Absent that rate lock, the Purchaser would not have proceeded with the sale. Elegran's services were critical here because the Purchasers' real estate attorney stated that such services were outside of the scope of his retention. (Carpinello Decl. at 6.)

6.    Next, Elegran connected the Purchasers with a skilled bankruptcy attorney so that they could get answers to their questions and so they could fully understand any risks involved with this situation and decide whether or not to move forward. The Court should be

4

aware that the primary, if not only, reason Elegran continued and continues to perform its duties despite the Debtor's express intention to withhold Elegran's compensation is that Elegran's clients have been and continue to be its number one concern and priority. Elegran have worked tirelessly for them for nearly a year and a half, and strongly believed that the Purchasers did and do not deserve the punishment of having to move forward without proper representation. Elegran could not proceed in good conscience if there was a risk to the Purchasers of them having to move forward without proper representation. (Carpinello Decl. at 7.)

7. Elegran further appealed to the Purchasers' lending bank on the Purchasers' behalf to get that rate lock extension approved multiple times because their rate was going to expire a day after the originally scheduled closing. (Carpinello Decl. at 8.)

8. Elegran continuously checked in with the Purchasers' real estate attorney and lender, as well as the Debtor's broker to get updates on the sale of the 7th Street Property and a projected closing date and provide information to the questions the Purchasers were asking me. The Purchasers, as contract vendees, rightfully demanded answers to their questions for them to move forward with the sale. Elegran remained focused on this transaction closing, and closing with the Purchasers' bargained-for rate quote and Elegran was determined to make sure that the Purchasers had all of the information they needed to make their assessment regarding moving forward. (Carpinello Decl. at 9.)

9. The Debtor has an agreement with Compass (the "Compass Agreement") that provides for co-brokering commissions to be paid. (Carpinello Decl. at 10, Ex. A.) This is a "dual agent" agreement and paragraph 4 thereof expressly permits payment of co-brokering commissions "at closing"). (Carpinello Decl. at 10, Ex. B.) Further still, the Residential

5

Brokerage Division of The Real Estate Board of New York ("REBNY"), which governs New York brokers and related transactions, has issued rules and regulations concerning co-brokering of real estate transactions (the "REBNY Rules"). The REBNY Rules at Article IV, Section 1(A) require the payment of co-brokering commissions where a buyer is procured for a sale. Those Rules provide in relevant part:

> In the event that: (i) *a Co-Broker procures a Buyer* for an Exclusive Property; (ii) a contract of sale for the Exclusive Property is fully executed by a Buyer and the Owner; (iii) the Buyer defaults; (iv) the Owner retains all or a portion of the down payment given by the Buyer; and (v) the Owner pays the Exclusive Broker a percentage of the down payment retained by the Owner, then, in the absence of any agreement setting forth a different commission split, *the Co-Broker shall be paid an equal share of the amount paid by the Owner to the Exclusive Broker.*

REBNY Rules at Art. IV, Sec.1(A) (emphasis added). In fact, the REBNY Rules co-broke agreement even expressly emphasizes the co-broke for new developments. Further, the 7th Street Property was advertised on both the RLS broker server and on Streeteasy as having a 2.5% broker's fee. Accordingly, no matter how viewed, Elegran should be paid and should be paid at the 7th Street Closing. The services were rendered and those services were valuable to the Purchasers, but more importantly were valuable to the Debtor's estate. It would be contrary to the wording of the Compass Agreement, contrary to the REBNY Rules, unfair, and improper to allow the Debtor to close without paying Elegran for the valuable services it and Elegran rendered. (Carpinello Decl. at 10.)

10. The Debtor's bankruptcy attorneys and real estate attorneys both knew of this Court's decision to escrow all sales proceeds while they simultaneously knew that the brokers, whose fees were being held back, were continuing and in fact needed to continue to render services through the 7th Street Closing that benefited the Debtor and facilitated the closing of these sales, and in particular the 7th Street Closing. Yet, the Debtor made no effort to contact

Elegran to disclose that the Debtor was opposing payment of our compensation/ commission at closing per our Agreement. The Debtor's attorneys requested Elegran's invoice on two occasions and neither time did Debtor's counsel disclose that the Debtor had no intention of paying the broker's fee at the 7th Street Closing, despite the invoice and contract explicitly requiring such payment. (Carpinello Decl. at 11.)

11. Finally, among other things, in anticipation of the 7th Street Closing, Elegran still has to do a final walk through with the Purchasers, review the punch list items, orchestrate an exchange of the keys, coordinate with the bank regarding a 'clear-to-close', and assist the Purchasers, Elegran's clients, with getting the necessary documents for moving. In other words, despite the Debtor's intention not to abide by its requirement to pay Elegran's commission, the Debtor must acknowledge that Elegran has rendered valuable services and will continue to render valuable service right up to the 7th Street Closing. Other than the co-broker agreement, neither Elegran nor its salesperson, Alexis Carpinello, have any relationship with the Debtor or its brokers.

12. Accordingly, Elegran should be paid. There is simply no valid reason under law or fact for Elegran's duly-earned compensation to be withheld for any period of time and, therefore, it should be paid at the 7th Street Closing. (Carpinello Decl. at 11.)

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b) and venue is proper before this Court pursuant to 28 U.S.C. § 1409.

14. The statutory predicate for the relief sought herein is §105 of the Bankruptcy Code.

## RELIEF REQUESTED

15. By this Motion, Elegran requests an order pursuant to the relevant agreements including the Compass Agreement and the REBNY Rules compelling and pursuant to section 105(a) of the Bankruptcy Code and directing the Debtor to pay Elegran at the 7th Street Closing its co-broker and other commissions due to it on the sale of the 7th Street Property. Section 105(a) of the Bankruptcy Code provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

U.S.C. ¶105(a).

16. For the reasons set forth above, it would be an abuse of process to permit the Debtor to obtain the benefit of Elegran's services and not pay the broker's commissions. As noted, as perhaps most important for the purposes of this Motion, the Debtor is deriving a significant material benefit from the 7th Street Closing and from the valuable services Elegran rendered. What possible basis could allow the Debtor to enjoy the beneficial results of this sale without simultaneously requiring the Debtor to bear its burden under the 7th Street Property sale contract, under the Compass Agreement and under the REBNY Rules by which all brokers are bound in New York? This is a court of equity and it would be plainly inequitable to permit this to happen. Elegran has earned these commissions. In a challenging economic environment, Elegran needs these commissions, which are a material part of its earnings and are needed to cover Elegran's operating expenses. In other words, the commissions are substantial and material to Elegran and they should be paid and paid at the 7th Street Closing, especially since there are no valid reasons not to pay them.

## CONCLUSION

17. Based upon the foregoing, Elegran respectfully submits that the Motion should be granted and the Debtor should be required to pay Elegran's commissions from the sales proceeds at the 7th Street Closing.

WHEREFORE Elegran respectfully requests that the Court grant the Motion in its entirety together with such other and further relief as the Court deems just and proper.

Dated: Brooklyn, New York
July 21, 2022

Respectfully submitted,
Law Office of Rachel S. Blumenfeld
*Attorney for the Debtors*

By: /s/ Rachel S. Blumenfeld
Rachel S. Blumenfeld
26 Court Street, Suite 2220
Brooklyn, NY 11242
Tel: (718) 858-9600