# EXHIBIT D

---

**EIGHTH AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**OF**

**NRIA PARTNERS PORTFOLIO FUND I, LLC**

**November 23, 2021**

---

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY INTERESTS PROVIDED FOR HEREIN (THE "INTERESTS"). ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NRIA PARTNERS PORTFOLIO FUND I, LLC (THE "COMPANY") IS UNDER NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT IN THE FUTURE.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR A VALID EXEMPTION FROM REGISTRATION THEREUNDER. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN ARTICLE V OF THIS OPERATING AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIROR OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................. 2

ARTICLE II GENERAL PROVISIONS .............................................................................. 11

| Section 2.01 | Formation .............................................................................. 11 |
| Section 2.02 | Name ...................................................................................... 11 |
| Section 2.03 | Organizational Certificates and Other Filings ...................... 11 |
| Section 2.04 | Principal Place of Business .................................................... 11 |
| Section 2.05 | Registered Office and Registered Agent ................................ 11 |
| Section 2.06 | Term ....................................................................................... 11 |
| Section 2.07 | Fiscal Year; Names of Members ............................................ 13 |
| Section 2.08 | Liability of Non-Managing Members ..................................... 13 |
| Section 2.09 | Purpose .................................................................................. 13 |
| Section 2.10 | Co-Investment Rights ............................................................ 14 |

ARTICLE III MANAGEMENT OF THE COMPANY ........................................................ 14

| Section 3.01 | Management ........................................................................... 14 |
| Section 3.02 | Powers of the Manager .......................................................... 14 |
| Section 3.03 | Reliance by Third Parties ....................................................... 16 |
| Section 3.04 | Other Activities of the Manager ............................................ 16 |
| Section 3.05 | Limitation of Liability ............................................................ 18 |
| Section 3.06 | Indemnification ...................................................................... 19 |
| Section 3.07 | Removal of the Manager ........................................................ 20 |

ARTICLE IV MEMBERSHIP INTERESTS; CAPITAL CONTRIBUTIONS; PREFERRED RETURN RATE;
CAPITAL ACCOUNTS; ALLOCATIONS AND DISTRIBUTIONS; REDEMPTION ...................... 22

| Section 4.01 | Membership Interests; Capital Contributions. ........................ 22 |
| Section 4.02 | Capital Accounts .................................................................... 24 |
| Section 4.03 | Allocations of Net Profits and Net Losses ............................. 25 |
| Section 4.04 | Distributions .......................................................................... 28 |
| Section 4.05 | Valuation of Company Assets ................................................ 32 |
| Section 4.06 | Liabilities; Reserves ............................................................... 32 |
| Section 4.07 | Determination by the Manager of Certain Matters ................. 32 |

ARTICLE V TRANSFERS AND WITHDRAWALS ........................................................... 33

| Section 5.01 | Admissions and Withdrawals Generally ................................. 33 |
| Section 5.02 | Investment Representation of the Non-Managing Members .... 33 |
| Section 5.03 | Accredited Investor Representations ...................................... 34 |

Section 5.04   Transfer of the Manager ................................................................................. 35

Section 5.05   Assignments or Transfer of Non-Managing Member Interests .................... 36

Section 5.06   Required Withdrawals of Non-Managing Members ................................... 38

Section 5.07   Death, Disability etc., of Non-Managing Members .................................. 39

Section 5.08   Method of Payment to Withdrawing Members .......................................... 39

ARTICLE VI TERMINATION AND DISSOLUTION OF THE COMPANY ........................ 40

Section 6.01   Termination .................................................................................................. 40

Section 6.02   Winding Up and Final Distribution ............................................................. 40

Section 6.03   No Restoration Obligation ........................................................................... 40

ARTICLE VII REPORTS TO MEMBERS; MEETINGS; TAX MATTERS ........................ 41

Section 7.01   Reports to Current Members ....................................................................... 41

Section 7.02   Meetings of Members. ................................................................................. 41

Section 7.03   Tax Matters .................................................................................................. 43

Section 7.04   Confidentiality ............................................................................................. 44

ARTICLE VIII EXPENSES ................................................................................................... 46

Section 8.01   Expenses ...................................................................................................... 46

ARTICLE IX MISCELLANEOUS ........................................................................................ 48

Section 9.01   Waiver of Partition/Action for Accounting ................................................ 48

Section 9.02   Counterparts ................................................................................................. 48

Section 9.03   Further Assurance ........................................................................................ 49

Section 9.04   Remedies Cumulative .................................................................................. 49

Section 9.05   Parties in Interest ......................................................................................... 49

Section 9.06   Amendments to the Operating Agreement .................................................. 49

Section 9.07   Governing Law ............................................................................................ 50

Section 9.08   Jurisdiction and Venue ................................................................................ 50

Section 9.09   Waivers ........................................................................................................ 50

Section 9.10   Exhibits and Schedules ................................................................................ 50

Section 9.11   Determination of Matters Not Provided for in this Agreement .................. 50

Section 9.12   Notices ......................................................................................................... 50

Section 9.13   Power of Attorney ........................................................................................ 51

Section 9.14   Anti-Money Laundering Compliance .......................................................... 51

Section 9.15   Goodwill ...................................................................................................... 52

Section 9.16   Publicly Traded Partnership ........................................................................ 52

Section 9.17   Entire Agreement ......................................................................................... 52

Section 9.18   Severability .................................................................................................. 52

US_ACTIVE-163597142.3

Section 9.19    Binding Effect ................................................................................................................52

Section 9.20    Counsel to the Manager ................................................................................................53

Section 9.21    Use of Name................................................................................................................53

Section 9.22    General Usage................................................................................................................54

Section 9.23    Recitals and Exhibit(s) Incorporated ................................................................54

US_ACTIVE-163597142.3

# EIGHTH AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

### OF

### NRIA PARTNERS PORTFOLIO FUND I, LLC

This Eighth Amended and Restated Limited Liability Company Operating Agreement is made and entered into as of the 23rd day of November, 2021, by and among National Realty Investment Advisors, LLC ("NRIA"), a Delaware limited liability company, as the Initial Manager; Casey Group, Ltd., a Maryland corporation, as the Additional Manager; and each of the Persons whose names are set forth under the heading "Non-Managing Members" on the Schedule of Members, as maintained in the books of the Company by the Initial Manager, as a non-managing member (each, a "Non-Managing Member" and collectively the "Non-Managing Members"), which parties hereby continue NRIA Partners Portfolio Fund I, LLC (the "Company") as a Delaware limited liability company pursuant to the Delaware Limited Liability Company Act, 6 Del. Code § 18-101, et seq., as in effect as of the Certificate Filing Date, and as thereafter amended from time to time, or any successor statute (the "Act"), as follows.

WITNESSETH:

WHEREAS, the Company was formed pursuant to the Certificate of Formation, dated February 5, 2018, and filed in the office of the Secretary of State of the State of Delaware on February 5, 2018;

WHEREAS, the Company was originally organized as NRIA Partners Portfolio I, LLC, on February 5, 2018, and then, by filing a certificate of amendment with the Delaware Secretary of State on February 15, 2018, changed its name to NRIA Partners Portfolio Fund I, LLC;

WHEREAS, this Agreement was initially entered on February 5, 2015 and was amended and restated on September 1, 2018, March 20, 2019, July 20, 2020, June 14, 2021, August 10, 2021, September 1, 2021, and October 13, 2021 (the latest of which shall be referred to herein as the "Amended Agreement");

WHEREAS, in order to reflect the appointment by the Common Members of the Additional Manager as a manager of the Company, effective as of October 27, 2021, having certain powers as described in that certain Appointment and Acceptance of an Additional Manager of NRIA Partners Portfolio Fund I, LLC dated October 20, 2021 ("Appointment and Acceptance"); to make amendments relating thereto; and to make other amendments, all as permitted under Section 9.06 of the Amended Agreement;

WHEREAS, all the terms of the Appointment and Acceptance shall be incorporated into this Agreement and shall be made part of this Agreement; and

WHEREAS, the Members desire to continue the Company as a limited liability company and to pursue the purposes as described in Section 2.09 of this Agreement.

NOW, THEREFORE, in consideration of the mutual premises, agreements, and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Amended Agreement is hereby amended and restated in its entirety to read as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, unless the context otherwise requires, the following terms have the following meanings:

"Act" has the meaning set forth in the preamble.

"Additional Manager" shall mean Casey Group, Ltd., a Maryland corporation.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(a)        credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)        debit to such Capital Account the items described in paragraphs (4), (5) and (6) of Regulations Section 1.704-1(b)(2)(ii)(d).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with Regulations Section 1.704-1(b)(2)(ii)(d) to the extent relevant thereto and is to be interpreted consistently therewith.

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time.

"Adjusted Preferred Return Rate" has the meaning set forth in Section 4.01(e).

"Affiliate" shall mean, with respect to a Person, any other Person who either directly or indirectly controls, is controlled by, or is under common control with the first Person.

"Agreement" shall mean this Eighth Amended and Restated Operating Agreement, together with any and all extensions, renewals, modifications, substitutions and amendments hereof.

"Allocation Year" shall mean (a) the period commencing on the Effective Date and ending on December 31, 2018, (b) any subsequent period commencing on January 1 and ending on the following December 31, or (c) any portion of the period described in clause (a) or (b) for which the Company is required to allocate Net Profits, Net Losses, and other items of Company income, gain, loss or deduction pursuant to Article IV.

"Amended Agreement" has the meaning set forth in the Recitals.

"Annual Return of Capital Percentage" shall mean, with respect to any Preferred Member, six percent (6%), except that the Initial Manager, in its sole discretion, may agree with a Preferred Member to a higher percentage based on the amount of such Preferred Member's subscription for Preferred Interests.

US_ACTIVE-163597142.3

"<u>Appointment and Acceptance</u>" has the meaning set forth in the preamble.

"<u>Bankruptcy</u>" shall mean, with respect to a Person, (a) any proceeding that is commenced against such Person as a "debtor" for any relief under bankruptcy or insolvency laws, or laws relating to the relief of debtors, reorganizations, arrangements, compositions, or extensions and such proceeding is not dismissed within ninety (90) days after such proceeding has commenced, or (b) any proceeding commenced by such Person for relief under bankruptcy or insolvency laws or laws relating to the relief of debtors, reorganizations, arrangements, compositions, or extensions.

"<u>Benefit Plan Investor</u>" shall mean a Limited Partner that is (a) an "employee benefit plan" subject to Part 4 of Subtitle B of Title I of ERISA (an "<u>ERISA Member</u>"), (b) certain other employee benefit plans or retirement accounts, such as Keogh plans or individual retirement accounts subject to Section 4975 of the Code (an "<u>IRA</u>"), or (c) an entity all or part of whose underlying assets are considered "plan assets" of an ERISA Plan or an IRA described in the preceding clause (a) or (b), and that has indicated such status on its Subscription Agreement (a "<u>Plan Asset Entity</u>").

"<u>Bipartisan Budget Act</u>" means the U.S. Bipartisan Budget Act of 2015.

"<u>Business Day</u>" shall mean any day that is not a Saturday or Sunday and is not a legal holiday or a day on which banks generally are authorized or obligated by law or regulations to remain closed in New York.

"<u>Capital Account</u>" shall mean the capital account established and maintained for each Member pursuant to <u>Section 4.02</u>.

"<u>Capital Contribution</u>" shall mean, with respect to each Member, the aggregate amount of cash and the initial Gross Asset Value of any property (net of liabilities assumed or taken subject to by the Company, without duplication) contributed by or in the name of such Member pursuant to <u>Section 4.01(c)</u> in connection with the issuance of Interests or otherwise.

"<u>Certificate</u>" shall mean the Certificate of Formation of the Company, dated as of February 5, 2018, and filed in the Office of the Secretary of State of the State of Delaware on February 5, 2018, as amended and restated from time to time.

"<u>Certificate Filing Date</u>" shall mean the date on which the Certificate was filed in the Office of the Secretary of State of the State of Delaware.

"<u>Claims</u>" has the meaning set forth in <u>Section 3.06(a)</u>.

"<u>Code</u>" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"<u>CMBS</u>" shall mean real estate-related structured credit investments with a focus in Commercial Mortgage Backed Securities and Freddie Mac Multifamily (Residential) Mortgage Backed Securities, collateralized by stabilized, institutional-quality, cash-flowing properties.

"<u>Common Interests</u>" shall mean the Membership Interests (other than the Preferred Interests) providing the Common Members with the relative rights, powers, and duties as specified in this Agreement.

- 3 -

"Common Member" shall mean a Member holding Common Interests.

"Company" has the meaning set forth in the preamble.

"Company Assets" shall mean all of the Company's assets including, without limitation, the Portfolio Investments, cash, properties, rights (contractual or otherwise), real property, personal property, tangible property, and intangible property.

"Company Minimum Gain" shall have the meaning assigned the term "partnership minimum gain" in Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"Company Percentage" has the meaning set forth in Section 7.02(e).

"Company Representative" shall mean the "partnership representative" designated as such pursuant to Section 6223(a) of the Code (as of the effective date of the Bipartisan Budget Act).

"Company Termination Date" has the meaning set forth in Section 2.06.

"Confidential Information" has the meaning set forth in Section 7.04(a).

"Covered Actions" has the meaning set forth in Section 3.06(a).

"Covered Persons" has the meaning set forth in Section 3.05(a).

"Damages" has the meaning set forth in Section 3.06(a).

"Debt Securities" has the meaning set forth in Section 4.01(a).

"Depreciation" shall mean, for each Allocation Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such period for federal income tax purposes, except that if the Gross Asset Value of an asset differs from its adjusted tax basis for federal income tax purposes at the beginning of such period, then Depreciation means an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such period bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such period is zero, then Depreciation is to be determined with reference to such beginning Gross Asset Value using any reasonable method determined by the Initial Manager.

"Disabling Conduct" has the meaning specified in Section 3.05(a).

"Disposition Proceeds" has the meaning set forth in Section 4.04(b).

"DOL Regulation" shall mean 29 C.F.R. § 2510.3-101, as amended from time to time, or any successor regulation thereto.

"Effective Date" shall mean February 5, 2018.

"Early Individual Preferred Member Termination Date" has the meaning set forth in Section 4.04(g)(i).

US_ACTIVE-163597142.3

"EM Calculation Date" has the meaning set forth in Section 4.01(e)(iv).

"Equity Multiple" has the meaning set forth in Section 4.01(e).

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Dissolution" has the meaning set forth in Section 6.01.

"Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended from time to time.

"Fiscal Quarter" shall mean periods beginning on January 1, April 1, July 1, and October 1, and ending on March 31, June 30, September 30, and December 31, respectively.  The Company's first Fiscal Quarter shall begin on the Effective Date and end on the last day of the Fiscal Quarter in which the Effective Date occurs, and the Company's last Fiscal Quarter shall end on the date the Company terminates pursuant to the provisions of this Agreement.

"Fiscal Year" has the meaning set forth in Section 2.07(a).

"FOIA" has the meaning set forth in Section 7.04.

"FOIA Person" has the meaning set forth in Section 5.02(e).

"GAAP" shall mean generally accepted accounting principles in the U.S., consistently applied.

"Gross Asset Value" shall mean with respect to any asset, the adjusted tax basis of the asset for federal income tax purposes, except as follows:

(a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset;

(b)    the Gross Asset Values of the Company Assets shall be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as reasonably determined by the Initial Manager as of the following times: (i) the acquisition of an additional Interest by a new or existing Member in exchange for a more than de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Assets as consideration for an Interest; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (iv) the issuance of an Interest in exchange for services rendered or to be rendered; provided, that an adjustment described in clause (i), (ii), and (iv) of this paragraph shall be made only if the Initial Manager reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(c)    the Gross Asset Value of any Company Asset distributed to any Member shall be adjusted to equal the gross fair market value (taking Section 7701(g) of the Code into account) of such Company Asset on the date of distribution as reasonably determined by the Initial Manager;

(d)    the Gross Asset Values of the Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted tax basis of such Company Assets pursuant to Section 734(b) or

US_ACTIVE-163597142.3

743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (f) of the definition of "Net Profits" and "Net Losses" or Section 4.03(c)(vii); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d); and

(e)        If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b), (c) or (d), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Incompetency" shall mean a situation where a Person is deemed incompetent if such Person is adjudged incompetent by a decree of a court of competent jurisdiction.  A Person shall also be deemed incompetent if such Person is convicted of a crime of moral turpitude or that would cast reasonable doubt on such Person's ability to discharge faithfully his or her duties as a managing member or a Principal.

"Initial Manager" shall mean NRIA; provided, however, that references to the "Initial Manager" herein, except where the context clearly requires to the contrary or is otherwise stated, shall mean any other Manager designated by a Majority in Interest as the "Initial Manager" where (i) (the Company has not been terminated pursuant to Section 6.01(a) or Section 6.01(b) and the Manager then holding the designation of "Initial Manager" is no longer a "manager" of the Company.

"Individual Preferred Member Termination Date" has the meaning as set forth under Section 4.04(g)(ii).

"Installment Exchange Contracts" shall mean installment sales contracts relating to the purchase and resale of residential properties from eligible sellers (typically sellers with homes with a purchase price of $500,000 or such other prices as determined by the Initial Manager in its the sole discretion) who are also "accredited investors."

"Initial Term" has the meaning set forth in Section 2.06.

"Interests" shall mean, collectively, the Common Interests and the Preferred Interests owned by each Member and representing the respective proportionate interest attendant to the Membership Interests.

"Investment Company Act" shall mean the U.S. Investment Company Act of 1940, as amended

"IRA" has the meaning set forth in the definition of "Benefit Plan Investor."

"Leverage" has the meaning set forth in Section 3.02(b).

"Licensor" has the meaning set forth in Section 9.21.

"Majority in Interest" shall mean, at any time, Common Members then entitled to vote in the Company and holding a majority of the total Common Interests determined by dividing the Common Interests of each Common Member by the aggregate Common Interests of all Common Members.

US_ACTIVE-163597142.3

"<u>Managed Assets</u>" shall mean total assets of the Company (less amounts withheld in the sole discretion of the Initial Manager for fees, expenses, reserves, and contingencies), plus the amount of Leverage incurred by the Company for investment purposes.

"<u>Manager</u>" shall mean the Initial Manager, the Additional Manager, or any Person appointed as a Manager by a Majority in Interest or pursuant <u>Section 3.07</u>, for so long as each such Person has not been removed as a Manager pursuant to <u>Section 3.07</u>. Each Manager shall be a "manager" within the meaning of Section 18-101(10) of, and for all purposes under, the Act.

"<u>Marks</u>" has the meaning set forth in <u>Section 9.21</u>.

"<u>Member Meeting</u>" has the meaning set forth in <u>Section 7.02(a)</u>.

"<u>Members</u>" shall mean NRIA in its capacity as a Common Member and the Non-Managing Members.

"<u>Member Nonrecourse Debt</u>" has the meaning assigned to the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

"<u>Member Nonrecourse Debt Minimum Gain</u>" shall mean that amount determined in accordance with the principles of Regulations Section 1.704-2(i)(3) pertaining to "partner nonrecourse debt minimum gain."

"<u>Member Nonrecourse Deductions</u>" shall have the meaning assigned to the term "partner nonrecourse deductions" in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"<u>Membership Interest</u>" shall mean the entire interest of a Member as a member in the Company, including such Member's Capital Account and the Interests owned by such Member and the respective rights attendant to such Interests, including (i) interest in the Company's Net Profits and Net Losses; (ii) interest in gains, losses, deductions, and credits for tax purposes; (iii) interest in other assets; (iv) interest in liquidation proceeds; and (v) right to participate as a Member, all to the extent provided in this Agreement.

"<u>Memorandum</u>" shall mean that certain Confidential Private Placement Memorandum of the Company with respect to the offering of the Preferred Interests, dated June July 14, 2021, as amended, supplemented, restated or otherwise modified from time to time.

"<u>Net Asset Value</u>" has the meaning set forth in <u>Section 4.05(d)</u>.

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean, for each Allocation Year or other period, an amount equal to the Company's taxable income or loss, respectively, for such Allocation Year or other period determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be included;

US_ACTIVE-163597142.3

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code (including expenditures treated as such pursuant to Regulations Section 1.704-1(b)(2)(iv)(i)), and not otherwise taken into account in computing Net Profits or Net Losses, shall be subtracted;

(c)    in the event the Gross Asset Value of any Company Asset is adjusted pursuant to subparagraphs (b), (c) or (d) of the definition of "Gross Asset Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of such Company Asset) or an item of loss (if the adjustment decreases the Gross Asset Value of such Company Asset) from the disposition of such Company Asset and shall be taken into account for purposes of computing Net Profits or Net Losses;

(d)    gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Asset disposed of, notwithstanding that the adjusted tax basis of such Company Asset differs from its Gross Asset Value;

(e)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year or other period, computed in accordance with the definition thereof;

(f)    to the extent an adjustment to the adjusted tax basis of any Company Asset pursuant to Section 734(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the tax basis of such Company Asset) or loss (if the adjustment decreases the tax basis of such Company Asset) from the disposition of such Company Asset and shall be taken into account for purposes of computing such Net Profits or Net Losses; and

(g)    notwithstanding any other provision of this definition, any items which are specially allocated under Section 4.03(c) shall not be taken into account in computing Net Profits or Net Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 4.03(c) shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"Non-Managing Members" has the meaning set forth in the preamble.

"Non-Managing Member Interest" shall mean any Interest of the Company other than Common Interest, and for the avoidance of doubt, Preferred Interests shall be deemed to be Non-Managing Member Interests.

"Nonrecourse Deductions" has the meaning assigned to the term "nonrecourse deductions" in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"NRIA" has the meaning set forth in the preamble.

"Operating Expenses" has the meaning set forth in Section 8.01(b).

US_ACTIVE-163597142.3

"Operating LLC" shall mean an operating limited liability company that is wholly-owned by a Real Estate Asset LLC, through which the Real Estate Asset LLC indirectly owns a particular Real Estate Asset.

"Organizational Expenses" has the meaning set forth in Section 8.01(a).

"Person" shall mean any individual, partnership, joint venture, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof in their capacity as such), government (or agency or subdivision thereof), or other entity.

"Plan Asset Entity" has the meaning set forth in the definition of "Benefit Plan Investor."

"Portfolio Investments" shall mean Real Estate Assets, Installment Exchange Contracts, and CMBS.

"Preferred Distribution Percentage" has the meaning set forth in Section 4.01(a).

"Preferred Interests" shall mean the Non-Managing Member Interests (other than the Common Interests) providing the Preferred Members with the relative rights, powers, and duties as specified in this Agreement and the Memorandum.

"Preferred Member" shall mean a Non-Managing Member holding Preferred Interests.

"Preferred Return Amount" has the meaning as set forth under Section 4.04(g)(ii)(2).

"Principal" shall mean each of Rey E. Grabato, II, D. Coley O'Brien, or any other Person appointed as a principal of the Initial Manager.

"Proceeding" has the meaning set forth in Section 3.06(a).

"Property" shall mean a Real Estate Asset owned by an Operating LLC.

"Quorum" has the meaning set forth in Section 7.02(d).

"Real Estate Asset LLC" shall mean a limited liability company through which the Company indirectly invests in Real Estate Assets and for which NRIA also serves as the manager. "Real Estate Assets" shall mean property development including, but not limited to, the development of multifamily, townhome, condominium, and mixed-use properties.

"Redemption Date" has the meaning set forth in Section 4.04(g).

"Redemption Price" has the meaning set forth in Section 4.04(g).

"Reed Smith" has the meaning set forth in Section 9.20.

"Regulations" shall mean the Income Tax Regulations, including Temporary Regulations, promulgated under the Code as amended (including corresponding provisions of successor regulations).

"Regulatory Allocations" has the meaning set forth in Section 4.03(c)(viii).

"Removal by the Common Members" has the meaning set forth in Section 3.07(b).

US_ACTIVE-163597142.3

"Removal by the Preferred Members" has the meaning set forth in Section 3.07(a).

"Removal Date by the Preferred Members" has the meaning set forth in Section 3.07(c)(ii)(1).

"Removal Date by the Preferred Members" has the meaning set forth in Section 3.07(c)(i)(1).

"Securities" shall mean (a) shares, capital stock, shares of beneficial interest, warrants, loans, bonds, notes, debentures, whether subordinated, convertible or otherwise, mutual funds, units in collective investment trusts, partnership interests, money market funds, commercial paper, certificates of deposit, bank debt, trade claims, obligations of the U.S., any state thereof, any foreign government or international agency and instrumentalities of any of them, bankers' acceptances, trust receipts and other obligations, and instruments or evidences of indebtedness commonly referred to as securities of whatever kind or nature of any Person, corporation, partnership, trust, government or entity whatsoever; (b) rights and options and contracts for differences relating thereto, whether readily marketable or not; and (c) forward contracts, trade options, futures, "spot" transactions and swap arrangements involving stock indexes or other indexes, financial instruments, interest rates, currencies and derivative instruments for bona fide hedging purposes.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended from time to time.

"Sharing Percentage" shall mean, with respect to any Member, a fraction, expressed as a percentage, the numerator of which equals the amount of the Member's aggregate Capital Contributions and the denominator of which equals the aggregate amount of Capital Contributions of all Members.

"Side Letter" has the meaning set forth in Section 9.17.

"Subscription Agreements" shall mean, collectively, those certain subscription agreements by and between the Company and each of the Non-Managing Members, together with any and all investor questionnaires, instruments, or agreements executed and delivered in connection therewith and any and all extensions, renewals, modifications, substitutions, and amendments thereof.

"Targeted Preferred Return Rate" has the meaning as set forth under Section 4.01(d).

"Tax Matters Member" has the same meaning as "tax matters partner" as defined in Section 6231(a)(7) of the Code (prior to the effective date of the Bipartisan Budget Act).

"Term" has the meaning set forth in Section 2.06.

"Term of Investment" has the meaning set forth in Section 4.01(e).

"Total Use of Funds Estimate" shall mean, regarding a Property, all hard and soft costs and expenses (e.g., land cost, development cost, property tax, insurance, senior lenders' interest reserves, etc.) associated with such Property.

"Transfer" shall mean (a) when used as a verb, to sell, assign, pledge, mortgage, or otherwise dispose of or (b) when used as a noun, any sale, assignment, pledge, mortgage, or disposition.

"Transferee" has the meaning set forth in Section 5.05(a).

US_ACTIVE-163597142.3

## ARTICLE II
## GENERAL PROVISIONS

Section 2.01    Formation

.  The parties hereto hereby continue a limited liability company formed on the Certificate Filing Date pursuant to the Act.  Each Manager is hereby designated as the "manager," within the meaning of the Act, to execute, deliver, and file with the Secretary of State of the State of Delaware any amendments or restatements of the Certificate and any other certificates required or permitted to be filed with the Secretary of State of the State of Delaware (and any amendments or restatements thereof).

Section 2.02    Name

.  The name of the Company is "NRIA Partners Portfolio Fund I, LLC."  The Initial Manager may make any variations in the Company's name which the Initial Manager deems necessary or advisable; provided, however, that written notice of such name change shall be given to the Members within a reasonable period of time after the effectiveness of such change.  The affairs of the Company shall be conducted under the Company's name or such other name as the Initial Manager may determine in its sole discretion.

Section 2.03    Organizational Certificates and Other Filings

.  If requested by the Initial Manager, the Non-Managing Members shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the Initial Manager to accomplish all filing, recording, publishing, and other acts that may be required to comply with all requirements for (a) the formation and operation of a limited liability company under the laws of the State of Delaware and (b) the operation of the Company as a limited liability company, or a partnership in which the Non-Managing Members have limited liability, in all jurisdictions where the Company conducts or proposes to conduct business.

Section 2.04    Principal Place of Business

.  The principal place of business of the Company shall be located at 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094 or at such other place or places as the Initial Manager may from time to time select in its sole discretion; provided, that written notice of such selection is given to the Non-Managing Members within a reasonable period of time after the effectiveness of the change in such place.

Section 2.05    Registered Office and Registered Agent

.  The address of the Company's registered office in the State of Delaware is c/o National Registered Agents, Inc., 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801. The name and address of the Company's registered agent for service of process in the State of Delaware is National Registered Agents, Inc., 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801. The Initial Manager may at any time change the Company's registered office and/or registered agent for service of process in the State of Delaware.

Section 2.06    Term

- 11 -

US_ACTIVE-163597142.3

. The Company commenced on the Certificate Filing Date and is expected to end on or about September 1, 2036 (the "Initial Term"), subject to extension by the Initial Manager, in its sole discretion. Notwithstanding the foregoing, the Company may terminate the Initial Term or terminate the extended term (where the Initial Term has been extended) in accordance with ARTICLE VI. The Initial Term and any early termination or extension thereto are referred to herein as the "Term" and the last day of such Term is referred to herein as the "Company Termination Date."

US_ACTIVE-163597142.3

Section 2.07    Fiscal Year; Names of Members

.

      (a)    The fiscal year of the Company (the "Fiscal Year") shall be the calendar year. The Company's first Fiscal Year shall begin on the Certificate Filing Date and end on December 31 of the year in which the Certificate Filing Date occurs. Thereafter, the Company's Fiscal Year shall commence on January 1 of each year and end on December 31 of such year or, if earlier, the date the Company terminates during such year pursuant to the provisions of this Agreement. For the avoidance of doubt, the Initial Manager, at any time, may elect a taxable year that is different from the Fiscal Year, if permitted by the Code and the applicable Regulations.

      (b)    The names of all of the Members and their status, as applicable, as a Manager, a Common Member, and/or a Non-Managing Member shall be maintained in the books and records of the Company.

Section 2.08    Liability of Non-Managing Members

     . Except to the extent provided under the Act, in no event shall any Non-Managing Member (or former Non-Managing Member) have any personal liability for the repayment and discharge of debts and obligations of the Company; provided, however, that the foregoing shall not limit any obligation or liability of any Non-Managing Member to the Company set forth in this Agreement or to the extent such obligation or liability is required by law and cannot be determined by agreement of the parties hereto. The obligations of the Non-Managing Members under Section 3.06, Section 4.01, Section 4.04, and Section 5.05, are conditional obligations and are payable only to the extent, and only in such amount, as provided for in this Agreement. Notwithstanding any other provision of this Agreement, in no event shall any Non-Managing Member be obligated to make any Capital Contribution in excess of such Member's Capital Contributions to the Company or have any liability for the repayment and discharge of the debts and obligations of the Company (apart from such Non-Managing Member's Interest), except that a Non-Managing Member (or former Non-Managing Member) may be required, (i) for purposes of meeting such Non-Managing Member's obligations under this Section 2.08, to make additional contributions or payments up to, but in no event in excess of, the aggregate amount of distributions actually received by such Non-Managing Member (or former Non-Managing Member) from the Company; provided, that any such additional contributions shall be made by such Non-Managing Members (or former Non-Managing Members), pro rata, in proportion to their Sharing Percentages at the time for which the relevant debts or obligations of the Company are attributable, and (ii) to return any funds distributed to such Non-Managing Member in error.

Section 2.09    Purpose

     . The purposes of the Company are to invest, directly or indirectly, its capital in Portfolio Investments; to identify, acquire, hold, manage, and dispose of such Portfolio Investments in accordance with the terms of this Agreement; and to engage in any other activities which may be directly or indirectly related or incidental thereto. The Company shall have all power and authority to enter into, make, and perform all contracts and other undertakings and to engage in all activities and transactions and take any and all other actions necessary, appropriate, desirable, incidental, or convenient to or for the furtherance or accomplishment of the above purposes or of any other purpose permitted by the Act or the furtherance of any of the provisions herein set forth and to do every other act and thing incident thereto or connected

US_ACTIVE-163597142.3

therewith, including, without limitation, investing of funds of the Company pending their utilization or disbursement, and any and all of the other powers that may be exercised on behalf of the Company by the Initial Manager pursuant to this Agreement. Subject to applicable rules and regulations, Real Estate Assets shall comprise no less than fifty-five percent (55%) of the Company's assets at all times, and all of the Company's assets (other than cash and cash equivalents) at all times shall consist of Portfolio Investments. Notwithstanding the foregoing, the Initial Manager, in its sole discretion, may allocate the Company's assets among the Portfolio Investments in any manner so as to comply with applicable rules and regulations now or in the future.

Section 2.10     Co-Investment Rights

. The Initial Manager may in its sole discretion give any or all of the Members or their Affiliates or any other Person, an opportunity to co-invest in particular Portfolio Investments alongside the Company as may be further described in the Memorandum. The a Manager and/or its Affiliates may make an investment in any vehicle formed for such co-investment opportunity.

## ARTICLE III
## MANAGEMENT OF THE COMPANY

Section 3.01     Management

(a)     . Except to the extent expressly set forth herein, the Initial Manager shall be vested with the complete control of the management and conduct of the business of the Company. The Non-Managing Members as such shall have no responsibility for the management of the Company and shall have no authority or right to act on behalf of the Company or to bind the Company in connection with any matter, it being understood that any Non-Managing Member Interest held by the a Manager shall in no way limit or otherwise affect such Manager's power and authority as a "manager" of the Company as set forth in this Agreement or in the Act. The Initial Manager shall be NRIA; provided, however, for the avoidance of doubt, in accordance with its rights to remove and determine any Manager pursuant to Section 3.07, a Majority in Interest may at time appoint an additional or substitute manager of the Company, without the consent of any existing Manager(s) or the Non-Managing Members.

Section 3.02     Powers of the Initial Manager

s. The Initial Manager shall have and exercise the power on behalf and in the name of the Company that a manager of a limited liability company may have or exercise under the Act and is authorized and empowered to carry out any and all of the purposes of the Company and to perform (either itself or through any of its Affiliates) all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a)     direct the formulation of investments and strategies for the Company in accordance with this Agreement and the Memorandum and to engage any Person, including any Affiliate, for any purpose consistent with the Company's objectives and which is deemed appropriate for the Company by the Initial Manager in its sole discretion;

(b)     solely for investment-related purposes on behalf of the Company, (i) use leverage which may include, without limitation, loans from certain financial institutions, repurchase agreements, and/or securities lending arrangements; (ii) raise monies or utilize any other forms of Leverage including,

without limitation, through the use of structured financial products; (iii) issue, accept, endorse, and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures, and other negotiable or non-negotiable instruments and evidences of indebtedness; and (iv) grant or issue guarantees (clauses (i) through (iv) are collectively referred to as, "Leverage");  provided, however, that the target Leverage ratio is 70.0% to 75.0% of the Company's total assets (which approximates to 300% of the Company's net assets after giving effect to such Leverage), measured using the greater of fair market value, stabilized value, and total cost; provided, further, that there is no limit on the amount the Company may borrow with respect to any Real Estate Asset LLC, Operating LLC, individual Property, project, or investment.

(c)    appoint and enter into a contract with any Person to do any and all acts and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Company Assets, including, without limitation, the right to possess, lend, Transfer, and institute, settle, or compromise suits and administrative proceedings and other similar matters;

(d)    open, maintain, and close accounts with brokers, dealers, and custodians, which power shall include the authority to issue all instructions and authorizations to brokers, dealers, and custodians regarding Company Assets therein and to pay, or authorize the payment and reimbursement of, without limitation, commissions;

(e)    open, maintain, and close bank accounts and draw checks or other orders for the payment of monies;

(f)    do any and all acts on behalf of the Company and exercise all rights of the Company with respect to its interest in any Person including, without limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other similar matters;

(g)    organize one or more corporations or other entities formed to hold Portfolio Investments or Company Assets including, without limitation, Real Estate Asset LLCs and Operating LLCs;

(h)    make any and all elections for federal, state, local, and foreign tax purposes, including any election to adjust the tax basis of Company Assets pursuant to Section 754 of the Code; provided, that no election shall be made that would cause the Company to lose its status as a partnership for federal income tax purposes;

(i)    engage one or more custodians, attorneys, placement agents, independent accountants, prime brokers, administrators, consultants, and any other Persons that the Manager deems necessary or advisable;

(j)    maintain, for the conduct of Company affairs, one or more offices, and in connection therewith, rent or acquire office space, engage personnel, whether part-time or full time, and do any other acts that the Manager deems necessary or advisable in connection with the maintenance and administration of such office or offices (including, without limitation, entering into agreements with the Manager and its Affiliates and Non-Managing Members and their Affiliates for the maintenance and administration of such office or offices);

(k)    enter into a servicing agreement with an entity or entities (including Non-Managing Members and their Affiliates) as the Manager shall determine in its sole discretion, for the

- 15 -

oversight of the Company's financial records, preparation of reports to the Non-Managing Members, monitoring of payment of Operating Expenses, and the performance of administrative and professional services in connection with the servicing and monitoring of the Portfolio Investments;

(l)       make, execute, deliver, record, and file all certificates, instruments, documents, reports, statements, or any amendment thereto, of any kind necessary or desirable to accomplish the business, purpose, and objectives of the Company, in each case as required by any applicable law, agreement, or its business judgment;

(m)       authorize any partner, director, officer, employee, or other agent of the Manager or its Affiliates or agent or employee (if any) of the Company to act for and on behalf of the Company in all matters incidental to the foregoing and to do any other act that the Manager deems necessary or advisable in connection with the management and administration of the Company; and

(n)       make, execute, sign, acknowledge, swear to, record, and file (i) this Agreement and any amendment to this Agreement; (ii) the Certificate and all amendments thereto required or permitted by law or the provisions of this Agreement; (iii) all certificates and other instruments deemed advisable by the Manager to carry out the provisions of this Agreement and applicable law or to permit the Company to become or to continue as a limited liability company in the State of Delaware and all other jurisdictions in which the Company conducts or plans to conduct business; (iv) all instruments that the Manager deems appropriate to reflect a change or modification of this Agreement or the Company in accordance with this Agreement, including, without limitation, the substitution of assignees as Non-Managing Members pursuant to Section 5.05 and amendments to this Agreement; (v) all conveyances and other instruments, certificates, or other documents deemed advisable by the Manager to effect the winding up and termination of the Company (including, but not limited to, a certificate of cancellation); (vi) all fictitious or assumed name certificates or any other business certificate required or permitted to be filed on behalf of the Company; and (vii) all other instruments or documents which may be required or permitted by law to be filed on behalf of the Company.

Each other Manager shall have those powers given to it when such Manager is appointed as a manager of the Company pursuant to this Agreement.  For the avoidance of doubt, unless a power has been vested with such other Manager, all powers of a Manager as described in this Agreement, including, but not limited to, those powers as set forth under this Section 3.02 shall remain the Initial Manager.

Section 3.03       Reliance by Third Parties

.  Persons dealing with the Company are entitled to rely conclusively on a certificate of a Manager to the effect that it is acting as the Manager and on the power and authority of the Manager set forth or as provided for herein.

Section 3.04       Other Activities of the Manager

s.

(a)       Subject to the requirements contained herein, the Initial Manager shall cause its personnel to devote such time as shall be reasonably necessary to conduct the business affairs of the Company.

US_ACTIVE-163597142.3

(b)      Subject to the express provisions elsewhere herein and/or other provisions agreed to with the relevant Manager by the Company, the Initial Member, and/or relevant Members, the parties hereto acknowledge that with respect to each Manager and its Affiliates:

(i)      each of such Manager and its Affiliates may act as investment adviser, sponsor, or managing member (or the equivalent) for other Persons and may give advice, and take action, with respect to any such other Persons which may follow investment programs similar to those of the Company or differ from the advice given, or the timing or nature of action taken, with respect to the Company;

(ii)      where there is a limited supply of an investment opportunity, such Manager shall use its best efforts to allocate such investment opportunities among the Manager's clients;

(iii)      such Manager, its Affiliates, and their respective members, partners, officers, directors, employees, shareholders, agents, and representatives thereof may engage in transactions or cause or advise other Persons to engage in transactions which may differ from or be identical to the transactions advised upon or engaged in by such Manager for the Company's account; and

(iv)      such Manager shall not have any obligation to engage in any transaction for the Company's account or to recommend any transaction to the Company which such Manager, its Affiliates, and their respective members, partners, officers, directors, employees, shareholders, agents, and representatives thereof may engage in for their own accounts or the account of any other Person, except as otherwise required by applicable law.

(c)      The Non-Managing Members hereby agree that the Initial Manager may offer the right to participate, directly or indirectly, in investment opportunities of the Company to one or more Members or other private investors, groups, partnerships, or corporations whenever the Initial Manager so determines (and the Non-Managing Members acknowledge that such investment practices involve an inherent conflict of interest and agree that the Initial Manager shall have no liability attributable to or based upon such conflict of interest in the absence of intentional harm to the Company by the Initial Manager or a member thereof (it being understood that merely causing any subsequent investment vehicle permitted to be formed hereunder to take advantage of an investment opportunity or to exercise any legal or contractual rights available to it shall not be deemed intentional harm to the Company).

(d)      By reason of the investment advisory and other activities of the Initial Manager and its Affiliates, the Initial Manager may acquire confidential information or be restricted from initiating transactions in certain Securities and/or with respect to one or more Portfolio Investments.  It is acknowledged and agreed that the Initial Manager shall not be free to divulge, or to act upon, any such confidential information with respect to the Initial Manager's performance of its responsibilities under this Agreement and that, due to such a restriction, the Initial Manager may not initiate a transaction the Initial Manager otherwise may have initiated, and the Company may be frozen in an investment position that it otherwise might have liquidated or closed out.

(e)      The Non-Managing Members hereby acknowledge that the Initial Manager may be prohibited from taking action for the benefit of the Company (i) due to confidential information acquired or obligations incurred in connection with an outside activity of the Initial Manager, its Affiliates, equity holders, or other related Persons; (ii) in consequence of an equity holder, Affiliate, or other related Person of the Initial Manager serving as an officer or director with respect to a Portfolio Investment; or (iii) in

- 17 -

US_ACTIVE-163597142.3

connection with activities undertaken by an equity holder, Affiliate, or other related Person of the Initial Manager prior to the date first above written.  No Person shall be liable to the Company or any Member for any failure to act for the benefit of the Company in consequence of a prohibition described in the preceding sentence.

(f)    The Members recognize that the differing financial, regulatory, tax, and other status and circumstances of the Members may give rise to conflicts of interest among the Non-Managing Members with regard to the timing of selection of investments, disposition of assets, making of tax elections, or other Company matters.  Except as otherwise specifically provided in this Agreement, the Initial Manager, when making decisions or taking action with respect to the Company or its business, shall not be required to take into consideration the separate status or circumstances of any Non-Managing Member or group of Non-Managing Members.

Section 3.05    Limitation of Liability

.

(a)    The Managers, their Affiliates, members, partners, officers, directors, employees, shareholders, agents, and managers of each of them (collectively, the "Covered Persons") shall not be liable to the Company or any other Member for any act or omission, including any mistake of fact or error in judgment, taken, suffered, or made by such Covered Person, relating to or arising out of the investment or other activities of the Company, or activities undertaken in connection with the Company, or otherwise relating to or arising out of this Agreement, except for (i) fraud, (ii) gross negligence, or (iii) willful misconduct (each, a "Disabling Conduct").  An individual Covered Person shall not have any personal liability to the Company or any other Member by reason of any change in federal, state, or local income tax laws, or in interpretations thereof, as they apply to the Company or the Non-Managing Members, whether the change occurs through legislative, judicial, or administrative action.

(b)    Any Covered Person may consult with legal counsel, accountants, appraisers, engineers, and any other skilled Person selected by it, and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company taken in good faith and in reliance on and in accordance with the advice of such Person shall be full justification for such act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if such Person was selected with reasonable care.

(c)    To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Person is permitted or required to make a decision or take an action (i) in its sole discretion or under a similar grant of authority or latitude, the Person shall be entitled to consider such interests and factors as it desires, including its own interests, and shall be entitled to decide or act for any reason or no reason and shall not be required to consider the interests of any other Person; or (ii) in its "good faith" or under another express standard, the Person shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein or by relevant provisions of law or in equity or otherwise; provided, that neither clause (i) nor clause (ii) eliminates a Manager's implied contractual covenant of good faith and fair dealing; provided, further, that, in making any such decision described in clause (i) or clause (ii), the relevant Manager shall act consistent with its fiduciary duties to the Non-Managing Members.

US_ACTIVE-163597142.3

Section 3.06        Indemnification

.

(a)        To the fullest extent permitted by law, the Company shall and hereby agrees to indemnify, hold harmless, and release (and each Member does hereby release) each Covered Person from and against any and all claims, demands, damages, liabilities, costs, expenses, including legal fees, losses, suits, proceedings, and actions, whether judicial, administrative, investigative, or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to, or arising out of the investment or other activities of the Company, or activities undertaken in connection with the Company, or otherwise relating to or arising out of this Agreement ("Covered Actions"), including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration, or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses covered by this Section 3.06 are referred to collectively as "Damages"), except to the extent that such Damages arose from Disabling Conduct to which such Covered Person has pleaded guilty or nolo contendere, or it shall have been determined by a court of competent jurisdiction in a final judgment that such Damages arose from a Disabling Conduct of such Covered Person.  Notwithstanding the foregoing, a Covered Person will only be eligible for indemnification pursuant to this Section 3.06(a) for Claims relating to or arising out of transactions or Covered Actions that took place during the time such Covered Person was a shareholder, officer, director, employee, agent, partner, member, or manager of any of the Managers or any of their Affiliates.  The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Person.  The satisfaction of any indemnification and any saving harmless pursuant to this Section 3.06(a), as and when appropriate under Section 3.06(c), shall be from and limited to Company Assets, and no Member shall have any personal liability on account thereof except to the extent provided in Section 2.08.

(b)        Expenses incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Company, in the sole discretion of the Initial Manager, prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately be determined, by a court having appropriate jurisdiction in the decision that is not subject to appeal, that such Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity or otherwise and shall extend to such Covered Person's successors, assigns, and legal representatives.

(c)        In the event any Covered Person becomes involved in any capacity in any action, proceeding, or investigation brought by or against any Person (including a Non-Managing Member) in connection with any matter arising out of or in connection with the Company's business or affairs (including a breach by any Non-Managing Member of this Agreement or the Non-Managing Member's Subscription Agreement) and to which such Covered Person may have a right to indemnification hereunder, the Company will periodically reimburse such Covered Person for its legal and other expenses (including the cost of any investigation, preparation, defense, or settlement thereof) incurred in connection therewith prior to the final disposition thereof, provided, that such Covered Person shall promptly repay

US_ACTIVE-163597142.3

to the Company the amount of any such reimbursed expenses paid to it if it shall ultimately be determined, by a court having appropriate jurisdiction in the decision that is not subject to appeal, that such Covered Person is not entitled to be indemnified by the Company in connection with such action, proceeding, or investigation as a result of Disabling Conduct.

(d)    Any Covered Person entitled to indemnification from the Company hereunder shall obtain the written consent of the Initial Manager prior to entering into any compromise or settlement which would result in an obligation of the Company to indemnify such Person if such Covered Person is other than the Initial Manager. Additionally, if liabilities arise out of the conduct of the affairs of the Company and any other Person for which the Person entitled to indemnification from the Company hereunder was then acting in a similar capacity, the amount of the indemnification provided by the Company shall be limited to the Company's proportionate share thereof as determined in good faith by the Initial Manager in light of its fiduciary duties to the Company and the Non-Managing Members.

(e)    Any Covered Person who is entitled to indemnification under this Section 3.06 shall be deemed to be a creditor of the Company and shall be entitled to enforce the obligations of Members to return distributions pursuant to Section 2.08 following the termination of the Company.

Section 3.07    Manager Removal.

(a)    The Company, having obtained the consent of Preferred Members representing at least seventy-five percent (75%) of the Preferred Interests outstanding at a duly called meeting of the Members in accordance with Section 7.01(c), may remove NRIA as a Manager of the Company and/or as a manager of any Real Estate Asset LLC where (i) NRIA has been convicted of fraud, embezzlement, or a similar felony by a court of competent jurisdiction in a final judgment; (ii) NRIA has filed for Bankruptcy; (iii) NRIA has willfully and materially breached this Agreement and/or the operating agreement of the relevant Real Estate Asset LLC, and such breach is not cured within forty-five (45) days after the NRIA receives written notice of such breach from a Preferred Member, provided that if any such breach cannot reasonably be cured within such forty-five (45) day period, then such forty-five (45) day period shall be extended by the period of time reasonably required to remedy such breach so long as NRIA is diligently endeavoring to cure the same; or (iv) all of the applicable Preferred Members have not received (A) the expected minimum annualized return of twelve percent (12%) or (B) return of capital due to such Preferred Members, as the case may be, as of a date that is more than ninety (90) days from the date on which such return or return of capital was required to be made to such Preferred Members (such a removal, a "Removal by the Preferred Members").

(b)    The Common Members holding at least seventy-five percent (75%) of the Common Interests outstanding may remove any Manager of the Company at a special meeting called by the Common Members for that purpose or by written consent (such a removal, a "Removal by the Common Members").

(c)    Consequences of a Manager Removal.  In connection with the removal of NRIA as a Manager pursuant to a Removal by the Preferred Members or a removal of a Person as a Manager of the Company pursuant to a Removal by the Common Members:

(i)    Removal by the Preferred Members.

- 20 -

US_ACTIVE-163597142.3

(1)     On the date stipulated in the notice (which shall be no earlier than the date of such notice) (the "Removal Date by the Preferred Members"), NRIA shall be removed as a Manager.

(2)     Preferred Members holding a majority in interest of the Preferred Interests, with the consent of a Majority in Interest, may appoint a replacement Manager, with such replacement being effective upon such Person's acceptance of such appointment on such terms as may be agreed with the Preferred Members holding a majority in interest of the Preferred Interests, with the consent of a Majority in Interest.

(ii)     Removal by the Common Members.

(1)     On the date stipulated in the notice (which shall be no earlier than the date of such notice) (the "Removal Date by the Common Members"), the Person specified in such notice shall be removed as a Manager of the Company.

(2)     A Majority in Interest may appoint a replacement Manager, with such replacement being effective upon such Person's acceptance of such appointment on such terms as may be agreed with a Majority in Interest.

(iii)     On the Removal Date by the Preferred Members or the Removal Date by the Common Members, as the case may be, the removed Manager shall be entitled to receive compensation earned prior to the date of such removal at the same time as such compensation would have been paid to such Manager if it had not been removed, and the removed Manager shall not be entitled to receive any compensation accrued on or after the date of such removal.

(iv)     The removed Manager hereby irrevocably constitutes and appoints any such Person as may be stipulated in any notice pursuant to Section 3.07(c)(i)(2) or Section 3.07(c)(ii)(2), as the case may be (and any of such Person's officers, employees or directors), with full power of substitution, as the true and lawful attorney and agent of the removed Manager to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents, forms and certificates that may from time to time be required by the laws of any jurisdiction to give effect to the provisions of this Section 3.07 including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file all forms, certificates and other instruments, including any amendments to this Agreement, as may be necessary for such purposes.

(d)     Co-operation on Removal.  The removed Manager shall:

(1)     provide to the replacement Manager (or such other Person as has been notified to the removed Manager) or the liquidator of the Company, all books of accounts, records, registers and other documents belonging to the Company; and

(2)     use its best efforts to transfer control of the Company and all assets of the Company to such replacement Manager or other Person without delay.

(e)     Consequences of Termination Notice.  Upon the delivery of a notice pursuant to a Removal by the Preferred Members or Removal by the Common Members pursuant to Section 3.07(c)(i)(2)

US_ACTIVE-163597142.3

or Section 3.07(c)(ii)(2), as the case may be, the Common Members may elect to terminate the Company and in that event, the Company shall be dissolved and wound up in accordance with ARTICLE VI.

(f)    For the avoidance of doubt, the removal of NRIA as a Manager of the Company will not result in NRIA being removed as a Common Member of the Company or require it to Transfer any of its Interests (including the Common Interests).

## ARTICLE IV
### MEMBERSHIP INTERESTS; CAPITAL CONTRIBUTIONS; PREFERRED RETURN RATE; CAPITAL ACCOUNTS; ALLOCATIONS AND DISTRIBUTIONS; REDEMPTION

Section 4.01    Membership Interests; Capital Contributions.

(a)    Membership Interests.  The Company's securities currently consist of Preferred Interests and Common Interests and one class of debt securities (the "Debt Securities"), as described below. The Company is currently offering the Preferred Interests and Debt Securities to prospective investors.

(i)    Preferred Interests.  Holders of Preferred Interests are Members of the Company but have limited voting authority.  In the event of the Company's liquidation, dissolution, or winding up, the holders of the Preferred Interests will have the right to share proportionately in the Company's remaining net assets, if any, after payment of the Company's creditors and liquidation expenses.  The Company is currently seeking total investments in Preferred Interests of up to Seven Hundred Fifty Million Dollars ($750,000,000.00).  However, the Initial Manager, in its sole discretion, may accept aggregate investments either less than or in excess of this amount.

(ii)    Common Interests.  Holders of Common Interests are Members of the Company and have full voting authority.  In the event of the Company's liquidation, dissolution, or winding up, the holders of the Common Interests will have the right to share proportionately in the Company's remaining net assets, if any, after payment of the Company's creditors and liquidation expenses have been made and after all required distributions have been made to the Preferred Interest holders.  NRIA is the sole holder of the Common Interests.

(iii)    Debt Securities.  The Debt Securities may be converted on a dollar for dollar basis (based on the original principal amount) into Preferred Interests at the option of the holder of such Debt Securities on or after the fifth (5th) anniversary of the date of note corresponding to such Debt Securities.

(b)    Minimum Investment.  The minimum investment by a Preferred Member is One Hundred Thousand Dollars ($100,000), subject to waiver by the Initial Manager in its sole discretion.  The Preferred Interests will generally be available for subscription each Business Day or at such other time and/or frequency as determined by the Initial Manager in its sole discretion (each a "Subscription Date").

(c)    Capital Contributions.  Each Preferred Member shall pay or convey to the Company, by way of a Capital Contribution to the Company, cash (or, in the Initial Manager's sole and absolute discretion, Securities or other financial instruments) in the amount set forth in the Subscription Agreement or document of transfer pursuant to which such Preferred Member subscribed for or otherwise acquired its Preferred Interest. Unless otherwise agreed by the Initial Manager, all Capital Contributions to the Company shall be made in U.S. Dollars by wire transfer of immediately available funds on the date of the relevant Subscription Date.  Furthermore, it is agreed and understood that all amounts (i) contributed

US_ACTIVE-163597142.3

by a Preferred Member to the Company and (ii) distributed by the Company to such Preferred Member, shall be made from and to, respectively, an account in the name of such Preferred Member as specified in the Subscription Agreement.

    (d)    <u>Targeted Preferred Return Rate</u>.  The amount of a Preferred Member's Targeted Preferred Return Rate will be determined based on the amount of such Preferred Member's subscription for Preferred Interests as described in the Memorandum. Each Preferred Member's Targeted Preferred Return Rate may be adjusted in the future as described under the <u>Section 4.01(e)</u> for purposes of calculating distributions to such Preferred Member as described under the <u>Section 4.04(g)(ii).</u>

    (e)    <u>Adjusted Preferred Return Rate</u>. With respect to each Preferred Member, the Company shall adjust such Preferred Member's Targeted Preferred Return Rate based on the Company's performance during the period beginning on such Preferred Member's Subscription Date and ending on such Preferred Member's Individual Preferred Member Termination Date (each, a "<u>Term of Investment</u>"), using an "<u>Equity Multiple</u>" metric, as described below.  The adjusted Targeted Preferred Return Rate is referred to herein as the "<u>Adjusted Preferred Return Rate</u>" (which shall not be less than an annualized return of twelve percent (12%) for any Preferred Member, with any shortfall to be paid by NRIA using its own funds to such Preferred Member).

    (i)    All Properties reaching 100% sell-out and transfer to a third-party buyer at an arm's length transaction during a Preferred Member's Term of Investment (up to and including the last day of the calendar month in which the Company was in actual receipt of the Preferred Member's Redemption Request, as discussed in <u>Section 4.01(e)(iv)</u>) shall be considered in calculating the Equity Multiple, regardless of the percentage of completion of such Properties as of such Preferred Member's Subscription Date.

    (ii)    The Equity Multiple shall be calculated based upon the cash proceeds (net of any and all expenses) paid back to the Company at the time of final sale and transfer of a particular Property divided by the cash invested by the Company  with respect to  such Property.

    (1)    For example, if $10 million of cash was invested by the Company in two separate, fully completed Properties which directly resulted in $20 million of cash equity (net of any and all expenses) paid back to the Company upon final sale and transfer of such Properties, the Equity Multiple shall be 2.0X ($20 million divided by $10 million equals 2.0X).

    (iii)    The Equity Multiple shall determine the percentage of each Preferred Member's Adjusted Preferred Return Rate, as follows:

    (1)    At 2.0X Equity Multiple or greater, a Preferred Member shall earn 100% of the Targeted Preferred Return Rate.

    (2)    From 1.9X Equity Multiple up to but not including 2.0X Equity Multiple, a Preferred Member shall earn 85% of the Targeted Preferred Return Rate.

    (3)    From 1.8X Equity Multiple up to but not including 1.9X Equity Multiple, a Preferred Member shall earn 80% of the Targeted Preferred Return Rate.

US_ACTIVE-163597142.3

(4)    From 1.75X Equity Multiple up to but not including 1.8X Equity Multiple, a Preferred Member shall earn 77% of the Targeted Preferred Return Rate.

(5)    All other Equity Multiples shall result in a Preferred Member earning the expected minimum annualized return of twelve percent (12%).

(iv)    Each Preferred Member must provide the Company at least ninety (90) days' written notice prior to the Individual Preferred Member Termination Date of its desire to redeem its Preferred Interest by completing a written Redemption Request, and submitting it to the Company. The Company shall have no less than ninety (90) days from the last day of the calendar month in which the Company was in actual receipt of the Preferred Member's Redemption Request to calculate the corresponding Equity Multiple (the date on which the Equity Multiple is calculated is referred to herein as the "EM Calculation Date"). After an Equity Multiple is calculated, the Initial Manager will inform the relevant Preferred Member regarding such Equity Multiple, and the Company shall then have fifteen (15) calendar days from the EM Calculation Date to make the relevant distributions to the Preferred Member.

Notwithstanding the foregoing, a Preferred Member may, with the consent of the Initial Manager (which consent may be withheld for any reason), request in writing to the Company, within five (5) calendar days of being informed by the Initial Manager of the Equity Multiple, to delay the relevant Individual Preferred Member Termination Date until additional Properties reach final sale and completion, for purposes of calculating a new Equity Multiple can be calculated; provided, however, that in no event shall such Individual Preferred Member Termination Date be extended by more than twelve (12) months.

(f)    Except as expressly set forth herein, no Member shall be entitled to any return of capital, interest, or compensation by reason of its Capital Contribution or by reason of serving as a Member.

Section 4.02    Capital Accounts

.

(a)    The Company shall establish and maintain a separate Capital Account for each Member in accordance with Regulations Section 1.704 1(b)(2)(iv) and in accordance with the following provisions:

(i)    To each Member's Capital Account, there shall be credited (A) such Member's Capital Contributions, (B) such Member's allocable share of Net Profits, (C) any items in the nature of income or gain that are specially allocated to such Member under Section 4.03(c), and (D) the amount of any liabilities of the Company that are assumed by such Member (or liabilities that are secured by any Company Assets distributed to such Member).

(ii)    To each Member's Capital Account, there shall be debited (A) the amount of cash and the Gross Asset Value of any Company Assets distributed to such Member pursuant to any provision hereof (net of liabilities secured by such distributed Company Assets that such Member is considered to assume or take subject to under Section 752 of the Code), (B) such Member's allocable share of Net Losses, (C) any items in the nature of expenses or losses that are specially allocated to such Member under Section 4.03(c), and (D) the amount of any liabilities of such Member that are assumed by the Company (or liabilities that are secured by any property contributed by such Member to the Company).

- 24 -

US_ACTIVE-163597142.3

(iii)    If any Interest is Transferred in accordance with the terms hereof, then the Transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.  In the case of a sale or exchange of an Interest at a time when an election under Section 754 of the Code is in effect, the Capital Account of the transferee Member shall not be adjusted to reflect the adjustments to the adjusted tax basis of Company Assets required under Sections 754 and 743 of the Code, except as otherwise required or permitted by Regulations Section 1.704-1(b)(2)(iv)(m).

(iv)    In determining the amount of any liability for purposes of Section 4.02(a)(i) and Section 4.02(a)(ii), there shall be taken into account Section 752(c) of the Code, and any other applicable provisions of the Code.

(b)    The foregoing provisions of this Section 4.02 and the other provisions hereof relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.  If the Initial Manager determines that it is necessary to modify the manner in which any debits or credits are made to the Capital Accounts (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Members), the Initial Manager may make such modification, provided, that it will not have a material effect on the amounts distributed to any Person pursuant to Section 6.02 upon the dissolution of the Company.  The Initial Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

Section 4.03    Allocations of Net Profits and Net Losses

.

(a)    General.  After taking into account the special allocations set forth in Section 4.03(c), and subject to Section 4.03(b), the Net Profits and Net Losses for each Allocation Year shall be allocated among each of the Members in the manner that will cause each of their Capital Accounts to proportionately equal, as closely as possible, the excess of (i) the amount that would be distributable to such Member under Section 4.04(d) if the Company were dissolved, its affairs wound up, and (A) all Company Assets were sold on the last day of the Allocation Year for cash equal to their respective Gross Asset Values (except Company Assets actually sold during such Allocation Year shall be treated as sold for the consideration received therefor), (B) all Company liabilities were satisfied (limited, with respect to each "partner nonrecourse liability" and "partner nonrecourse debt," as defined in Regulations Section 1.704-2(b)(4), to the Gross Asset Value of the Company Assets securing such liabilities), and (C) the net assets were immediately distributed in accordance with Section 4.04(d) to the Members over (ii) such Member's share (if any) of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of Company Assets.  To the extent that the allocation provisions of this Section 4.03(a) would fail to produce such final Capital Account balances, such provisions shall be amended by the Initial Manager if and to the extent necessary to produce such result.  The Initial Manager shall have the power to amend this Agreement without consent of the Non-Managing Members as it reasonably considers advisable to make the allocations and adjustment described in this Section 4.03(a).

US_ACTIVE-163597142.3

(b)       Limitation on Loss Allocations.  If any allocation of Net Losses would cause a Member to have an Adjusted Capital Account Deficit, those Net Losses instead shall be allocated to the other Members pro rata until their Capital Accounts have been reduced to zero, and any remaining Net Losses will be allocated to each Member in accordance with its respective interest in the Company, as determined by the Initial Manager and subject to the requirements of the Code and the Regulations.

(c)       Special Allocations.   The following allocations shall be made prior to the allocations set forth in Section 4.03(a) and in the following order and priority:

(i)       Minimum Gain Chargeback.  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Section 4.02, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.03(c)(i) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)      Member Minimum Gain Chargeback.   Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Section 4.03, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member that has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.03(c)(ii) is intended to comply with the minimum gain chargeback requirement in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset.  If a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), then items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any Adjusted Capital Account Deficit of such Member as quickly as possible, provided, that an allocation pursuant to this Section 4.03(c)(iii) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4.03 have been tentatively made as if this Section 4.03(c)(iii) were not in this Agreement.  This Section 4.03(c)(iii) is intended to comply with the qualified income offset provisions in Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

US_ACTIVE-163597142.3

(iv)    Gross Income Allocation.  If a Member has an Adjusted Capital Account Deficit at the end of any Allocation Year, then such Member shall be specially allocated items of Company gross income and gain in the amount of such excess as quickly as possible, provided, that an allocation pursuant to this Section 4.03(c)(iv) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4.03 have been made as if Section 4.03(c)(iii) and this Section 4.03(c)(iv) were not in this Agreement.

(v)    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Allocation Year shall be allocated to the Member that bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(vi)    Nonrecourse Deductions.  Nonrecourse Deductions for any Allocation Year shall be allocated to each Member in accordance with each Member's interest in the Company, as determined by the Initial Manager and subject to the requirements of the Code and the Regulations.

(vii)    Section 754 Adjustments.  To the extent that an adjustment to the adjusted tax basis of any Company Asset pursuant to Section 734(b) or 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis of such Company Asset) or loss (if the adjustment decreases such tax basis), and such gain or loss shall be specially allocated (i) to the Members in accordance with their interests in the Company, if Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or (ii) to the Member to which such distribution was made, if Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(viii)    Curative Allocations. The allocations set forth above in Section 4.03(b) and Section 4.03(c)(i) through Section 4.03(c)(vii) (collectively, the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.03(c)(viii).  Therefore, notwithstanding any other provisions of this Section 4.03 (other than the Regulatory Allocations), the Initial Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to this Section 4.03 without regard to the Regulatory Allocations.

(d)    Other Allocation Rules.

(i)    Net Profits, Net Losses, and any other items of income, gain, loss, or deduction shall be allocated to the Members pursuant to this Section 4.03 as of the last day of each Allocation Year; provided, that Net Profits, Net Losses, and such other items shall also be allocated at such times as the Gross Asset Values of Company Assets are adjusted pursuant to subparagraph (a) of the definition of Gross Asset Value.

US_ACTIVE-163597142.3

(ii)     For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Initial Manager using any permissible method under Section 706 of the Code and the Regulations thereunder.

(iii)     The Members acknowledge the income tax consequences of the allocations made by this Section 4.03 and shall report their respective shares of Company income and loss for income tax purposes in a manner consistent with this Section 4.03.

(e)     Tax Allocations; Code Section 704(c) Allocations.

(i)     Except as otherwise provided in this Section 4.03(e), each item of Company income, gain, loss, and deduction for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under this Section 4.02(b), except that if such allocation is not permitted by the Code or other applicable law, then the Company's subsequent income, gains, losses, deductions, and credits for federal income tax purposes will be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their respective Capital Accounts.

(ii)     In accordance with Section 704(c) of the Code and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value using any allocation method permitted under Regulations Section 1.704-3, as determined by the Initial Manager.  In the event the Gross Asset Value of any Company Assets is adjusted pursuant to subparagraph (a) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such Company Assets shall take account of any variation between the adjusted tax basis of such Company Assets for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Regulations thereunder.

(iii)     Any elections or other decisions relating to the allocations described in this Section 4.03(e) shall be made by the Initial Manager, in any manner that reasonably reflects the purpose and intention hereof.  Allocations pursuant to this Section 4.03(e) are solely for purposes of federal, state, and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items, or distributions pursuant to any provision hereof.

Section 4.04     Distributions

 and Redemptions

(a)     General.  Except as otherwise expressly provided herein, no Member shall have the right to receive any distribution or return of such Member's Capital Contribution until the relevant distributions are due to such Member.  Distributions of Company Assets that are provided for in this ARTICLE IV or in ARTICLE VI shall be made only to Persons who, according to the books and records of the Company, were the holders of record of Interests on the date determined by the Initial Manager as of which the Members are entitled to any such distributions, or the assignees of such holders of record.

US_ACTIVE-163597142.3

Notwithstanding any other provision of this Agreement, neither the Company nor a Manager, on behalf of the Company, shall make a distribution to a Member on account of its Interest if such distribution would violate Section 18-607 of the Act or other applicable law.

(b)     Distributions in General.  At the sole discretion of the Initial Manager and except as otherwise expressly provided herein, net proceeds from the sale of all or any portion of a Portfolio Investment available for distribution ("Disposition Proceeds") may, but is not required to, be distributed to the Members until the relevant distributions are due to such Members.  Current cash receipts and other non-cash income (other than Disposition Proceeds), if any, net of expenses, at the sole discretion of the Initial Manager, may also, but is not required to, be distributed to the Members until the relevant distributions are due to such Members.  Notwithstanding the foregoing, the Initial Manager will be entitled to withhold from any and all distribution amounts necessary to create, in its sole discretion, appropriate reserves for Operating Expenses and liabilities of the Company, as well as for any required tax withholdings with respect to any Non-Managing Member(s) (in accordance with Section 4.04(e)).

(c)     Return of Capital Contributions – Year 1 through Year 5.  With respect to each Preferred Member, on or about the 15th of the month immediately following the Subscription Date corresponding to the Capital Contribution made by such Preferred Member, the Company shall begin making monthly distributions intended to reflect a return of capital to such Preferred Member for a period of five (5) years in amounts that will result in such Preferred Member receiving an amount totaling such Preferred Member's Annual Return of Capital Percentage per year, with distributions intended to reflect the remaining unreturned Capital Contribution and the Preferred Return Amount to be made to such Preferred Member as of the Individual Preferred Member Termination Date of such Preferred Member pursuant to Section 4.04(g).

(d)     Liquidating Distributions.  Upon a liquidation of the Company at the end of its Term, net proceeds from the liquidation of the Company's assets (after deducting any and all of the Company's expenses, debts, and other obligations) will be distributed to the Members in the following order of priority (taking into account any prior distributions made pursuant to Section 4.04(b) and Section 4.04(c)):

(i)     First, 100% to those Preferred Members that have been Preferred Members of the Company at least sixty-one (61) months as of the Company Termination Date (pro rata among such Preferred Members in accordance with their respective Capital Contributions) until each such Preferred Member has received distributions equal to such Preferred Member's Capital Contributions that have not been previously returned.

(ii)     Second, 100% to all other Preferred Members not included in clause (i) above (pro rata among such Preferred Members in accordance with their respective Capital Contributions) until each such Preferred Member has received distributions equal to such Preferred Member's Capital Contributions that have not been previously returned.

(iii)     Third, 100% to those Preferred Members that have been Preferred Members of the Company at least sixty-one (61) months as of the Company Termination Date (pro rata among such Preferred Members in accordance with their respective Capital Contributions) until each such Preferred Member has received cumulative distributions equal to any amount remaining due to such Preferred Member as calculated by applying such Preferred Member's Adjusted Preferred

US_ACTIVE-163597142.3

Return Rate for the period from such Preferred Member's Subscription Date through the Company Termination Date.

(iv)     Fourth, 100% to all other Preferred Members not included in clause (iii) above (pro rata among such Preferred Members in accordance with their respective Capital Contributions) until each such Preferred Member has received cumulative distributions equal to any amount remaining due to such Preferred Member as calculated by applying such Preferred Member's Adjusted Preferred Return Rate for the period from such Preferred Member's Subscription Date through the Company Termination Date.

(v)     Fifth, 100% to the Common Members pro rata.

(e)     <u>Withholding</u>.  Notwithstanding anything to the contrary herein, (i) each Member hereby authorizes the Company to withhold and pay over, or otherwise pay, any withholding or other taxes payable by the Company (pursuant to the Code or any other provision of federal, state, local, or other law) with respect to such Member or as a result of such Member's participation in the Company, including as a result of any distribution to such Member and (ii) if and to the extent that the Company is required to withhold or pay any such taxes, such Member will be deemed for all purposes hereof to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment will be deemed to be a distribution to such Member (or any successor to such Member's Interest) is then entitled to receive a distribution.  If the aggregate of such payments to a Member for any period exceeds the distributions that such Member would have received for such period but for such withholding, the Company shall notify such Member as to the amount of such excess and such Member shall promptly contribute to the Company, and shall indemnify the Company for, such amount.

(f)     <u>In-Kind Distributions</u>.  Company Assets may be distributed to both the Common Members and the Non-Managing Members in lieu of cash in connection with the liquidation of the Company.  Company Assets distributed in kind pursuant to this <u>Section 4.04(f)</u> shall be subject to such conditions and restrictions as the Initial Manager determines are legally required.  Such restrictions shall apply equally to the Company Assets distributed to all Members.

(g)     <u>Redemptions</u>.

(i)     <u>Early Individual Preferred Member Termination Date</u>.  With respect to each Preferred member, on or after a date that is at least thirty (30) months immediately following such Preferred Member's Subscription Date, such Preferred Member may, with the consent of the Initial Manager (which consent may be withheld for any reason), elect to redeem all of its Preferred Interest corresponding to such Subscription Date by submitting a Redemption Request to the Company at least ninety (90) days prior to the date on which the Preferred Member wishes to redeem (each, an "<u>Early Individual Preferred Member Termination Date</u>").  If such Redemption Request is accepted by the Initial Manager in its sole discretion, the Company will make distributions to such Preferred Member as follows:

(1)     a distribution equal to any unreturned amount of such Preferred Member's Capital Contribution corresponding to such Early Individual Preferred Member Termination Date; and

US_ACTIVE-163597142.3

(2)     a distribution equal to an amount calculated by applying an Adjusted Preferred Return Rate of twelve percent (12%) from the relevant Subscription Date through such Early Individual Preferred Member Termination Date.

The Company shall then have fifteen (15) calendar days from the Early Individual Preferred Member Termination Date to make the relevant distributions to the Preferred Member.

(ii)     Individual Preferred Member Termination Date.  With respect to each Preferred Member's Capital Contribution corresponding to a particular Subscription Date, the Company, subject to the last paragraph of this Section 4.04(g)(ii), on or after a date that is five (5) years and 1 month (or 61 months) from such Subscription Date (each, an "Individual Preferred Member Termination Date"), will make distributions to such Preferred Member as described immediately below in full redemption of such Preferred Member's Preferred Interest,, if (A) such Preferred Member has submitted a Redemption Request (in the form attached to the Memorandum) to the Company at least ninety (90) days prior to such Individual Preferred Member Termination Date (which notice requirement may be waived by the Initial Manager in its sole discretion) or, (B) notwithstanding the fact that such Preferred Member has not submitted such Redemption Request, the Initial Manager, in its sole discretion, determines to make such distributions to the Preferred Members as follows:

(1)     a distribution equal to any unreturned amount of such Preferred Member's Capital Contribution corresponding to such Individual Preferred Member Termination Date; and

(2)     a distribution equal to an amount calculated by applying such Preferred Member's Adjusted Preferred Return Rate from the relevant Subscription Date through such Individual Preferred Member Termination Date (the "Preferred Return Amount").

If the above distributions are made to such Preferred Member on such Individual Preferred Member Termination Date, such Preferred Member will no longer be a Member of the Company as of such date (unless such Preferred Member has subscribed for additional Preferred Interests on a Subscription Date that is later than the Subscription Date of the Preferred Interests that are the subject of these distributions and, therefore, is subject to a different Individual Preferred Member Termination Date). Conversely, if the above distributions are not made to such Preferred Member, such Preferred Member will continue to be a Member of the Company until the relevant Individual Preferred Member Termination Date(s).

Notwithstanding the foregoing, the Initial Manager, in its sole discretion and if requested by a Preferred Member and the Initial Manager reasonably believes that it would be in the best interest of the relevant Preferred Member(s) may extend the sixty-one (61) month period referenced in Section 4.04(g)(ii) for twelve (12) additional months.  In that event, the Preferred Return Amount will continue to accrue during this extended period and the Preferred Member will also receive monthly distributions as described in Section 4.04(c). Conversely, the Initial Manager, in its sole discretion, may accelerate the Individual Preferred Member Termination Date to an earlier date with respect to any Preferred Member and make the distributions as described above to such Preferred Member as of such accelerated Individual Preferred Member Termination Date.  As a result, each Preferred Member acknowledges that such Preferred Member may find its total return

US_ACTIVE-163597142.3

on investment to be less than it might have otherwise been had its Individual Preferred Member Termination Date not been accelerated.

(h)  Tax Distributions to the Members.  The Company may, upon request, make distributions to the Members in an amount sufficient to permit the payment of the tax obligations of the Members and their direct or indirect owners (including, but not limited to, the Principal) in respect of allocations of income related to the Members' Interests to the extent not previously taken into account for such purpose or otherwise distributed to the Members.  Any such distributions shall be taken into account in making subsequent distributions to the Members.

Section 4.05    Valuation of Company Assets

.

(a)  The Company shall value Portfolio Investments at their fair value in accordance with GAAP.

(b)  Certain of the Portfolio Investments will have no readily determinable market price.  The Company will value each Portfolio Investment without a readily available market quotation at fair value as determined in good faith by the Initial Manager.

(c)  Any Portfolio Investment that has permanently declined in value, as determined by the Initial Manager, shall be written down to its fair value, as of the date of the determination.

(d)  Following the determination of the fair value of each Portfolio Investment, the net asset value of the Company (the "Net Asset Value") will be calculated in good faith by the Company at the end of each Fiscal Quarter.  In determining the value of the Interest of any Member, or in any accounting among the Members or of any of them, no value shall be placed on the goodwill, going concern value, name, records, files, statistical data, or similar assets of the Company.

(e)  All good faith determinations by the Initial Manager of the fair value of any Portfolio Investment shall be, absent manifest error, final and binding for all purposes of this Agreement on the parties to this Agreement, their successors and assigns, and each Person that holds a direct or indirect beneficial interest in any of the foregoing.

Section 4.06    Liabilities; Reserves

.  Liabilities shall be determined in accordance with GAAP, applied on a consistent basis; provided, that the Initial Manager in its discretion may provide reserves for estimated accrued expenses, liabilities, and contingencies.  Such reserves shall be charged and accrued against the net Company Assets, in proportion to the respective Capital Account balances of each Member, in any amounts that the Initial Manager deems necessary or prudent.

Section 4.07    Determination by the Initial Manager of Certain Matters

.  All matters concerning the valuation of Portfolio Investments and other Company Assets and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Initial Manager, or its designee, in its sole discretion.

- 32 -

## ARTICLE V
## TRANSFERS AND WITHDRAWALS

Section 5.01    <u>Admissions and Withdrawals Generally</u>

. A Person shall be admitted as a Non-Managing Member at such time that (a) a copy of the Subscription Agreement is executed by or on behalf of such Person, (b) this Agreement or an amendment hereto or a counterpart hereof or thereof is executed by or on behalf of such Person, (c) such Person receives confirmation from the Company of the admission of such Person as a Non-Managing Member, and (d) such Person is listed as a Non-Managing Member in the records of the Company. Subscriptions may be (a) accepted by the Initial Manager or (b) rejected, in whole or part, by the Initial Manager in its sole discretion, for any reason or no reason. Except as expressly provided in Section 4.04 and this ARTICLE V or otherwise in this Agreement, no Member shall have the right to withdraw from the Company or to withdraw any part of its Capital Account. The names of all Persons admitted as Members and their status as Manager, a Common Member, and/or a Non-Managing Member shall be maintained in the records of the Company.

Section 5.02    <u>Investment Representation of the Non-Managing Members</u>

.

(a)    This Agreement is made with each Non-Managing Member in reliance upon such Non-Managing Member's representation to the Company, which by executing this Agreement, such Non-Managing Member hereby confirms, except as otherwise disclosed in writing to and accepted by the Initial Manager (which such writing shall constitute a representation by such Non-Managing Member hereunder), that such Non-Managing Member's Interest is to be acquired for investment purposes only for its own account and not as nominee, trustee, or agent of any other Person, and not with a view to the sale or distribution of any part thereof, and that such Non-Managing Member has no present intention of selling, granting participation in, or otherwise distributing the same. Each Non-Managing Member further represents that such Non-Managing Member does not have any contract, undertaking, agreement, or arrangement with any Person to Transfer to any third party such Non-Managing Member's Interest.

(b)    Each Non-Managing Member understands that its Interest has not been registered under the Securities Act and that any Transfer of such Interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom. Furthermore, each Non-Managing Member understands and acknowledges that such Non-Managing Member's Interest is an illiquid investment and no public market now exists, or will ever exist, for any of the Interests. Each Non-Managing Member understands that it will have no right to cause any registration of its Interest under the Securities Act.

(c)    Each Benefit Plan Investor (i) acknowledges that it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Company; (ii) acknowledges that, to the extent it is subject to ERISA, (A) it is aware of the provisions of Section 404 of ERISA relating to the requirement for investment and diversification of the assets of an employee benefit plan subject to ERISA; (B) represents that it has given appropriate consideration to the facts and circumstances relevant to the investment by such ERISA Member or Plan Asset Entity in the Company and has determined that such investment is reasonably designed, as part of such ERISA Member's or Plan Asset Entity's portfolio of investments, to further the purposes of such ERISA Member

- 33 -

US_ACTIVE-163597142.3

or Plan Asset Entity; and (C) represents that, taking into account the other investments made with the assets of such ERISA Member or Plan Asset Entity, and the diversification thereof, such ERISA Member's or Plan Asset Entity's investment in the Company is consistent with the requirements of Section 404 of ERISA; (iii) acknowledges that it understands that current income will not be a primary objective of the Company; and (iv) represents that its investment in the Company is not a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(d)    Each Non-Managing Member that is a partnership, grantor trust, S corporation, or other flow through entity for federal income tax purposes hereby represents that it has not been formed or utilized for the purpose of permitting the Company to satisfy the 100 partner limitation set forth in Regulation Section 1.7704 1(h)(1)(ii).

(e)    Except to the extent otherwise disclosed to the Initial Manager and acknowledged by the Initial Manager in writing prior to its admission, each Non-Managing Member represents that such Non-Managing Member is not a FOIA Person, and agrees that such Non-Managing Member will immediately notify the Initial Manager in the event it is or otherwise becomes a FOIA Person at any time during the Term. For purposes of this Agreement a "FOIA Person" shall mean any Person that is (i) directly or indirectly subject to either Section 552(a) of Title 5, U.S. Code (commonly known as the "Freedom of Information Act") or any similar federal, state, county, or municipal public disclosure law, whether foreign or domestic; (ii) subject, by regulation, contract or otherwise, to disclose Company information to a trading exchange or other market where interests in such Person are sold or traded, whether foreign or domestic; (iii) required to or will likely be required to disclose Company information to a governmental body, agency, or committee (including, without limitation, any disclosures required in accordance with the Ethics in Government Act of 1978, as amended, and any rules and regulations of any executive, legislative or judiciary organization), whether foreign or domestic, by virtue of such Person's (or any of its Affiliates') current or proposed involvement in government office; (iv) an agent, nominee, fiduciary, custodian, or trustee for any Person described in the preceding clauses (i) through (iii) of this Section 5.02(e) where Company information provided or disclosed to such Non-Managing Member by the Company, a Manager is provided or could at any time become available to such Person described by the preceding clauses (i) through (iii) of this Section 5.02(e); or (v) an investment fund or other entity that has any Person described in the preceding clauses (i) through (iii) of this Section 5.02(e) as a partner, member, or other beneficial owner where Company information provided or disclosed to such Non-Managing Member by or on behalf of the Company, a Manager is disclosed to or could at any time become available to such Person described by the preceding clauses (i) through (iii) of this Section 5.02(e).

Section 5.03    Accredited Investor Representations

.

(a)    Each Non-Managing Member represents that such Non-Managing Member has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company and is able to bear the economic risk of that investment. Each Non-Managing Member represents that such Non-Managing Member has had an opportunity to ask questions of and receive answers from the Initial Manager in order to obtain such additional information as such Non-Managing Member has deemed necessary to make an informed investment decision with respect to a purchase of an Interest and, unless otherwise disclosed in writing to the Initial Manager (which such writing shall constitute a representation by such Non-Managing Member hereunder), that such Non-

US_ACTIVE-163597142.3

Managing Member is an "accredited investor," as that term is defined in Regulation D promulgated by the Securities and Exchange Commission.

(b)       Except as otherwise disclosed in writing to the Initial Manager (which such writing shall constitute a representation by such Non-Managing Member hereunder), each Non-Managing Member represents that (i) such Non-Managing Member (a) is not an "investment company," as defined in the Investment Company Act, (b) does not rely on the exception provided in either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be excepted from the definition of an "investment company," as defined in the Investment Company Act, and (c) has not elected to be a business development company pursuant to Section 54 of the Investment Company Act; (ii) such Non-Managing Member's Capital Contribution does not exceed forty percent (40%) of such Non-Managing Member's assets; (iii) such Non-Managing Member's shareholders, partners, members, or other holders of equity or beneficial interests in such Non-Managing Member are not able to decide individually whether to participate, or the extent of their participation, in such Non-Managing Member's investment in the Company or in particular investments made by the Company; (iv) to the best of such Non-Managing Member's knowledge, such Non-Managing Member does not control, nor is controlled by or under common control with, any other Non-Managing Member; (v) such Non-Managing Member was not formed for the specific purpose of investing in the Company; (vi) such Non-Managing Member would be considered, and the Interest held by such Non-Managing Member would be considered to be beneficially owned by, "one person" for purposes of Section 3(c)(1) of the Investment Company Act; and (vii) no other Person or Persons will have a beneficial interest in such Non-Managing Member's Interest other than as a shareholder, partner, member or other beneficial owner of equity interests in such Non-Managing Member.

Section 5.04       Transfer of the Initial Manager

.

(a)       The Initial Manager may, at any time, assign all or a portion of its Interest to any Affiliate and, in the Initial Manager's sole discretion, admit the Affiliate as an additional or substitute manager of the Company (and/or a Non-Managing Member in the case of any Non-Managing Member Interest owned by the Initial Manager). The consent of the Non-Managing Members to the admission of any Affiliate as an additional or substitute manager (and/or a Non-Managing Member in the case of any Non-Managing Member Interest owned by the Initial Manager) shall not be required. In addition, without the consent of the Non-Managing Members, the Initial Manager may, at the Initial Manager's expense, be reconstituted as or converted into a corporation, partnership, or other form of entity (any such reconstituted or converted entity being deemed to be the Initial Manager for all purposes hereof) by merger, consolidation, conversion, or otherwise, or Transfer its Interest (in whole or in part) to one of its Affiliates so long as (i) such reconstitution, conversion, or Transfer does not have material adverse tax or legal consequences for the Non-Managing Members; (ii) such other entity is under common control with the Initial Manager; and (iii) such other entity shall have assumed in writing the obligations of the Initial Manager under this Agreement, the Subscription Agreements, and any other related agreements of the Initial Manager. Additionally, the Initial Manager may, at any time and without the consent of the Non-Managing Members, pledge its economic (but not management) interest in the Company to secure a borrowing pledge related to the activities or operations of the Company.

(b)       If the Initial Manager ceases to be the manager of the Company pursuant to Section 3.07, except as required by applicable law, neither the Initial Manager nor its successors in interest shall

US_ACTIVE-163597142.3

have any of the powers, obligations, or liabilities of a manager of the Company under this Agreement or under applicable law.

        Section 5.05     <u>Assignments or Transfer of Non-Managing Member Interests</u>

.

        (a)     No Non-Managing Member shall Transfer its Interest or its interest in Company Assets without the prior written consent of the Initial Manager, except as expressly provided in this Agreement. For purposes of this <u>Section 5.05</u>, all restrictions and obligations applicable to a Non-Managing Member concerning a Transfer of its Interest shall apply, mutatis mutandis, to any Transfer by an assignee of an Interest. No transferee of an Interest (a "<u>Transferee</u>") may be admitted to the Company as a substitute Non-Managing Member without (i) the consent of the Initial Manager, (ii) such Transferee executing an assignment and assumption agreement in a form acceptable to the Initial Manager, and (iii) making all representations and warranties previously made by such Non-Managing Member under this Agreement, including the representations and warranties in <u>Section 5.02</u> and <u>Section 5.03</u>.

        (b)     Notwithstanding any other provision of this Agreement, no Transfer of the Interest of a Non-Managing Member shall be permitted until the Initial Manager shall have received, or waived receipt of (in whole or in part), an opinion of counsel (which counsel may be retained or employed by the Non-Managing Member so long as such counsel shall be reasonably acceptable to the Initial Manager) satisfactory to it that the effect of such Transfer would not:

        (i)     result in a violation of the Securities Act or the Exchange Act;

        (ii)     require the Company to register as an investment company under the Investment Company Act;

        (iii)     require the Company, a Manager, or any member, partner, equity holder, or employee of the foregoing to register as an investment adviser or an investment adviser representative under the Advisers Act or under state law;

        (iv)     result in a termination of the Company for federal income tax purposes;

        (v)     result in a violation of any law, rule, or regulation by the Non-Managing Member, the Company, a Manager or any member, partner, or employee of the foregoing;

        (vi)     increase the number of Non-Managing Members;

        (vii)     result in the assets of the Company being deemed "plan assets" (within the meaning of the DOL Regulation);

        (viii)     result in the Company being characterized as a "publicly traded partnership" (as defined in Section 7704(b) of the Code) or otherwise be characterized as other than a partnership for federal income tax purposes; or

        (ix)     result in a FOIA Person holding an Interest.

US_ACTIVE-163597142.3

(c)      Such legal opinion shall be provided to the Initial Manager by the transferring Non-Managing Member or the proposed Transferee (except that the opinion in Section 5.05(b)(ii), Section 5.05(b)(iii), Section 5.05(b)(iv), Section 5.05(b)(v), and Section 5.05(b)(vii) regarding the Company, the Initial Manager, and the members of the Initial Manager shall be rendered by counsel to the Company or the Initial Manager), and all reasonable costs associated with such opinion shall be borne by the transferring Non-Managing Member or the proposed Transferee. Any Transfer made in violation of this Agreement shall be null and void as against the Company, the other Members, the Transferee, and the transferor.

(d)      Notwithstanding any other provision of this Agreement to the contrary, without the consent of the Initial Manager, no Transfer of all or a portion of the Interest of a Non-Managing Member shall be permitted if (i) the Initial Manager determines that such Transfer will either cause the Company to be characterized as a "publicly traded partnership" (as defined in Section 7704(b) of the Code) or will materially increase the risk that the Company will be so characterized or (ii) such Transfer would occur in a transaction registered under the Securities Act. In the case of any Transfer, the Transferee shall not be admitted to the Company as a substitute Non-Managing Member without the consent of the Initial Manager. In particular and without limiting the foregoing, no Transfer shall be permitted, given effect or otherwise recognized, and such Transfer (or purported Transfer) shall be void ab initio, if at the time of such Transfer, the Interests are (or, by reason of such Transfer, would become) traded on an "established securities market" (within the meaning of Regulation Section 1.7704-1(b)) or are (or would become) "readily tradable on a secondary market or the equivalent thereof" (within the meaning of Regulation Section 1.7704-1(c)).

(e)      In the event of any Transfer that results in multiple ownership of a Non-Managing Member's Interest, the Initial Manager may require that one or more trustees or nominees be designated to represent all or a portion of the Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement and for the purpose of exercising all rights of the Transferees under this Agreement.

(f)      In the event a Non-Managing Member Transfers (or proposes to Transfer) all or any portion of its Interest, the Initial Manager may require that all reasonable legal and other out-of-pocket expenses incurred by the Company on account of the Transfer (or proposed Transfer) be paid by such Non-Managing Member, whether or not the Transfer is consummated; provided, however, that as of the effective date of any Transfer, the transferor and Transferee shall be jointly and severally liable for all such expenses. At the Initial Manager's election, the Company may seek reimbursement of such expenses through (i) a direct reimbursement by the Transferee or transferor either following the Transfer (or proposed effective date of the Transfer) or as of the Transfer as a condition precedent to the Initial Manager providing such required consent or (ii) withholding of distributions that otherwise would be made to the Transferee or the transferor. The Initial Manager may apply the amount of any such withheld distribution to satisfy all or any part of the transferor's or the Transferee's obligation (in which case such amounts shall be deemed to have been distributed to such Person and then paid by such Person in full or partial satisfaction of such obligations). In the event that any such distribution consists of Securities or other non-cash assets, the Initial Manager may, on behalf of the transferor or the Transferee, cause the Company to sell or otherwise liquidate such in-kind distribution upon such terms and conditions, and at such times, as the Initial Manager deems appropriate, and apply the proceeds of such sale or other liquidation, net of transaction fees and other expenses, to satisfy all or any part of such Person's obligation that are then due. All items of Net Profit or Net Loss generated from the holding or disposition of any such withheld distribution shall be allocated solely to the Capital Account of the transferor or the Transferee on whose behalf such amounts are held, and the corresponding items of taxable income, gain, loss and deduction

US_ACTIVE-163597142.3

shall, in accordance with <u>Section 4.03(e)</u> and to the maximum extent permitted under applicable law, be allocated solely to such Person.

(g)    Except as otherwise specifically provided in this Agreement or with the consent of the Initial Manager, all economic attributes of a transferor's Interest (such as Capital Contributions, Capital Account balance, and obligation to return distributions or make other payments to the Company attributable to such Interest) shall carry over to a Transferee in proportion to the percentage of the Interest so transferred.

(h)    Notwithstanding any other provision of this Agreement to the contrary, without the consent of the Initial Manager, a Transfer effected pursuant to this <u>Section 5.05</u> shall be recorded on the books of the Company and deemed to occur immediately following the last day of the Fiscal Quarter in which the Initial Manager received all appropriate executed documentation required or requested hereunder from both the transferor and Transferee, or such other date as the Initial Manager shall determine in its sole discretion.

Section 5.06    <u>Required Withdrawals of Non-Managing Members</u>

.

(a)    If the Initial Manager, in its sole discretion, determines that the continued participation of a Non-Managing Member is likely to, among other things, (i) require registration of the Interests under the Securities Act or any other securities laws applicable to the Company or the Interest to be Transferred; (ii) cause the Company to fail to qualify for an exemption from registration under the Investment Company Act; (iii) result in any material adverse consequences to the Company or its Non-Managing Members generally (including for any tax or regulatory purposes); or (iv) result in any violation of other applicable laws or regulations, the Initial Manager may terminate (in whole or in part) the Interest of such Non-Managing Member upon reasonable prior notice to such Non-Managing Member.

(b)    Without limiting the generality of the foregoing, the Initial Manager may, in its discretion, exclude or remove a Non-Managing Member from a particular Portfolio Investment for any of the reasons described in each of clauses (iii) and (iv) of <u>Section 5.06(a)</u> by effectuating such exclusion or removal through a partial termination of such Non-Managing Member's Interest. In addition, the Initial Manager may immediately terminate (in whole or in part) or cause the Transfer of the Interest of any Non-Managing Member for "cause" if the Non-Managing Member (i) engages in illegal conduct or gross misconduct which the Initial Manager determines could result in reputational harm to the Company, the Initial Manager, or its Affiliates; (ii) is convicted of, or pleads nolo contendere to, a felony or a serious misdemeanor, or (iii) illegally or fraudulently obtains funds which the Non-Managing Member seeks to invest.

(c)    Payments in respect of a termination of Interests effected pursuant to this Section 5.06 shall be made in accordance with <u>Section 4.04(g)(i)</u> or <u>Section 4.04(g)(ii)</u>, as the case may be, depending on the Subscription Date associated with the Interests being withdrawn; provided, however, that if mandatorily withdrawn Non-Managing Member is a Member of the Company for less than thirty (30) months at time of withdrawal, such Non-Managing Member will only receive any unreturned amount of such Non-Managing Member's Capital Contribution and may only receive distributions in accordance with <u>Section 4.04(g)(ii)</u> at the sole discretion of the Initial Manager. In the event of a termination of all of the

- 38 -

US_ACTIVE-163597142.3

Interest of a Non-Managing Member pursuant to this Section 5.06, such Non-Managing Member shall no longer be a Member of the Company.

Section 5.07  Death, Disability etc., of Non-Managing Members

. The withdrawal, death, disability, incapacity, incompetency, termination, Bankruptcy, insolvency, or dissolution of a Non-Managing Member shall not in and of itself dissolve the Company. The legal representatives of a Non-Managing Member shall succeed as assignee to the Non-Managing Member's Interest upon the death, disability, incapacity, incompetency, termination, Bankruptcy, insolvency, or dissolution of a Non-Managing Member, but shall not be admitted as a substitute Member without the consent of the Initial Manager, which consent may be given or withheld in its sole discretion. For the avoidance of doubt, any such legal representative assignee shall have the same rights of withdrawal as the Non-Managing Member would have had, but may not make an additional Capital Contributions without the consent of the Initial Manager, which consent may be withheld in its sole discretion. In the event of death, disability, incapacity, incompetency, termination, Bankruptcy, insolvency, or dissolution of a Non-Managing Member, the Non-Managing Member Interest of the Non-Managing Member shall continue at the risk of the Company's business until the effective date of the Non-Managing Member's withdrawal or the earlier termination of the Company.

Section 5.08  Method of Payment to Withdrawing Members

.

(a)  Subject to Section 5.08(b), payments to withdrawing Non-Managing Members pursuant to this ARTICLE V may be made in cash or in-kind and as otherwise determined by the Initial Manager in its sole discretion. Withdrawal payments in cash shall be made by wire transfer to the account specified for such Member in the records of the Company. Notwithstanding anything to the contrary contained in this Agreement, the Non-Managing Members understand and acknowledge that (i) the Company may make a distribution of any asset in-kind from the Company to any Non-Managing Member despite the fact that the percentage of the asset distributed to such Non-Managing Member exceeds such Non-Managing Member's pro rata share in distributions from the Company generally, and (ii) if the Initial Manager determines in its sole discretion that the Company does not have sufficient cash or in-kind assets to fully fund the distribution upon withdrawal payment to a Non-Managing Member, the Company may issue a subordinated note to a withdrawing Non-Managing Member on such terms as are reasonably agreed upon by the Initial Manager and the withdrawing Non-Managing Member.

(b)  If a Non-Managing Member is required to withdraw from the Company pursuant to Section 5.06(a) or Section 5.06(b), the Initial Manager, in its discretion, may withhold up to twenty percent (20%) of the amount payable to the withdrawing Non-Managing Member under Section 5.06(a) for adjustments which may be required by the Company for the Fiscal Year in which such withdrawal occurs. Any amounts withheld by the Initial Manager under this Section 5.08(b) will be distributed to the withdrawing Non-Managing Member within a reasonable period of time after delivery of the financial statements to the Non-Managing Members pursuant to Section 7.02 hereof for the Fiscal Year in which such Non-Managing Member withdrew from the Company.

US_ACTIVE-163597142.3

## ARTICLE VI
## TERMINATION AND DISSOLUTION OF THE COMPANY

Section 6.01        Termination

.  The existence of the Company commenced on the Certificate Filing Date and shall continue until the Company is dissolved and subsequently terminated, which dissolution shall occur upon the first of any of the following events (each an "Event of Dissolution"):

(a)        A determination made by the Initial Manager and the Common Members holding at least seventy-five percent (75%) of the Common Interests outstanding;

(b)        Termination of the Company pursuant to Section 3.07(e); or

(c)        The entry of a decree of judicial dissolution under Section 18-802 of the Act.

Section 6.02        Winding Up and Final Distribution

.

(a)        Upon the occurrence of an Event of Dissolution, the Company shall be wound up and liquidated.  The Initial Manager or, if the Initial Manager is no longer a manager of the Company and there is no other Manager, an entity controlled by a Principal or, if there is no such entity, a liquidator appointed by a Majority in Interest, shall proceed with the winding up of the affairs of the Company and shall make distributions out of Company Assets in the following manner and order:

(i)        To satisfy all creditors of the Company as required by the Act (including the payment of expenses of the winding up, liquidation, and the dissolution of the Company) including Members who are creditors of the Company, to the extent otherwise permitted by law, either by the payment thereof or the making of reasonable provision therefor (including the establishment of reserves, in amounts established by the Initial Manager, or, if the Initial Manager is no longer a manager of the Company and there is no other Manager, such entity controlled by a Principal or if there is no such entity, such liquidator); and

(ii)        The remaining proceeds, if any, plus any remaining Company Assets (including any Capital Account deficit restoration payments made by the Initial Manager pursuant to Section 6.03), shall be distributed to the Members in accordance with Section 4.04(d).  Distributions pursuant to this Section 6.02(a)(ii) shall be made by the end of the Fiscal Year during which the liquidation occurs (or, if later, within ninety (90) days after the date of such liquidation).

(b)        Notwithstanding the provisions of Section 4.03, if, after giving effect to all allocations of Net Profits and Net Losses under Section 4.03 for all periods (including the Fiscal Year during which the liquidation of the Company occurs), any Member's Capital Account is not equal to the amount to be distributed to such Member pursuant to Section 6.02(a)(ii), the Net Profits or Net Losses for the Fiscal Year in which the Company is liquidated are to be allocated among the Members in such a manner as to cause, to the nearest extent possible, each Member's Capital Account to be equal to the amount to be distributed to such Member pursuant to Section 6.02(a)(ii).

Section 6.03        No Restoration Obligation

- 40 -

US_ACTIVE-163597142.3

. No Member other than the Initial Manager shall have an obligation to restore a negative balance in its Capital Account.  The Initial Manager shall have an obligation to restore any negative Capital Account balance at the time of and in connection with any Event of Dissolution.

## ARTICLE VII
## REPORTS TO MEMBERS; MEETINGS; TAX MATTERS

Section 7.01    Reports to Current Members

.

(a)    The Company shall prepare and transmit to each Member an unaudited financial report setting forth as of the end of that Fiscal Year:

(i)    a balance sheet of the Company; and

(ii)    an income statement of the Company.

(b)    Each Non-Managing Member will receive unaudited statements of the Company's Net Asset Value quarterly.  Upon inquiry, Non-Managing Members may be given access to additional or more frequent information, at the discretion of the Initial Manager.  Additional information made available to any Non-Managing Member will be made available to each other Non-Managing Member making a similar request; provided, however, no information that is confidential or proprietary as to a Non-Managing Member shall be made available to any other Non-Managing Member.

(c)    The Non-Managing Members hereby acknowledge that pursuant to Section 18-305(g) of the Act, the rights of a Non-Managing Member to obtain information from the Company shall be limited to only those rights provided for in this Agreement, and that any other rights provided under Section 18-305(a) of the Act shall not be available to the Non-Managing Members or applicable to the Company.  Notwithstanding anything in this Agreement to the contrary, including any requirement to deliver financial statements or to allow the inspection of the Company's books, any information provided or disclosed to a Non-Managing Member may be adjusted, at the Initial Manager's discretion, such that the actual names and other identifying data that relate to the Company's current, past, or prospective Portfolio Investments need not be disclosed to the Non-Managing Members.

Section 7.02    Meetings of Members.

(a)    General. Non-Managing Members owning Non-Managing Member Interests representing a Company Percentage (as defined below) of at least twenty percent (20%) may call a meeting of the Members (including NRIA) for the sole purpose of considering whether to remove NRIA as a Manager of the Company pursuant to Section 3.07 (such meeting is referred to herein as a "Member Meeting").  Member Meetings that have been called in accordance with the foregoing can be held at any place within or outside Delaware, or by remote communication, as mutually consented to by the Non-Managing Member(s) that called such Member Meeting and the Initial Manager (which consent shall not be withheld by the parties thereto).  Members (including NRIA) are permitted to participate in a Member Meeting by means of telephone communications, video conference, or similar communications equipment by means of which all individuals participating in such Member Meeting can hear each other at the same time (and participation by such means constitutes presence in person at any such Member Meeting).

- 41 -

(b)    <u>Notice</u>.  For a Member Meeting to be duly convened, notice of the time and place of such Member Meeting must be given at least ten (10) days prior to such Member Meeting pursuant to either oral or written notice to all Non-Managing Members entitled to vote on any of the matters with respect to which such Member Meeting is called (if such Member Meeting is to be held in person) or at least forty-eight (48) hours prior to such Member Meeting pursuant to oral or written notice to all Non-Managing Members entitled to vote on any of the matters with respect to which such Member Meeting is called (if such Member Meeting is to be held by telephone communications, video conference, or similar communications equipment), or (in either case) upon such shorter notice as is approved by all Non-Managing Members entitled to vote on any of the issues for which such Member Meeting is called.  NRIA shall be provided with any Member Meeting notice at the same time such notice is provided to the Non-Managing Members entitled to vote on any of the matters with respect to which such Member Meeting. The business to be transacted at, or the purpose of, a Member Meeting must be specified in the notice of such Member Meeting or waiver of notice thereof.  If the approval of any of the matters with respect to which such Member Meeting is called requires approval or consent of specific Members or Members holding a particular class, series, or type of interests of the Company, then, in order for action with respect to such matter to be duly taken at such Member Meeting, such Members must have received notice of such Member Meeting in the same manner as provided in this <u>Section 7.02(b)</u> or must have waived such notice (or been deemed to have waived such notice under <u>Section 7.02(c)</u>).

(c)    <u>Waiver of Notice</u>.  Attendance by a Member at a Member Meeting will thereby constitute such Member's waiver of notice of such Member Meeting, unless such Member attends such Member Meeting for the express purpose of objecting, and does so object at the beginning of such Member Meeting, to the transaction of any business at such Member Meeting on the ground that such Member Meeting was not duly called or convened.

(d)    <u>Adjourned and Rescheduled Meetings</u>.  If a Quorum (defined to mean the presence at a Member Meeting of the Non-Managing Members holding Non-Managing Member Interests that represent an aggregate Company Percentage more than half of the aggregate Non-Managing Member Interests at the time such Member Meeting is called) is not present at a duly called Member Meeting, then the Non-Managing Members present at such Member Meeting are permitted to adjourn the Member Meeting until a Quorum is present.  Non-Managing Members entitled to vote on any of the issues for which a Member Meeting is called that are not present at such Member Meeting that has been adjourned and rescheduled must be given notice of the rescheduled Member Meeting in accordance with <u>Section 7.02(b)</u> or must have waived such notice (or been deemed to have waived such notice under <u>Section 7.02(c)</u>).

(e)    <u>Voting</u>.  Each Non-Managing Member holding Non-Managing Member Interests is entitled to vote that Company Percentage corresponding to such Non-Managing Member Interests in respect of all matters to be voted on by the Non-Managing Members.  If a Quorum is present (either in person or by proxy) at a Member Meeting called in accordance with the terms hereof, then, with respect to a matter submitted for action at such Member Meeting, the approval of the requisite Company Percentages will be the act of the Non-Managing Members with respect to such matter.  For purposes of the foregoing, "<u>Company Percentage</u>" shall mean, with respect to any Non-Managing Member, a fraction, expressed as a percentage, determined by dividing (i) such Non-Managing Member's Non-Managing Member Interests by (ii) all of the Non-Managing Members' Non-Managing Member Interests.  The sum of the foregoing Non-Managing Members' Company Percentages shall be one hundred percent (100%).  The aggregate Company Percentage of the foregoing Non-Managing Members as a group shall be the sum of the Company Percentages of each of such Non-Managing Members.

US_ACTIVE-163597142.3

(f)    Action By Written Consent.  The Non-Managing Members are permitted to take any action without a Member Meeting if Non-Managing Members, the affirmative votes or consents of which would be sufficient in order to approve such action at a duly held Member Meeting at which all Non-Managing Members entitled to vote or consent on such action were present and voted or consented, consent thereto in writing (or by electronic transmission) to the adoption of a resolution authorizing such action.  The resolution and the written consents thereto by the Non-Managing Members are to be filed with the minutes of the proceedings of the Members. The Company shall provide notice of the taking or approval of action without a Member Meeting by less than unanimous written consent of the Non-Managing Members entitled to vote or consent on such action (promptly after such written consent has been filed with the minutes of the proceedings of the Members) to those Non-Managing Members that have not consented thereto in writing and that, if such action had been taken at a Member Meeting, would have been entitled to notice of the Member Meeting if the record date for such Member Meeting had been the date on which a sufficient number of Non-Managing Members to take such action have signed such written consent.

Section 7.03    Tax Matters

.

(a)    Tax Matters Member; Company Representative; Tax Audits.

(i)    The Initial Manager is hereby designated as the Tax Matters Member.  The Tax Matters Member is authorized and required to represent the Company in connection with all tax audits, examinations, and investigations of the affairs of the Company by any federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith.

(ii)    As of the effective date of the Bipartisan Budget Act, the Initial Manager is designated as the Company Representative, who shall have sole authority to act on behalf of the Company with respect to any audit, controversy, refund action, or other matter (subject to the provisions of the Bipartisan Budget Act).  The Initial Manager, in its capacity as the Company Representative, shall have the authority to take all action and make all decisions and elections required by the Bipartisan Budget Act.

(iii)    All expenses incurred in connection with any tax audit, examination, or investigation of the Company shall be borne by the Company.  The Initial Manager, in its capacity as the Tax Matters Member or the Company Representative, as applicable, shall keep all Members reasonably informed of the progress of any such examination, audit, or other proceeding. Each Member agrees to cooperate with the Tax Matters Member or the Company Representative, as applicable, and to do or refrain from doing any and all things reasonably required by the Tax Matters Member or the Company Representative, as applicable, in connection with the conduct of such proceedings.

(b)    Tax Returns; Information Returns to Members. The Company shall prepare and timely file, or cause the accountants of the Company to prepare and timely file, all federal, state, and local income tax returns or other returns or statements required by applicable law. Subject to Section 7.03(c), the Company shall, to the extent permitted by applicable law, elect (or refrain from electing) any income or

- 43 -

other tax elections or otherwise take such tax positions as the Initial Manager, in its sole discretion, determines necessary or advisable.  The Non-Managing Members shall not take any position on their individual tax returns inconsistent with the reporting of tax items on the Company's tax return.  The Company shall use commercially reasonable efforts to provide (or cause to be provided) to each Member and, to the extent necessary, to each former Member (or its legal representatives), by April 15th of the calendar year immediately following the end of each Fiscal Year, or as soon as practicable thereafter, Internal Revenue Service Schedule K-1 with respect to such Fiscal Year (or substantially similar report setting forth in sufficient detail information which shall enable such Member or former Member (or its legal representatives) to prepare its federal income tax returns).

(c)      Partnership Status for Income Tax Purposes.  The Members intend that the Company shall be treated as a partnership for federal, state, and local income tax purposes, and the Company shall not elect, and a Manager shall not permit the Company to elect, to be treated as an association taxable as a corporation for federal, state, or local income tax purposes under Regulations Section 301.7701-3 or under any corresponding provision of state or local law.  Each Member and the Company shall file all tax returns consistent with such treatment.

(d)      Tax Indemnification.  Notwithstanding anything to the contrary herein, if the Company becomes subject to any tax as a result of any adjustment to taxable income, gain, loss, deduction or credit for any taxable year of the Company (pursuant to a tax audit or otherwise), each Non-Managing Member (and each former Non-Managing Member) shall indemnify the Company and each Manager against any such taxes (including any interest and penalties) to the extent such tax (or portion thereof) is properly attributable to such Non-Managing Member (or former Non-Managing Member).  In such event, the Initial Manager, at its option, may (i) require such Non-Managing Member (or former Non-Managing Member) to reimburse the Company for the amount of such tax (including interest and penalties) properly attributable to such Non-Managing Member (or former Non-Managing Member) or (ii) reduce any subsequent distributions to such Non-Managing Member by the amount of such tax (including interest and penalties) properly attributable to such Non-Managing Member (it being understood, for the avoidance of doubt, that the amount of such reduction shall be deemed to have been distributed to such Non-Managing Member for all purposes of this Agreement (and such Non-Managing Member's Capital Account shall be reduced by such amount)).  In the event of any claimed over-assessment of tax against a Non-Managing Member (or former Non-Managing Member), such Non-Managing Member (or former Non-Managing Member) shall be limited to an action against the applicable jurisdiction and not against the Company or any Manager.  A Manager, on behalf of the Company, may take any action permitted under applicable law to avoid the assessment of any such taxes against the Company (including, without limitation, an election to issue adjusted Schedule K-1s to the Non-Managing Members (and/or former Non-Managing Members) which takes such adjustments to taxable income, gain, loss, deduction or credit into account.

Section 7.04      Confidentiality

.

(a)      In connection with the organization of the Company and its ongoing business, the Non-Managing Members may receive or have access to confidential information concerning the Company, including, without limitation, information relating to portfolio positions, valuations, information regarding potential investments, financial information, and trade secrets (the "Confidential Information"), which is non-public and may be proprietary in nature.  No Non-Managing Member, nor any Affiliate, legal representative, or tax, legal, or other advisor of any Non-Managing Member, shall disclose or cause to be

US_ACTIVE-163597142.3

disclosed any Confidential Information to any Person nor use any Confidential Information for its own purposes or its own account, except (i) to its employees, officers, directors, and advisors, in each case who agree to keep such information confidential, in connection with monitoring its investment in the Company and (ii) as otherwise required by any regulatory authority, law or regulation, or by legal process. Without limitation of the foregoing, each Non-Managing Member acknowledges that notices and reports to Non-Managing Members hereunder may contain material non-public information concerning, among other things, the Company Assets and the Company's investment strategy (as more fully described in the relevant Memorandum) in relation thereto and agrees not to use such information other than in connection with monitoring its investment in the Company and each Non-Managing Member, personally and on behalf of its Affiliates, legal representatives, and tax, legal and other investment managers agrees in that regard not to trade in securities on the basis of any such information. Notwithstanding the foregoing or anything to the contrary in this Agreement, or in any document relating to the Company which prohibits any Member from disclosing any Confidential Information regarding the Company, each Member may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Member relating to such tax treatment and tax structure. The preceding sentence is intended to cause the interest in the Company not to be treated as having been offered under conditions of confidentiality for purposes of Treasury Regulations Sections 1.6011-4(b)(3) and 301.6111-2(a)(2)(ii) (or any successor provisions) and shall be construed in a manner consistent with such purpose.

(b)      To the extent that the Initial Manager determines in good faith that there is a reasonable likelihood that as a result of the Freedom of Information Act, 5 U.S.C. § 552, ("FOIA"), any U.S. state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement, a Non-Managing Member or any of its Affiliates may be required to disclose information relating to the Company, its Affiliates, and/or any Company Assets, such Non-Managing Member hereby agrees to use commercially reasonable efforts to notify the Initial Manager promptly in writing of any such potential disclosure and to take commercially reasonable steps to oppose and present the requested disclosure unless (i) a court order to disclose such information has been issued by a court of competent jurisdiction or such Non-Managing Member is advised by counsel (which, in the case of a Non-Managing Member that is an institutional investor, may be staff counsel regularly employed by such institutional investor) that there exists no reasonable basis on which to oppose such disclosure or (ii) such disclosure relates solely to fund-level, aggregate performance information (i.e., aggregate cash flows, the name of the Company, the year of formation of the Company, such Non-Managing Member's own Capital Contributions, the date the investment was made by such Non-Managing Member, the amount of such Non-Managing Member's cash drawn by the Company, the amount of cash returned to such Non-Managing Member by the Company, the market value of such Non-Managing Member's investment in the Company, and the net internal rate of return and the resulting investment multiple of such Non-Managing Member's investment in the Company) and does not include (A) any information relating to individual Company Assets, (B) copies of this Agreement and related documents, or (C) any other information not referred to in clause (ii) above, or any other information which the Initial Manager determines in good faith is confidential, proprietary, or should not be disclosed absent compulsion of legal process.

(c)      In order to preserve the confidentiality, and to prevent the disclosure by a Non-Managing Member, which disclosure the Initial Manager determines in good faith is reasonably likely to occur, of certain information disseminated by the Initial Manager or the Company under this Agreement, including, but not limited to, quarterly, annual, and other reports (other than Internal Revenue Service

US_ACTIVE-163597142.3

Schedule K-1s) and information provided at the Company's informational meetings, the Initial Manager may (i) provide any of the foregoing information to such Non-Managing Member by means of access on the Company's website in password protected, non-downloadable, non-printable format, (ii) require such Non-Managing Member to return any copies of any of the foregoing information provided to it by the Initial Manager or the Company to the extent that such Non-Managing Member is permitted to do so under applicable law, (iii) provide to such Non-Managing Member access to any of the foregoing information only at the Company's (or its counsel's) office, or (iv) withhold all or any part of the foregoing information otherwise to be provided to such Non-Managing Member (other than the Internal Revenue Service Schedule K-1s); provided, that the Initial Manager shall not withhold any information pursuant to this clause (iv) if a Non-Managing Member confirms in writing to the Initial Manager that compliance with the procedures provided for in clauses (i), (ii), or (iii) above or other means mutually agreeable to the Initial Manager and the relevant Non-Managing Member would be legally sufficient to prevent such potential disclosure.

(d)    Any obligation of a Non-Managing Member pursuant to this Section 7.04 may be waived by the Initial Manager in its sole discretion.

## ARTICLE VIII
## EXPENSES

Section 8.01    Expenses

.

(a)    Organizational Expenses.  The Company has paid all costs and expenses incurred in connection with the organization of the Company and the offering of Interests (which, without limitation, include the Preferred Interests) including, without limitation, any related legal, accounting, consulting, filing, and start-up costs (collectively, the "Organizational Expenses"). The Company has also paid all of the Organizational Expenses of the Initial Manager.

(b)    The Company shall be responsible for all operating expenses attributable to the Company and the Managers (such expenses, "Operating Expenses"), including, but not limited to, the following expenses incurred by, or allocable to, the Company and the Managers:

(i)    support administrative and operating expenses, working capital requirements, and other expenses related to general corporate purposes (for the avoidance of doubt, this clause (i) includes, without limitation, expenses attributable to (A) compensation (e.g., salaries, benefits, etc.) paid to the Managers' officers (which include the Principals), employees, and/or independent contractors and distributions made to members of the Managers and (B) one or more leases associated with the Managers' offices;

(ii)    offering expenses of the Interests, including, without limitation, (A) marketing and advertising expenses and (B) expenses attributable to compliance with all relevant laws and regulations (including, without limitation, those laws and regulations related to private placement, lobbying law, and distribution rules in the U.S. and other foreign jurisdictions and compliance with anti-money laundering laws and know-your-customer requirements (including related software and license costs));

- 46 -

US_ACTIVE-163597142.3

(iii)    expenses incurred by the Company, the Managers, or their Affiliates, in connection with the Company's investments (whether or not consummated), including, without limitation, brokerage commissions; transaction costs; ticket charges; clearing and settlement charges; custodial fees; expenses related to and any vehicle (e.g., Real Estate Asset LLCs and Operating LLCs) through which the Company may hold Portfolio Investments (e.g., Properties), which expenses include, but not limited to, a fee paid to NRIA by a Real Estate Asset LLC of up to 3.0% of the total costs of the project corresponding to the Property(ies) associated with such Real Estate Asset LLC for acquisition and due diligence services provided by NRIA to such Real Estate Asset LLC with respect to such Property(ies) (e.g, ground cost, entitlements, financing fees, carrying costs, construction costs etc.); the management, operation, development, improvement, financing, and disposition of the Portfolio Investments; and the fees and costs of any independent consultant engaged in connection with the valuation of Portfolio Investments or other Company Assets or liabilities;

(iv)    interest on and fees and expenses arising out of all Leverage, including, but not limited to, expenses associated with the arrangement thereof and other financing charges (including initial and variation margin);

(v)    all fees and expenses associated with the Company's investment in one or more pooled investment vehicles, including, but not limited to, the management fees and/or performance allocations/ fees charged by such pooled investment vehicles;

(vi)    other expenses incurred in connection with the ongoing operations of the Company and the Managers, including costs relating to communications with Members (including printing, mailing, investor web portal, and other costs of information dissemination); fees charged by third-party fund administrator, if any (including for certain information technology services and middle-office trade support services, as well as for accounting, reporting, tax, compliance, and audit services and software); third-party accounting, tax compliance, and related expenses (including expenses incurred in connection with any audit of the Company and the Managers, any "surprise" audit, tax filings, preparation of tax information, and audits) and costs of valuation and pricing services;

(vii)    third-party legal and compliance fees and related expenses, including fees and expenses related to (A) filings, documents, and registrations relating to the Company and the Managers with the SEC and/or other foreign or domestic regulators (including the Form PF, if relevant), and short and long exposure and/or ownership filings with U.S. and foreign regulators; (B) compliance by the Company and the Managers with U.S. federal, state, local, non-U.S., and other laws and regulations (including, but not limited to, securities laws, the U.S. Employee Retirement Income Security Act of 1974, as amended, Department of Labor and SEC rules and regulations), (C) side letters between the Company with Members and compliance therewith, and (D) agreements related to products and/or services for the benefit of the Company and the Managers and compliance therewith;

(viii)    expenses of the Company and the Managers relating to litigation and threatened litigation, if any, and expenses related to legal inquiries (formal and informal), including regulatory "sweeps";

US_ACTIVE-163597142.3

(ix)     insurance premiums paid by the Company, the Managers, and/or their officers, principals, and partners with regard to losses, claims, damages, liabilities, and expenses that would otherwise be indemnification expenses;

(x)     indemnification expenses; provided, for the avoidance of doubt, that any such expenses being paid or reimbursed as the result of a request for indemnification pursuant to the terms of the Operating Agreement will be subject to the terms of such indemnification;

(xi)     registered office, corporate licensing, corporate secretarial, and other similar expenses of the Company and the Managers;

(xii)     taxes and other governmental charges that may be payable by the Company and that are not attributable to any Member (e.g., sales and transfer taxes);

(xiii)     expenses related to proxy voting research, reporting, execution, and recordkeeping services;

(xiv)     fees and expenses associated with the preparation of amendments and revisions to the offering memoranda (e.g., the Memorandum), the Operating Agreement, and subscription agreements of the Company and the solicitation of consent to such amendments;

(xv)     fees and expenses associated with any transfer of Interests, including with respect to transfer documentation and legal and tax analysis;

(xvi)     meeting expenses for any meetings of the Members;

(xvii)     expenses incurred in connection with liquidating the Company;

(xviii)   extraordinary expenses; and other similar expenses, all as the Initial Manager determines in its sole discretion and in each case, whether performed by internal staff and/or Affiliates of the Managers and/or their respective Affiliates and/or by third parties.

(c)     The Initial Manager may withhold on a pro rata basis from any distributions amounts necessary to create, in its sole discretion, appropriate reserves for expenses and liabilities (including adequate provisions for Operating Expenses and liabilities which the Initial Manager believes may arise), as provided for in Section 4.06.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01     Waiver of Partition/Action for Accounting

.  Except as may be otherwise required by law, each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition or for an accounting or for similar action of any of the Company Assets.

Section 9.02     Counterparts

US_ACTIVE-163597142.3

. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or other electronic transmission (including, without limitation, exchange of PDFs by electronic mail) shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of a party hereto transmitted by facsimile or other electronic means shall be deemed to be its original signature for all purposes.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

Section 9.03    Further Assurance

. Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

Section 9.04    Remedies Cumulative

. Subject to Section 3.06, remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Manager or Member may be lawfully entitled.

Section 9.05    Parties in Interest

. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and the Managers, and their respective successors and assigns, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third party Person to any party to this Agreement, nor shall any provision give any third party Person any right of subrogation or action over or against any party to this Agreement.

Section 9.06    Amendments to the Operating Agreement

.

(a)    All amendments to this Agreement, and each amendment or waiver of any provision of this Agreement, must be in writing and approved by the Initial Manager; provided, however, that any proposed amendment that would materially adversely affect (i) a particular class or series of Members or Membership Interests disproportionately (relative to its effects on Members holding any other class and/or series of Membership Interest), shall also require the prior written consent of such Members, or Members holding a majority interests of the class and/or series of Membership Interest, so affected, or (ii) a particular Member disproportionately (relative to its effects on other Members holding the same class and/or series of Membership Interest), or that purport to change the class and/or series of the Membership Interest held by such Member, shall also require the prior written consent of the Member so affected.  Any amendments approved in accordance with this Section 9.06 shall be binding upon the Company and all Members.

(b)    Each Non-Managing Member is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Company without its consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Company is taken by a Manager in the manner contemplated by this

- 49 -

US_ACTIVE-163597142.3

Agreement, each Non-Managing Member agrees that, notwithstanding any objection which such Non-Managing Member may assert with respect to such action, such Manager may exercise its authority granted herein in any manner which may be necessary or appropriate to permit such amendment to be made or action lawfully taken or omitted.

Section 9.07    Governing Law

. Notwithstanding the locations where this Agreement may be executed by any of the parties, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or as may be hereafter amended shall govern the Company aspects of this Agreement.

Section 9.08    Jurisdiction and Venue

. The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of New Jersey or of the United States of America located in the State of New Jersey.

Section 9.09    Waivers

. The failure of any party hereto to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 9.10    Exhibits and Schedules

. All exhibits and schedules referred to in this Agreement and attached hereto are incorporated herein by reference.

Section 9.11    Determination of Matters Not Provided for in this Agreement

. The Initial Manager shall decide any and all questions arising with respect to the Company and this Agreement, which are not specifically or expressly provided for in this Agreement.

Section 9.12    Notices

. Each notice or report relating to this Agreement shall be in writing and delivered (a) in person, by registered or certified mail or by private courier, (b) by facsimile, or (c) by electronic mail, unless a Non-Managing Member has elected in its Subscription Agreement not to receive notices, reports, or other information by electronic mail. All notices to the Company shall be addressed to its office and principal place of business. All notices addressed to a Member or a Principal shall be addressed to such Member or Principal, as applicable, at the address set forth in the records of the Company. Any Member may designate a new address by written notice to that effect given to the Company. Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be deemed duly given and received when delivered personally, when transmitted by electronic mail or by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed

US_ACTIVE-163597142.3

by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth in the Company's records.

Section 9.13    Power of Attorney

. By signing this Agreement, each Non-Managing Member irrevocably designates and appoints the Initial Manager its true and lawful attorney, in its name, place and stead to make, execute, sign, and file any agreements, instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the State of Delaware, the State of New Jersey, or any other state or other jurisdiction. In no event shall the Initial Manager be deemed to have the authority under this Section 9.13 to take any action that would result in any Non-Managing Member losing the limitation on liability afforded by Section 2.08. The power of attorney granted pursuant to this Section 9.13 is coupled with an interest, shall extend to each Non-Managing Member's successors, assigns, and legal representatives and shall not be revoked by the Bankruptcy, Incompetency, death, disability, dissolution, termination, or other event of legal incapacity of the granting Non-Managing Member. If specifically requested by a Non-Managing Member, the Initial Manager may vote such Non-Managing Member's Interest in the Initial Manager's discretion.

Section 9.14    Anti-Money Laundering Compliance

.

(a)    Each Non-Managing Member hereby acknowledges that the Company seeks to comply with all applicable laws concerning money laundering, terrorist financing, and similar activities. In furtherance of such efforts, such Non-Managing Member hereby represents and agrees that, to the best of such Non-Managing Member's knowledge based upon appropriate diligence and investigation: (i) none of the cash or property that is paid or contributed to the Company by such Non-Managing Member shall be derived from, or related to, any activity that is deemed criminal under U.S. law; and (ii) no contribution or payment to the Company by such Non-Managing Member shall (to the extent that such matters are within such Non-Managing Member's control) cause the Company or a Manager to be in violation of the U.S. Bank Secrecy Act, the U.S. Money Laundering Control Act of 1986, or the U.S. International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001. Each Non-Managing Member shall promptly notify the Initial Manager if any of the foregoing shall cease to be true and accurate with respect to such Non-Managing Member.

(b)    Each Non-Managing Member hereby agrees to provide to any Manager any additional information regarding such Non-Managing Member deemed necessary or convenient by such Manager to ensure compliance with all applicable laws concerning money laundering and similar illicit activities. Each Non-Managing Member understands and agrees that the Company or a Manager may release confidential information about such Non-Managing Member and, if applicable, any underlying beneficial owners, to proper authorities if such Manager determines that it is in the best interests of the Company or its Affiliates in light of relevant rules and regulations under the laws set forth above.

(c)    Each Non-Managing Member understands and agrees that, if at any time it is discovered that any of the foregoing representations are incorrect, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the Initial Manager may undertake appropriate actions to ensure compliance with applicable law or regulation, including segregation or withdrawal of such Non-Managing Member's investment in the Company, cessation of further

US_ACTIVE-163597142.3

distributions to such Non-Managing Member, refusal of future Capital Contributions by such Non-Managing Member, and other similar acts. In the event that the Initial Manager takes any of the foregoing acts, each Non-Managing Member agrees that the Initial Manager may manage the remaining portion of such Non-Managing Member's investment in the Company separate and apart from the Company Assets, including selling or otherwise disposing of such assets and reinvesting the proceeds therefrom. The rights and obligations of the Initial Manager under this <u>Section 9.14</u> shall expressly supersede any duties that the Initial Manager may have to such Non-Managing Member under the Act or otherwise.

(d)    In addition to any remedies at law or in equity, each Non-Managing Member severally agrees to indemnify and hold harmless the Company, each Manager and its Affiliates, and each other Non-Managing Member from and against any and all losses, liabilities, damages, penalties, costs, fees, and expenses (including legal fees and disbursements) which may result, directly or indirectly, from any acts taken by such Manager in accordance with this <u>Section 9.14</u>.

Section 9.15    <u>Goodwill</u>

. No value shall be placed on the name or goodwill of the Company, which shall belong exclusively to the Initial Manager.

Section 9.16    <u>Publicly Traded Partnership</u>

. The Company shall comply with the requirements of Section 7704 of the Code (as the same may be amended, supplemented or otherwise modified from time to time) in order to avoid status as a "publicly traded partnership" (as defined in Section 7704(b) of the Code).

Section 9.17    <u>Entire Agreement</u>

. This Agreement constitutes the entire contract among the parties hereto relative to the subject matter hereof and supersedes all prior term sheets, discussions, negotiations, and agreements, written or oral, with respect thereto. Notwithstanding the provisions of this Agreement or of any Subscription Agreement, it is hereby acknowledged and agreed that the Initial Manager on its own behalf or on behalf of the Company without any further act, approval or vote of any Non-Managing Member or any other Person may enter into a side letter or similar agreement (a "<u>Side Letter</u>") with a Non-Managing Member which has the effect of establishing rights under, or altering, or supplementing the terms hereof or of any Subscription Agreement. The parties hereto agree that any terms contained in a Side Letter to or with a Non-Managing Member shall govern with respect to such Non-Managing Member (but not with respect to any of such Non-Managing Member's assignees or transferees unless so specified in such Side Letter) notwithstanding the provisions of this Agreement or of any Subscription Agreement.

Section 9.18    <u>Severability</u>

. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

Section 9.19    <u>Binding Effect</u>

US_ACTIVE-163597142.3

. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Section 9.20    Counsel to the Initial Manager

. Reed Smith LLP ("Reed Smith") will act as counsel to the Initial Manager and its Affiliates in connection with the offering of the Interests.  In connection with this offering of Interests and operations of the Company, the Initial Manager and its Affiliates, Reed Smith will not be representing the Non-Managing Members.  No independent counsel has been retained to represent the Non-Managing Members.  Each Non-Managing Member acknowledges that Reed Smith does not represent any Non-Managing Member in the absence of a clear and explicit agreement to such effect between the Non-Managing Member and Reed Smith (and that only to the extent specifically set forth in that agreement), and that in the absence of any such agreement, Reed Smith shall owe no duties directly to a Non-Managing Member.  Each Non-Managing Member further acknowledges that, whether or not Reed Smith has in the past represented such Non-Managing Member with respect to other matters, Reed Smith has not represented the interests of any Non-Managing Member in the preparation and negotiation of this Agreement.    Reed Smith's representations of the Initial Manager and its Affiliates are limited to those specific matters upon which it has been consulted.  There may exist other matters that would have a bearing on any of them upon which Reed Smith has not been consulted.  Reed Smith does not undertake to monitor compliance with the investment program, valuation procedures, and other guidelines set out herein, nor does it monitor compliance with applicable laws.  Additionally, Reed Smith relies upon information furnished to it by the Initial Manager and does not investigate or verify the accuracy and completeness of information set out herein concerning the Company, the Initial Manager and its Affiliates, or other service providers and their affiliates and personnel.

Section 9.21    Use of Name

. Subject to the terms of this Agreement, for the duration of the Term, Rey Grabato (the "Licensor") hereby grants to the Company, under any rights owned or controlled by the Licensor, a non-exclusive, non-transferable, non-sublicensable royalty-free license to use the marks "National Realty Investment Advisors," "NRIA," and derivations thereof (collectively, the "Marks") as part of the Company's name and in connection with the general operation of the Company using that name.  The Members acknowledge that the Licensor shall have the right to terminate the foregoing license at any time upon written notice, and that the Company shall cease all use of the Marks upon receipt of such notice of termination whether or not the Licensor has any rights in the Marks.  The Licensor retains all rights, title, and interest in the Marks.  All goodwill from the Company's use of the Marks shall accrue to the Licensor, and at no time during the continuation or upon dissolution of the Company shall any value be placed on the Company name, or the right to its use, or the goodwill, if any, attached thereto for any purposes, nor shall such name or the right to its use be considered an asset of the Company.  The Members agree not to challenge the Licensor's rights in any of the Marks.  The Company shall comply with all standards and conditions maintained by the Licensor in connection with all use of the Marks by the Company.  All usage of the Marks by the Company shall include the appropriate trademark or service mark symbol as directed by the Licensor from time to time.  The Licensor shall have the sole right, but not the obligation, to file in the appropriate government or other applicable offices of each country in the world, at its own expense, trademark and service mark and domain name applications for the Marks or any marks confusingly similar to the Marks.  No Member shall, by virtue of its ownership of an Interest, hold any right, title or interest in

US_ACTIVE-163597142.3

or to the Marks.  Upon termination of the Company or the foregoing license for any reason, the Company shall have no right to use any of the Marks in any manner and shall immediately cease all use of the Marks.

Section 9.22    General Usage

. The titles and subtitles used in this Agreement are for convenience only and shall not be considered in the meaning or interpretation of this Agreement.  Except where the context clearly requires to the contrary or is otherwise stated: (i) all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement, and all references in this Agreement to designated "Articles" are to the designated Articles and other subdivisions of this Agreement; (ii) all pronouns contained in this Agreement, and any variations thereof, shall be deemed to refer to the masculine, feminine, or neutral, singular or plural, as applicable, as to the identity of any party may require; (iii) the word "or" shall not be applied in its exclusive sense; (iv) the words "include," and "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (v) the words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (vi) as used in this Agreement, the terms "former Non-Managing Members" and "former Managers" refer to the Persons that from time to time cease to be Non-Managing Members or Managers, as the case may be, under this Agreement; (vii) references to laws, regulations and other governmental rules, as well as to contracts, agreements, and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (viii) references to "cash," "$," or "dollars" shall mean the lawful currency of the U.S.; (ix) references to "Federal" or "federal" shall be to laws, agencies, or other attributes of the U.S. or other relevant national government (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the U.S.; (xi) references to "days" shall mean calendar days, as determined by reference to local time in Greenville, South Carolina; (xii) references to times of day shall be determined by reference to local time in Greenville, South Carolina; (xiii) the definitions of defined terms referenced in this Agreement shall apply equally to both the singular and plural forms of such terms; (xix) for purposes of the Act, the Non-Managing Members shall constitute a single class or group of non-managing members; (xv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages; and (xvi) except as expressly provided in this Agreement, any references to a Manager's discretionary election, determination, granting or withholding of consent, or other similar action or non-action shall mean that such election, determination, granting or withholding of consent, or other similar action or non-action is subject to the sole and absolute discretion of such Manager and shall not be subject to challenge by any Non-Managing Member, provided that such Manager acts in good faith.

Section 9.23    Recitals and Exhibit(s) Incorporated

. The recitals hereof and the Exhibits annexed hereto, if any, are hereby incorporated by reference into this Agreement, with the same force and effect as if the same were fully set forth herein.

[signature page follows]

US_ACTIVE-163597142.3

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the day and year first above written.

**MANAGER:**

National Realty Investment Advisors, LLC,
a Delaware limited liability company

By: _____
    Rey Grabato
    Chief Executive Officer


**NON-MANAGING MEMBERS:**

Each Non-Managing Member, each acting by and through
its duly authorized and empowered attorney-in-fact.

By:    National Realty Investment Advisors, LLC, attorney-in-fact

       (See signature of each Non-Managing Member
       in the Subscription Agreements)