**ICE MILLER LLP**
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Nathan D. Basalyga, Esq. (admitted *pro hac vice*)
1500 Broadway, Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com
nathan.basalyga@icemiller.com

*Counsel to AIRN Liquidation Trust Co., LLC in its capacity as Liquidation Trustee of the AIRN Liquidation Trust*

**ICE MILLER LLP**
George A. Gasper, Esq. (admitted *pro hac vice*)
One American Square, Suite 2900
Indianapolis, IN 46282
Phone: 317-236-2100
george.gasper@icemiller.com

Jeremy Grayem (admitted *pro hac vice*)
250 West Street, Suite 700
Columbus, OH 43215
Phone: 614-462-2700
jeremy.grayem@icemiller.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS) |
| In re:<br><br>AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>BLOOMBERG L.P.,<br><br>Defendant. | Adv. Pro. No. 26- ____________ (JKS) |

## **COMPLAINT**

AIRN Liquidation Trust Co., LLC ("Plaintiff"), in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Case No. 22-14539, Docket No. 3256] (as amended and supplemented, the "Plan")[1] and the order confirming same [Case No. 22-14539, Docket No. 3599] (the "Confirmation Order"), which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined in the Plan) and, to the extent applicable, has been appointed as the representative of the Contributing Investors identified in the Contributing Investors Schedule,[2] by and through its undersigned counsel, brings this complaint (this "Complaint") against Bloomberg L.P. ("Bloomberg"), and hereby alleges as follows:

## **NATURE OF THE COMPLAINT[3]**

1. This action arises out of a massive, multi-year fraud orchestrated by Thomas Nicholas Salzano, a/k/a Nick Salzano ("Salzano"), Rey E. Grabato II ("Grabato") and other co-conspirators (the "Insiders") who operated Debtor National Realty Investment Advisors, LLC and its affiliated entities (collectively "NRIA" or the "Debtors") as a Ponzi scheme. While holding itself out as a real estate development firm that also engaged in fund management services, NRIA induced its investors (collectively, the "Investor(s)") to invest by falsely promising extraordinarily

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.
[2] The Contributing Investor Schedule is accessible on the case website maintained by Omni Agent Solutions, Inc., the claims and noticing agent at: https://casedocs.omniagentsolutions.com/cmsvol2/pub_47446/6bab6e5e-57b0-4d2c-adf4-9e68b7ed24a5_List_of_Contributing_Investors_as_of_4.14.2025_Omni-c.pdf.
[3] The allegations in this Complaint are based upon the documents and information available to Plaintiff at the time of this filing and are subject to clarification, amendment, revision, or other modification in light of new documents and information obtained through subsequent discovery in this action, in the underlying Chapter 11 cases, or otherwise.

high guaranteed returns during a period of very low interest rates.[4] The Insiders' fraudulent scheme was almost completely dependent on the intensive marketing efforts of broadcast media. NRIA's media advertisements, including those broadcast by Bloomberg from almost the inception of NRIA, targeted the use of IRA and 401K accounts and raised approximately $664M from almost 2,000 Investors before its scheme collapsed, including hundreds of elderly and retired Investors.

2. Bloomberg is a multi-media conglomerate which maintains its principal place of business in New York City, New York. Bloomberg is engaged in, among other things, the business of broadcasting and disseminating news and advertisements through its 24-hour television channel and radio.

3. The Insiders' fraudulent scheme required a constant stream of money from new and existing Investors to remain alive. To do so, NRIA advertised heavily on radio and television nationwide, which lured Investors into the scheme by promising false guaranteed returns. Bloomberg included instructions to prospective Investors in its advertising to contact NRIA (and its Inside promoters) to finalize their investments. NRIA documented these calls in call logs identifying the source of each investment. NRIA maintained that information in various source files ("Subscription Files").

4. Salzano engaged Bloomberg as an advertising platform no later than 2010. Salzano's and NRIA's dependency on Bloomberg's media support and the intentional and consequential branding continued and intensified through December 2020. Yet, almost from the onset of Bloomberg's enduring relationship with NRIA, Bloomberg was on notice that NRIA's business model (as published on Bloomberg radio) was flagged by a journalist for the Business

[4] During the period from 2016 to 2020, the 10-year treasury ranged from below 1% in 2020 to a high of 3.2% in 2018. Savings account rates ranged from below 1% to about 2.5% and the rates for the 5-year certificates of deposit ranged from .39% to about 3% during the same period.

Insider for its apparent indicia of fraud. The article, published on May 4, 2010, by the Business Insider titled "Just Another Real Estate Scam? Meet National Realty …" begins "we heard an ad on Bloomberg Radio that advertised an offer that sounded too good to be true". The article continued, "like many sure-fire investment opportunities advertised over the airwaves, it sounded like a scam." Bloomberg was on notice of this article by virtue of its representatives being copied on a retraction demand e-mail from Grabato (copying Bloomberg presumably to use Bloomberg's reputation in the industry as validation and leverage). The article was eventually retracted.

5. During the decade that followed, Bloomberg published thousands of audio and video advertisements containing assurances of immediate distributions and guarantees of extraordinary returns (and even higher targeted returns) in support of every phase of NRIA's efforts to raise money from investors including the deeded property phase through 2016, the pre-fund phase beginning in 2016 and the onset of solicitation of the NRIA Partners Portfolio Fund I (the "Fund)" beginning in February 2018.

6. Bloomberg knowingly aided and abetted, substantially assisted, and profited from the Insiders' Ponzi scheme by promoting and airing NRIA's false and inflated guaranteed returns to its global audience through direct response advertising.[5] This created a false sense of urgency intended to prompt immediate action from potential Investors to call the unregistered NRIA agents serving as order takers and closers.

7. NRIA staffed its call center so that inexperienced commission only Insiders/closers armed with scripts (primarily drafted by Salzano) were prepared to take calls from Investors (following the on-air Bloomberg advertisements), to respond to their inquiries questioning the

---

[5] Direct response advertising was utilized by NRIA and is designed with a goal to promote a "call to action" to motivate listeners to contact the advertiser and buy the good or service. *AIRN Liquidation Trust Co., LLC v. Media Effective LLC, et al.*, Adv. Pro. No. 23-01335, Docket No. 91, at p. 8 (October 11, 2024)

inflated guaranteed returns and overcome objections regarding this clear indicia of a Ponzi scheme. According to former NRIA sales staff, the media advertisement campaign was so effective that they did not have to cold call or solicit Investors, rendering them little more than order takers. The fact that Bloomberg (and other well-known media) ran NRIA's advertisement lent credibility to NRIA. Salzano went so far as to directly acknowledge to one of his primary Bloomberg contacts that NRIA was using Bloomberg as a "BRANDING vehicle."

8. The facts asserted in this Complaint establish that:

a. Bloomberg knowingly aired NRIA advertisements that contained the term "guaranteed" when discussing a minimum 10% return and upside return of 21%, despite this being a clear Federal Trade Commission ("FTC") red flag and well-known indicia of fraud.

b. Bloomberg account representatives had a long history of socializing and soliciting Salzano through dinners and regular attendance at holiday parties and social events.

c. Bloomberg knew Salzano was the control person at NRIA by virtue of these personal relationships and thousands of direct e-mail communications with Salzano demonstrating his control of NRIA and final authority on NRIA scripts/script changes.

d. Bloomberg knew of Salzano's prior fraudulent history by virtue of reporting directly on the NorVergence fraud (discussed later) and Salzano's involvement but never disclosed Salzano's role as NRIA's control person to potential Investors. Further, Bloomberg knew that NRIA's Private Placement Memorandum (which Bloomberg was given) did not disclose Salzano's true role as a control person, or his prior fraud/criminality – yet Bloomberg continued to promote the securities to millions of its customers.

e. Bloomberg continually bowed to pressure tactics from Salzano when Bloomberg attempted to question some of the claims being made in the advertisements and decided to run the advertisements anyway.

f. Bloomberg ignored clear warnings – "red flags" - from Bloomberg's own outside counsel regarding investment return claims being made in the advertisements and running the advertisements anyway.

g. Bloomberg appears to have shut down an inquiry from one of its senior investigative journalists/writers (a former government prosecutor who

> specialized in fraud and had been with Bloomberg since 1992) who had contacted NRIA regarding the guaranteed return claims being made in these advertisements, and who was provided with a Private Placement Memorandum ("PPM") that contained false representations regarding Salzano.

9. NRIA could not have been as successful in reaching its Investor audience without utilizing Bloomberg, a highly trusted source for financial information, to promote and distribute these illicit security offerings. As a result, Bloomberg's advertisements resulted in the solicitation of approximately ***$40 million*** in investments into NRIA, according to NRIA's subscription records.

10. The full extent and nature of Bloomberg's wrongful actions will only be further revealed through discovery and additional evidence supporting the Plaintiff's assertions,[6] but it is obvious that the value of the services it alleged to have provided do not fairly equate to the significant payments made by NRIA to Bloomberg.

11. From June 2012 through 2021, NRIA transferred approximately **$3,785,073.50** directly or indirectly to Bloomberg for its advertising services (the "Fraudulent Transfers"). A summary of the Fraudulent Transfers, including details for the originating NRIA or Fund account, is set forth in **Exhibit A**. A total of $1,475,173.50 was transferred directly or indirectly from NRIA to Bloomberg after February 5, 2018, when the Fund was created.

12. Because the "business" and many of the properties owned and operated by the Debtors were not profitable, the funds transferred to Bloomberg actually came from Investors.

13. Plaintiff brings this action seeking entry of a judgment, among other things: (i) avoiding

[6] Despite Plaintiff's efforts to obtain targeted discovery, Bloomberg produced only 49 documents—mostly redundant—in response to the Subpoena for Bankruptcy Rule 2004 Examination, a blatantly deficient production that did not contain any documents or communications responsive to the requests in the Subpoena.

and recovering the Fraudulent Transfers pursuant to 11 U.S.C. §§ 544, 548, 550, N.J.S.A. §§ 25:2-25, 25:2-27, and applicable law; (ii) awarding damages against Bloomberg for, among other things, fraud, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty; (iii) granting Plaintiff equitable relief as requested herein; and (iv) granting Plaintiff such other and further relief as may be just and proper.

## PARTIES

14. Plaintiff is the Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan and the Liquidation Trust Agreement approved by the Confirmation Order.

15. Pursuant to Article IV.F of the Plan, Plaintiff holds and retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), including all Avoidance Actions and Contributed Claims and Liquidation Trust Actions, as each of those terms is defined in the Plan.

16. Defendant Bloomberg is a Delaware limited partnership whose principal place of business is 731 Lexington Avenue, New York, New York 10022.

17. Bloomberg supplies real-time business, financial, and legal news to subscribers worldwide. As a wire service, Bloomberg provides news, radio, and television programming throughout the world.

## JURISDICTION AND VENUE

18. This action arises in and relates to the Chapter 11 bankruptcy case, Case No. 22-14539, in the United States Bankruptcy Court for the District of New Jersey.

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

20. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this

case arises under the law of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367 because all state law claims alleged are so related to the claims within this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1334 that they form part of the same case or controversy and therefore are within the Court's supplemental jurisdiction.

21. Venue is proper pursuant to 28 U.S.C. § 1409 and 28 U.S.C. § 1391(b) because a substantial portion of the critical acts or omissions giving rise to the claims asserted herein occurred in this District.

22. This Court has personal jurisdiction over Bloomberg because Bloomberg maintains continuous and systematic contacts within the state, derives substantial revenue from the state, and has committed acts giving rise to this action within this District. The exercise of personal jurisdiction comports with Bloomberg's right to due process because it has purposefully availed itself of the privilege of conducting activities within the District of New Jersey, such that it should reasonably anticipate being hauled into court here.

23. The statutory and legal bases for the relief requested in this Complaint are sections 105(a), 544, 548, 550, and 551 of the Bankruptcy Code, Bankruptcy Rule 7065, and applicable state law, including N.J.S.A. 25:2-25, and N.J.S.A. 25:2-27, and N.J.S.A. 49:3-52, and N.J.S.A. 49:3-71.

## BACKGROUND

### A. Salzano Operated NRIA as a Textbook Ponzi Scheme.

24. NRIA is a Delaware limited liability company that was formed on November 27, 2006, by Salzano and Grabato. Salzano purportedly served as a "Senior Independent Executive Advisor and Portfolio Manager" of NRIA, although his involvement in the company was more akin to a President or chief executive officer until he was removed in October 2021.

25. Salzano controlled NRIA from its inception through and for a period after his alleged disassociation with the companies after his arrest on March 4, 2021, for wire fraud and aggravated identify theft related to his activities at NRIA. Grabato was the public facing purported majority owner, President, and the Chief Executive Officer of NRIA, and has fled the country to avoid prosecution.

26. In reality, Grabato was nothing more than a proxy for Salzano, who controlled NRIA. As e-mail exchanges discussed later will show, Bloomberg was aware of Salzano's control of NRIA due to Salzano's long-standing social relationship with multiple Bloomberg representatives and Salzano's regular direct communications with Bloomberg regarding advertisement content and changes. This included daily communications detailing the description of advertisements to be run the following day(s) on Bloomberg Radion and the precise time they were to run.

27. Salzano, Grabato, Scuttaro and others operated NRIA and its affiliated entities as a Ponzi scheme to defraud innocent Investors for the benefit of those in the NRIA inner circle, their Insiders, and affiliates. NRIA operated almost identically to how the United States Securities and Exchange Commission ("SEC") defines a Ponzi scheme, which is an investment fraud that pays existing or first-in investors with the monies of the newer investors so that it appeared the first-in investors are receiving value when in reality all they are receiving are the funds collected from the newer investors.

28. Simply put, NRIA did not have adequate funds to operate its business and pay Investor distributions without a constant influx of new Investor capital. Salzano, Grabato, and other co-conspirators used the Debtors to solicit approximately $664 million in investments from defrauded Investors, many of whom are retirees whose entire life savings were lost.

29. To solicit these investments, NRIA claimed to operate as a real estate investment, management, and development firm that, since its inception, has developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA represented and *guaranteed* that it would pay extraordinarily high returns to its Investors (as high as 21% or greater), and that its Investors would be paid their return of capital first.

30. In reality, NRIA was a Ponzi scheme, using new Investors' contributions to pay earlier Investor distributions, to purchase properties, to orchestrate an extensive marketing effort to attract new Investors, and to divert funds and pay the personal expenses of Salzano, Grabato, their family members, and others.

31. Investors would invest in the scheme in various ways throughout NRIA's existence: (i) initially, NRIA induced Investors through guaranteed returns to purchase properties that would be renovated, developed, rented, managed, and/or sold by U.S. Construction, Inc. ("USC") and Premier Access Property Management, Inc. (the "Deeded Property Phase"), (ii) then by investing in a series of limited liability companies sold by private placement memoranda that were to purportedly renovate specific properties and (the "Pre-Fund Phase"), (iii) finally, in February, 2018, by pooling their money into an investment fund managed by NRIA (the "Fund"). The evolution of NRIA's securities solicitations was designed to induce Investors to continue investing in NRIA to prolong the scheme's inevitable collapse. Bloomberg promoted NRIA on its various platforms during each phase of this fraudulent scheme. For example, Bloomberg aired over four hundred and fifty (450) advertisements, mostly one minute in length, on Bloomberg Radio in February 2018, pitching IRA diversification and 20% returns at the inception of the Fund.[7]

[7] The Fund was NRIA's escape vehicle used to roll-over Investors in the Pre-Fund properties who had not been repaid according to the terms of their offering documents.

**B. Salzano's Fraudulent/Criminal Past with NorVergence.**

32. Defrauding Investors was nothing new for Salzano and other Insiders. Salzano's brother, Peter Salzano, formed NorVergence, Inc. ("NorVergence"). Nick Salzano was never officially employed by NorVergence and served as a purported consultant, like with NRIA. But, behind the scenes, Salzano was an integral part of the NorVergence fraudulent business. Art Scuttaro was the Senior Vice President of Application Screening at NorVergence. Dustin Salzano, Nick's son and the principal of USC, the construction company that provided the vast majority of construction services to NRIA, worked at NorVergence while in college.

33. The NorVergence scheme involved leasing a device at highly inflated rates to vulnerable small businesses and non-profits that allegedly reduced phone bills by converting oral communications to data, but in reality, was just a scam to lock unwitting customers into five-year leases for NorVergence services.

34. Just like NRIA, the NorVergence scheme depended on a constant influx of new customers to generate funds to pay for NorVergence's expenses and the personal expenses of Salzano and others. Two years after its inception, NorVergence was forced into an involuntary Chapter 11 bankruptcy proceeding which was subsequently converted to a Chapter 7 liquidation proceeding.

35. The bankruptcy trustee in the NorVergence proceedings brought an adversary proceeding against forty-two (42) defendants, including Salzano. The complaint charged Salzano with fraudulent transfers under 11 U.S.C. §§ 544(b), 548, 550, as well as N.J.S.A. 25:2-1 to -36 and N.J.S.A. 25:2-27(b) and conversion, misappropriation, unjust enrichment, breach of fiduciary duty, and fraud. Salzano asserted his Fifth Amendment right against self-incrimination in response to the complaint.

36. In November 2004, the FTC filed a complaint against NorVergence for its improper conduct. In 2006, Salzano was investigated by the FTC for his involvement in NorVergence resulting in a permanent injunction barring Salzano from participating in similar fraudulent conduct in the future. Additionally, a $50 million consent judgment was entered against Salzano for his role in the NorVergence fraud. Moreover, Salzano was criminally charged and indicted for his role in the NorVergence scheme in Louisiana, which led to Salzano pleading guilty to five felony counts of theft over $500, being sentenced to three years' supervised probation, and being ordered to pay $45,000 to local businesses.

37. The NorVergence fraud is critical because Bloomberg reported multiple times on this fraud yet still decided to later work with Salzano and take specific direction from him.

38. Documents the Liquidation Trustee has uncovered to date (without any cooperation from Bloomberg) demonstrate that Bloomberg representatives solicited and socialized with Salzano dating back to at least 2013 (and possibly earlier), with one Bloomberg representative becoming a regular at NRIA's holiday parties. Bloomberg knew Salzano controlled NRIA, and as shown below, as early as 2010, had reported on his involvement in the NorVergence fraud.

39. NRIA, through Salzano, was aided media organizations/agencies, such as Bloomberg, and advertised heavily to solicit Investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio, YouTube, and television advertisements. See **Exhibit B** **(**true and accurate transcriptions of Bloomberg advertisements that have been sourced from audio files produced by Bloomberg in response to Rule 2004 discovery.)

40. Bloomberg's widely distributed NRIA-sponsored ads enticed investors with promises of "guaranteed" 10% returns and potential earnings of up to 21%. Bloomberg's role in

NRIA's fraudulent scheme cannot be overstated. Unquestionably, NRIA's ability to broadcast its advertisements *guaranteeing* investors inflated "safe" returns on the Bloomberg platform lent widely accepted credibility to the scheme. In fact, the PPM's received by potential investors (who learned about NRIA through Bloomberg's advertisements) contained an "absolute guarantee" document as an Exhibit to the PPM.

41. NRIA spent over ***$84 million*** on advertising and promotional costs, which amounts to approximately 13% of the funds received from Investors. Of that amount, NRIA paid Bloomberg approximately **$3,785,073.50**, directly or through intermediaries, to amplify its marketing efforts.

**C. Government Agencies that Reviewed the Evidence Found NRIA to be a Fraudulent Scheme.**

42. The evidence deduced to date by various governmental agencies led those agencies to conclude that NRIA was operated as a Ponzi scheme intended to defraud Investors, and those agencies have charged NRIA and NRIA leaders accordingly.

i. <u>New Jersey Bureau of Securities</u>

43. On June 21, 2022, just two weeks after the Petition Date, the New Jersey Bureau of Securities filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the Fund. *See* Letter to Honorable John K. Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS (Bankr. D.N.J. June 21, 2022) [Docket No. 60]. Attached to the New Jersey Bureau of Securities' letter response was a Summary Cease and Desist Order against the Fund, its

general partner, NRIA, NRIA Capital Partners, Inc., NRIA Structured Credit Strategies, LLC, and four Fund officers based, in large part, on the violations described above.[8]

ii. Federal Government

44. On October 13, 2022, the SEC announced charges it brought against NRIA and NRIA executives "for running a Ponzi-like scheme."[9] The SEC's Complaint alleges that the NRIA defendants "engaged in a Ponzi-like scheme" and that many NRIA Investors "expressly told NRIA staff that they feared the Fund was a Ponzi scheme."[10]

45. The United States of America, through the United States Attorney for the District of New Jersey (the "Government"), re-filed a Motion for Permission to Intervene and for a Stay on December 14, 2022 ("Motion for Stay") in *SEC v. NRIA, Grabato, O'Brien, and Scuttaro*, Case No. 2:22-cv-06066 (Dec. 14, 2022) (Docket No. 21-1). The Motion to Stay was filed to intervene and stay discovery in the SEC case until the conclusion of the USAO's parallel criminal case, captioned *United States v. Thomas Nicholas Salzano, a/k/a "Nick Salzano," and Rey E. Grabato, II*, 22-cr-00690 (Oct. 12, 2022). In its Motion for Stay, the Government noted that "NRIA generated little to no profits and operated as a Ponzi scheme, which was kept afloat by new Investors."[11] The Government filed a similar Motion for Stay in *Joe Fratantoro, et al, v. Rey Grabato II, et al.*, Case No. 2:23-cv-00053-WJM-MAH, (D.N.J. May 17, 2023) (Docket No. 27-1), which also characterized NRIA as a Ponzi scheme. The Complaint in the Government's

---

[8] *See* Summary Cease and Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities June 21, 2022) (the "Summary Order").

[9] Litigation Release No. 25558, Securities and Exchange Commission, New Jersey Real Estate Development Firm and Four Executives Charged with $600M Ponzi-Like Fraud (Oct. 14, 2022), accessible at: https://www.sec.gov/litigation/litreleases/2022/lr25558.htm.

[10] *See* Complaint, *SEC v. NRIA, Grabato, O'Brien, and Scuttaro*, Case No. 2:22-cv-06066 (Oct. 13, 2022), Docket No. 1 at 2, 11.

[11] Motion for Stay, *SEC v. NRIA, Grabato, O'Brien, and Scuttaro*, Case No. 2:22-cv-06066 (Dec. 14, 2022), Docket No. 21-1 at 2–3.

criminal case against Salzano for wire fraud and aggravated identity theft details Salzano and NRIA's "scheme to defraud" as described above.[12]

46. Further, the Government charged Scuttaro with conspiring with Salzano, Grabato, and others to defraud Investors of NRIA.[13] Scuttaro accepted a plea agreement.[14] Relevant here, the Government again alleged that NRIA was a Ponzi scheme kept alive by new Investors.[15] The Government also alleged that Salzano and Scuttaro provided scripts to NRIA project managers on how to handle concerns from Investors that NRIA was operating a Ponzi scheme and scripts "falsely represented that NRIA was not a Ponzi scheme and that it had substantial cash flow from operations to pay investor distributions."[16]

47. On February 27, 2024, Salzano pled guilty to securities fraud, conspiracy to commit wire fraud, and conspiracy to defraud the United States in the USAO's parallel criminal case, in which he further admitted to operating the Debtors pre-petition as a Ponzi scheme by admitting under oath to *each* of the elements of a Ponzi scheme.

48. On November 12, 2024, Salzano was sentenced to serve 144 months for Securities Fraud and Conspiracy to Commit Fraud, and 60 months for Conspiracy to Defraud the United States, to run concurrently. The Court also sentenced Salzano to three years of supervised release on each count to run concurrently, with special conditions imposed, a $300 special assessment, and restitution in the amounts of $513,889,438.92 with interest waived and due immediately to the "victims of the Ponzi scheme," and $6,457,667.62 with interest waived and due immediately to the IRS.[17]

---

[12] *See* Complaint, *USA v. Salzano, et al*, Case No. 2:22-cr-00690-EP (D.N.J. Mar. 4, 2021), Docket No. 1.
[13] Scuttaro Information, *USA v. Scuttaro*, Case No. 2:22-cr-00692-EP-1 (D.N.J. Oct. 13, 2022), Docket No. 1.
[14] Plea Agreement, *USA v. Scuttaro*, Case No. 2:22-cr-00692-EP-1 (D.N.J. Oct. 13, 2022), Docket No. 5.
[15] Scuttaro Information at 2.
[16] Scuttaro Information at 8–9.
[17] *USA v. Salzano, et al*, Case No. 2:22-cr-00690-EP (D.N.J. Mar. 4, 2021), Docket No. 100.

**D. Bloomberg: A Trusted Source of Financial News and Information.**

49. Bloomberg is more than just an advertising company. It is a trusted source of financial information, guidance, and news. Indeed, Bloomberg touts itself as playing a "vital role" in delivering accurate, real-time business and market-moving information:

> Bloomberg unleashes the power of information and technology to bring clarity to a complex world.
>
> Global customers rely on us to deliver accurate, real-time business and market-moving information that helps them make critical financial decisions. In a career at Bloomberg, you'll play a vital role in making it happen.

*What we do – Departments*, BLOOMBERG, https://www.bloomberg.com/company/what-we-do/ (last accessed March 30, 2026).

50. Bloomberg's News and Media departments "reach the world":




*Departments – News & Media*, BLOOMBERG, https://www.bloomberg.com/company/what-we-do/news-media/ (last accessed March 30, 2026).

51. Bloomberg goes on to confirm its role as a "global leader in business and financial information":

> Bloomberg is a global leader in business and financial information, delivering trusted data, news, and insights that bring transparency, efficiency, and fairness to markets. The company helps connect influential communities across the global financial ecosystem via reliable technology solutions that enable our customers to make more informed decisions and foster better collaboration.

52. When an audience is receiving information from Bloomberg, such as the Investors, a weight of credibility and trustworthiness is placed on the information it provides. And that is exactly what happened for Investors who invested in NRIA based on the information received from Bloomberg. Bloomberg assisted NRIA in reaching out to NRIA's targeted markets, broadcasting NRIA's purportedly safe and extraordinary returns in locations such as (but not limited to) New York City, Washington D.C., San Franscisco, and Boston.

53. Indeed, one Investor, referenced herein as "Investor X", was a professional in the finance industry at the time and first heard of NRIA while commuting to New York and listening to Bloomberg on the radio. Investor X considered Bloomberg to be a credible news source, which gave him comfort that NRIA was a legitimate business. He did not think that Bloomberg would allow a Ponzi scheme to advertise on its station and assumed that Bloomberg did some vetting of NRIA before allowing it to air advertisements of the Ponzi scheme. Investor X invested $2,987,454.00 in NRIA.

54. An Investor, referenced herein as "Investor Y," recalls hearing NRIA

advertisements aired on Bloomberg gave him additional comfort to invest in NRIA. Investor Y was a Bloomberg Terminal subscriber and believed that Bloomberg was a credible source of reliable financial information. Investor Y invested $600,000.00 in NRIA.

55. An Investor referenced herein as "Investor Z" recalls seeing NRIA advertisements "every single day" in mid-2017. Investor Z's perception of Bloomberg as a credible news source provided comfort for him to invest. He thought NRIA must have been reputable for Bloomberg to advertise for NRIA. Investor Z invested $431,800.00 in NRIA.

56. An Investor referenced herein as "Investor AA" recalls hearing "massive advertising for NRIA" on Bloomberg television and radio in 2021, noting that Bloomberg's reputation as a credible source" gave him the comfort to invest with NRIA, and he assumed Bloomberg would have conducted its own due diligence before airing such adds. This led Investor AA to invest $500,000 in NRIA which accounts for about 40% of his retirement savings.

57. An Investor referenced herein as "Investor BB" learned about NRIA through Bloomberg's radio advertisements for NRIA in 2019 and ultimately invested $450,000 with NRIA. Investor BB felt more comfortable with NRIA by virtue of Bloomberg's association with NRIA, stating he believed Bloomberg was a credible source and would have investigated NRIA prior to airing he advertisements. Investor BB's retirement savings have been significantly impacted by the NRIA investment.

58. Two other Investors who invested in NRIA together, referenced herein as "Investors CC and DD," heard about NRIA through Bloomberg radio advertisements and billboards in 2021. They believed Bloomberg's association with NRIA was a "stamp of approval" by Bloomberg as they believed Bloomberg was a credible source. Investor CC stated that his losses have been "dramatically impactful" as this money was going to be used for his son's college

education, and that the psychological impacts on him have been serious.

59. These Investors are not alone. Many Investors decided to invest their money in NRIA due to Bloomberg's credibility and reputation as a trusted and reliable source of financial information and news—a reputation Bloomberg itself admits it strives to maintain.

60. As previously noted, Salzano told Bloomberg's Donna Russo ("Russo"), a senior Bloomberg employee in charge of the NRIA account, that NRIA was using Bloomberg as a "BRANDING vehicle."

From: nicholas@nria.net At: 03/24/17 16:51:46

To: Donna Russo (BLOOMBERG/ NEWSROOM:)
Cc: rey@nria.net
Subject: Re:Modification To Schedule Required

Hi Donna,

How are you?

I have mentioned before our Bloomberg Local results are a bit low in terms of call ins after all these years. Our cost per qualified lead is the most expensive on BB Local.

We have thus historically used BB Local as a BRANDING vehicle mostly.

See **Exhibit C.**

61. The effectiveness of the media advertisements is discussed in an internal e-mail between Salzano and NRIA marketing employee Katey Kana ("Kana") on November 25, 2020, wherein Kana told Salzano that the media efforts result in "clusters" of direct calls and e-mails.

HI Nick,

Thinking this through roughly and want your feedback –

1. We get approximately ~50 calls daily and ~10 email inquiries (on average)
2. I now make all media vendors send me weekly placement logs so we can see exactly when we aired/where we aired
3. I have noticed we get clusters of calls and emails generally which signals to me that a media commercial just aired and we got the callers/emailers (obviously lol)

See **Exhibit D.**

**E. Bloomberg's Extensive Reporting on Prior Ponzi Schemes, Including NorVergence, and Early Awareness of Red Flags Regarding NRIA**

62. Bloomberg's decision to promote NRIA's illicit securities is particularly egregious because Bloomberg, as a respected financial news reporting platform, had reported extensively on prior Ponzi schemes, including the NorVergence fraud. See **Exhibit E** (the NorVergence reports) and other examples of Ponzi schemes covered by Bloomberg.[18]

63. The May 27, 2010, NorVergence report specifically references Salzano's son (Thomas J. Salzano) and his misappropriation of company funds. A mere two months after this May 27, 2010, Bloomberg article ran, Russo was e-mailing directly with Salzano regarding advertising slots for NRIA in July 2010.

-----Original Message-----
From: DONNA RUSSO, BLOOMBERG/ 731 LEXIN [mailto:drusso@bloomberg.net]
Sent: Wednesday, July 28, 2010 2:11 PM
To: Nicholas Salzano
Subject: Times for 7/29

[18] **Notable Ponzi Scheme Stories Covered by Bloomberg**

**Woodbridge Group Real Estate Scheme:** In November 2018, Bloomberg reported that Robert Shapiro, the former CEO of Woodbridge Group of Companies, agreed to a settlement with the SEC over a **$1.2B Ponzi scheme**. Shapiro had promised high returns from luxury real estate investments but instead used new investor money to pay earlier ones and fund a lavish lifestyle, including chartered planes and country club fees.

**BitConnect Cryptocurrency Lawsuit:** A class-action lawsuit was filed in January 2018 against BitConnect, an alleged "wide-reaching Ponzi scheme" that promised illogical returns as high as 40 percent monthly. The platform shut down its lending business soon after, causing its coin's market value to plummet.

**Madoff Scheme Recovery Efforts:** Bloomberg provided extensive updates throughout 2018 on the ongoing efforts to recover funds for victims of the Bernard Madoff fraud, a decade after his arrest.

**2009 arrest of Solomon Dwek** who ran a $400M NJ real estate Ponzi scheme.

64. For Bloomberg to somehow claim it did not have knowledge of Salzano's (or his family's) criminal record and fraudulent past simply does not pass muster.

65. On January 4, 2017, Bloomberg aired the following report on how the SEC "missed" Platinum Partners' Ponzi scheme. Incredibly, the video report highlights Platinum Partners' 17% returns, numerous other "red flags," its co-founding by a previously sanctioned bad-actor, and how a simple "Google search" would have revealed this information.

https://www.bloomberg.com/news/videos/2017-01-04/how-did-u-s-miss-platinum-partners-red-flags

66. This exact report could have been run regarding NRIA and Salzano and the 12-21% guaranteed returns as a "red flag"- yet, Bloomberg decided to do business with NRIA and Salzano and secure $3,785,073.50 in payment.

67. Around the same time Bloomberg was reporting the Norvergence scheme involving Salzano and his family, Bloomberg also became aware of the May 4, 2010, Business Insider article previously mentioned that specifically identified NRIA as "Just Another Real Estate Scam? Meet National Realty . . ." "This article repeatedly calls into question NRIA's then-existing business model, and focuses in repeatedly on NRIA's many "guarantees." See **Exhibit F** (containing what appear to be Salzano's hand-written notes to Grabato). This advertisement that forms the basis of the article aired on Bloomberg Radio, and is described as "an offer that sounded too good to be true."

68. One day later, Grabato e-mailed the article's author, Vince Veneziani ("Veneziani"), demanding a retraction, and specifically copied Bloomberg representative Marc Siegel ("Siegel") and Mariann DeLuca ("DeLuca"), presumably because the advertisement was aired by Bloomberg and because NRIA wanted to use Bloomberg's reputation as leverage against

Veneziani. So, as of May 5, 2010, Bloomberg was on direct notice that a Business Insider article was identifying NRIA's business model as a potential scam, and also identifying Bloomberg as the source of the subject advertisement.

```
-----Original Message-----
From: Rey Grabato
Sent: Wednesday, May 05, 2010 6:50 PM
To: 'vveneziani@businessinsider.com'
Cc: 'Nicholas Salzano'; 'MARC SIEGEL, BLOOMBERG/ 731 LEXIN'; 'MARIANN DELUCA, BLOOMBERG/ 731 LEXIN'
Subject: RETRACTION DEMAND

Please see our writing attached also coming to you via certified mail.


Vince Veneziani
Business Insider
119 5th Avenue, 7th Floor
New  York, NY 10003


May 5, 2010
```

**F. Bloomberg's Publication of False and Misleading Advertisements Soliciting Securities Sales**

69. In furtherance of the Insiders' fraudulent scheme, NRIA spent tens of millions of dollars on promising, promoting, and advertising unheard-of guaranteed returns (up to 21%) to innocent, unwitting Investors. Investors were literally bombarded with NRIA's promises of safe and extraordinary returns through hundreds of monthly radio and television advertisements at the same time that competing investments from financial institutions or government securities offered minimal (of almost no) returns. Bloomberg was one of the principal advertising entities aiding the Insiders in the promise, promotion, and advertising of NRIA's illicit securities offerings.

70. Bloomberg served an essential role in the Insiders' fraudulent scheme, promoting and airing false and misleading messages for NRIA to the public through direct response advertising, which was intended to prompt immediate action from potential Investors.

71. Of the more than $84 million NRIA spent on advertising and promotional costs, Bloomberg received, at a minimum, approximately $3.78 million over a period of ten (10) years, with an unusually high amount paid in 2020, near the height of the NRIA's fraudulent scheme.

72. Below are examples of advertisements that went directly to Bloomberg listeners, including the advertisements that contained no disclaimer language:

> Attention investors: want to diversify? Tired of the Wall Street Casino? National Realty provides high returns through secured New York City and Philadelphia real estate. Our model is 100% proven on 900 buildings over 10 years, and half a billion dollars of real estate under management. We acquire prime locations under market value and rebuild them at wholesale construction pricing. Our wholesale costing system creates an unfair equity-profit advantage for you. Just ask any one of our 200 repeat investors. With property returns ranging from 12% to 1200%, we have high-demand, quick-flip and rent properties. We are the only investment real estate provider that guarantees your investment satisfaction. That's National Realty: guaranteed resale value satisfaction, guaranteed profit satisfaction or your money back. Call now for our super high return Brooklyn and Philadelphia opportunities. Call 201-210-2727, that's 201-210-2727. See us at NRIA.net. Terms and conditions apply.

> New York, New Jersey, Philadelphia and Florida. New construction real estate. National Realty: providing 10% guaranteed returns monthly payouts and bonuses to 16% on your money. Securing you on deed with new construction property. With a proven 10 year track record, the lowest interest rates in nearly 50 years, massive new construction demand and low supply. Guess what's going up in value? Call now for 10% guaranteed returns, monthly payout checks and bonuses to 16%. Prime real estate goes fast, so you must call now 201-210-2727.

Both advertisements tout guaranteed returns, with the first describing return ranges from "12% to 1200%." Both advertisements employ direct calls to action from potential investors.[19]

73. The below advertisement was particularly egregious because it sought to take advantage of the then-relevant stimulus laws to entice unwitting investors to withdraw $100,000 out of existing 401ks and invest those funds into NRIA's Ponzi scheme, promising "10% monthly cash-flow" and "obtain total returns targeted at 18 to 21%."

---

[19] See scripts attached as **Exhibit B** (these are advertisements that were actually aired by Bloomberg on behalf of NRIA).

> Investors: need steady cash-flow? Don't take stock losses. NRIA is making special accommodation to help at this time. Under the new stimulus law, you can now borrow up to $100,000, without penalty, against your 401K or IRA and invest. To help, NRIA is extending a high 10% monthly investor payout from our real estate secured Class A Buildings Fund. Maintain your 401K and IRA stock position for the market rebound and diversify into real estate with 10% monthly cash-flow. You're backed by a 14 year track record and prime income property with $750 million of new construction. You'll receive 10% steady cash-flow. Keep your stocks and obtain returns with bonuses targeted at 18 to 21%. Use the new stimulus law to maintain your 401K and IRA stock upside and get 10% cash-flow now. Call 201-210-2727,

74. Bloomberg's own internally created documents show its unquestionable knowledge that NRIA was guaranteeing extraordinary returns. Bloomberg's invoices to NRIA, which detail the extent and breadth of Bloomberg's advertising services, contain "Copy" descriptions for the advertisements, that majority of which directly reference "guaranteed" returns. See **Exhibit G** (a copy of Bloomberg's May 29 – June 25, 2017, Invoice). This invoice shown how NRIA advertisements were spread out all through the work week, several times a day. This blanketing strategy was designed to entice the widest range of Bloomberg watchers/listeners.

75. Salzano, NRIA's undisclosed control person, maintained a close, personal relationship with Bloomberg's senior employees in charge of the NRIA account, including but not limited to Siegel and Russo.

76. Siegel and Russo were invited to dinners with Salzano and to NRIA's annual holiday parties. Siegel himself attended NRIA's holiday parties for several years as a Bloomberg account representative (and after when he went to iHeart Radio in or about 2017), and Russo expressed her excitement for dinners with Salzano and a "few LSD Infused Margaritas" at an NRIA party. Russo also provided Grabato with basketball tickets. Salzano was clearly close with Siegel and Russo. See **Exhibit H** (excerpts from various e-mails shown below).

**From:** SIEGEL, MARC [mailto:MARCSIEGEL@iheartmedia.com]
**Sent:** Tuesday, December 04, 2018 5:25 PM
**To:** Bethany Salzano
**Cc:** Nicholas Salzano
**Subject:** RE: You're Invited! NRIA's Holiday Party 2018

Bethany,

I'm crushed. I don't think I've missed this event in the last 8-9 years, but I'm flying out Friday night. You know how much I look forward to and appreciate being part of this tradition. I will definitely spot by to see you guys before I head off to what I hope is "Sunny Florida." I hope that you are all doing well. See you soon.

Best,

Marc

**Marc Siegel**
Vice President Of Sales | New York Region
**iHeartMedia Markets Group**

-----Original Appointment-----
From: Russo, Donna [mailto:drusso@bloomberg.com]
Sent: Tuesday, May 05, 2015 11:30 AM
To: Russo, Donna; Siegel, Marc; Bethany Salzano; Nicholas Salzano
Subject: Dinner w/Nicholas Salzano & Bethany Salzano (National Realty)
When: Tuesday, May 19, 2015 6:30 PM-8:00 PM (UTC-05:00) Eastern Time (US & Canada).
Where: Lavo: Best Meatball in NYC!

Hello!
Let me know if this new date works for Dinner!
Looking forward to seeing you!
Best,
Donna Russo
------------------------------------------------------------
Donna M. Russo
Account Manager/Marketing Specialist
Bloomberg Radio - WBBR/1130-AM

**From:** Donna Russo (BLOOMBERG/ NEWSROOM:) <drusso@bloomberg.net>
**Sent:** Wednesday, December 05, 2018 10:50 AM
**To:** Nicholas Salzano <nicholas@nria.net>
**Subject:** 2019 NRIA Renewal!

Hi Nicholas!
It was great speaking with you on Monday.

As we discussed, for your review, see attached for your 2019 renewal with ***NO Rate Increase and flat spend!***

In addition, my Traffic folks will add a ***filler schedule*** which includes "***live local billboards***" (approximately 2 per day Monday - Sunday) and a ***filler schedule,*** 5a - 12m for :60's in ***ALL Bloomberg Radio Markets: NY, Boston, SF and DC!***

Thank you Nicholas for your loyalty. Looking forward to a few ***"LSD Infused Margaritas"*** on 12/14! :)

Sincerely,
Donna Russo

and its attachment(s).-----Original Message-----From: DONNA RUSSO, BLOOMBERG/ 731 LEXIN [mailto:drusso@bloomberg.net] Sent: Monday, February 06, 2012 10:15 AMSubject: RE: Nets/Spurs on 2/11?Let me knowHi Rey...Hpe you are having a great Super Bowl Monday.D----- Original Message -----From: DONNA RUSSO (BLOOMBERG/ 731 LEXIN)At: 2/03 12:48:24Hi Rey...I have your tickets...4!Where can I send them Fedex?To your home? Office?Can someone sign for them?Please adviseThanks.D----- Original Message -----From: DONNA RUSSO (BLOOMBERG/ 731 LEXIN)At: 1/31 15:13:48Hi Rey...I will check and see if we have them available...:)Thanks!----- Original Message -----From: Rey Grabato To: DONNA RUSSO (BLOOMBERG/ 731 LEXIN)Cc: MARC SIEGEL (BLOOMBERG/ 731 LEXIN)At: 1/31 15:09:00Hi Donna,You think you can get me 4 tickets to the Net's home game on Feb 11 vs. San Antonio?Rey GrabatoManaging Member National Realty & Investment Advisors, LLC79 Hudson St. Suite

77. Siegel and Russo, at the very least, knew Salzano was NRIA's control person, a fact the was concealed from Investors.

78. As a news, financial reporting, and media company, Bloomberg was responsible for doing its due diligence on its client, including monitoring news and knowing key information about its client. Guidelines by the FTC label advertisements promising guaranteed returns as "automatic red flags."

79. To clear the FTC guidelines, advertisements that include guaranteed returns must be substantiated with something more than just the words of the client. *See FTC Policy Statement Regarding Advertising Substantiation*, 104 F.T.C. 839 (1984) ("*Substantiation Statement*"); *see also* FEDERAL TRADE COMMISSION, *Advertising and Marketing Basics*,

https://www.ftc.gov/business-guidance/advertising-marketing/advertising-marketing-basics (last accessed March 30, 2026 (stating that "[u]nder the law, claims in advertisements must be truthful, cannot be deceptive or unfair, and must be evidence-based.").

80. As Angela Solk ("Solk"), an advertising expert retained by the Trust in the matter *AIRN Liquidation Trust Co., LLC v. Media Effective, LLC*, Adv. Pro. No. 23-1335-JKS, explained, the term "guaranteed" can be misleading if the results or outcomes are not substantiated.[20]

81. As Bloomberg began providing its advertising services to NRIA, Bloomberg had ample information related to Salzano's prior fraudulent activity – it had reported specifically on Salzano and his family and the NorVergence scheme multiple times in 2010.

82. Bloomberg knew Salzano called the shots at NRIA. The advertisements Salzano was demanding be run contained guaranteed returns – a clear red flag, the type of red flag Bloomberg continually reported on. Yet, Bloomberg chose to take NRIA on as a client and run its advertisements for over a decade.

### G. Bloomberg's Collaboration with Salzano Even After Serious Internal Concerns were Identified

83. Bloomberg's use of NRIA's scripts that contained promises of guaranteed, excessively high returns, should have triggered an immediate "automatic red flag" under FTC guidelines. Bloomberg nevertheless routinely approved these scripts quickly and without real scrutiny, even when this clear "red flag" language was present.

[20] See *AIRN Liquidation Trust Co., LLC v. Media Effective, LLC*, Adv. Pro. No. 23-1335-JKS, Dkt. No. 76, Trial Tr. at 135:13-20; *see also* April 4, 2025, Decl. of A. Solk at ¶ 33 in support of testimony presented therein and attached as **Exhibit I**.

84. For example, as early as March 2017, when Salzano sent script changes to Russo and asked Bloomberg to re-record, Russo acted fast to get the scripts cleared and approved:

From: nicholas@nria.net At: 03/20/17 20:55:46
To: Steve Lanzone (BLOOMBERG/ NEWSROOM:)
Cc: Donna Russo (BLOOMBERG/ NEWSROOM:), bethany@nria.net
Subject: Re:URGENT: ASAP RE-RECORDING OF SHOW INTROS NEEDED

Hi Steve/Donna ,

**We need to cease this intro attached and re-record it a.s.a.p. as:**

" … Brought to you by National Realty Managers of New York City Cash Flow Real Estate providing **you 10 to 16% annualized** returns with Immediate monthly distributions – see them at NRIA.net "

The part in yellow is the script change. The above line is the exact new tag line led in script.

THIS IS URGENT – PLEASE ADVISE

Good Morning...
Our Traffic folks will update this asap! Thank you Nicholas.
AG, please confirm.
Thank you.
Donna

From: Steve Lanzone (BLOOMBERG/ NEWSROOM:) At: 03/21/17 07:38:11
To: nicholas@nria.net
Cc: Donna Russo (BLOOMBERG/ NEWSROOM:), bethany@nria.net
Subject: Re:URGENT: ASAP RE-RECORDING OF SHOW INTROS NEEDED

Hi Nicholas - These billboards are read live on air by our anchors, not pre-recorded. I've forwarded your request to our traffic manager. Donna will advise you on when the change will be implemented. Thanks, and have a great day - Steve

See **Exhibit J**.

85. Bloomberg's legal department reviewed and evaluated NRIA's scripts before airing. In April 2020, Bloomberg requested that NRIA provide documentation to support the claim that there will be "a 10% cash flow and a return with bonuses from 18-21%."

86. This request from Bloomberg's counsel received heavy pushback from Salzano, who expressed discontent with this request and suggested that NRIA would rather work with other radio stations who do not ask for such substantiation:

> Donna,
>
> it is absolutely absurd that the Bloomberg lawyers after 14 years of advertising or asking for fresh documentation . Like I have nothing else to do.
>
> Attached is the article from bloomberg.com explaining that one can borrow $100,000 now from their 401K as opposed to the historical $50,000 during a hardship. Is documented by your own website and reporters and it is a much easier process.
>
> Also attached are the six months 2019 financials showing that we paid out $4,300,000 in 18 TO 21% Distributions and cash flows at six months last year. $5,000,000 the prior year .
>
> we have been doing this a long long time please . see our 10 year historical track record documented attached as well.
>
> get this done or we're going to turn off the schedule as the other dozen radio stations we are on nationwide did not ask for anything like this.

87. Within a few hours, Bloomberg relented to NRIA's pressure tactics and approved the subject advertisement.

> Hi Nicholas,
> Good News! We got the green light to move forward. Your new spots will be live tomorrow. Thanks again for sending the additional information. Have a good evening and please stay well and healthy!
> Sincerely,
> Donna Russo

See **<u>Exhibit K</u>**.

88. As a result of this pushback, Bloomberg relented, overrode the advice of its counsel, and relied only on the unverified representations of Salzano (NRIA's undisclosed control person) to give the green light to the false and misleading advertisements airing to the public.

89. Pressure tactics, threats, and strong opposition to providing support for normal business and operating requests is yet another red flag of fraud. Yet Bloomberg ignored those obvious and blatant tactics and turned a blind eye to focus on earning more fees for their services.

90. In another instance, on September 15, 2020, Bloomberg's outside counsel suggested a modification to NRIA's script which again was rejected by Salzano. Salzano assured that the script was being highly audited by NRIA's own legal counsel and that it "100% complies with SEC Regulation."

> Having raised more than $250,000,000 with the below disclosure - absent the new addition of the 1 NEW line requested from Bloomberg legal – and running daily on Bloomberg radio the past 10 years
>
> this is a respected but surprising request. It is respected and understood but it is difficult to add in because every second in a radio commercial is VERY tight. Additionally our existing disclaimer has been reviewed
>
> numerous times and is carried by all media nationally Including many other famous national brands such as CNBC . Lastly since unfortunately we're not the new kids on the block anymore this matter has been successfully reviewed on
>
> a regulatory basis many times With legal counsel for required compliance language . We actually added to the language as it is based on ideas from regulators presented us over the years . So frankly this matter has been highly audited.
>
> Let me assure Bloomberg counsel that NRIA 100% complies with SEC Regulation D 506 C rules and accepts investments only from proven and vetted accredited investors with proofs of accreditation. Our files Contain these digital proofs for our entire 15 year total history.

See **<u>Exhibit L.</u>**

91. Again, rather than risk losing the NRIA business, Bloomberg acquiesced the following day on September 16, 2020, after Salzano's pushback and deliberately chose to disregard its outside counsel's advice and "agreed to run the ads" as Salzano requested.

> Hi Nicholas,
> Happy Wednesday!
>
> Sorry for the delay in responding.
>
> It was an outside legal team that recommended that you include the disclaimer in your ads. After receiving your note and documentation yesterday, our internal legal team has agreed to run the ads without the disclosure.
>
> Thank you for your patience. Please advise next steps regarding the new ads.

*Id*.

92. As this correspondence confirms, Bloomberg had an "outside legal team" looking specifically at NRIA's advertisements that found serious concerns with those advertisements. Yet, Bloomberg chose to disregard its' outside counsel's advice to include a disclaimer with NRIA's advertisements, and instead, went along with whatever Salzano wanted, all to the detriment of the Investors.

93. Notwithstanding the FTC Guidelines that any advertisement promising guaranteed returns must be substantiated by something more than the client's words, *see Substantiation Statement*, 104 F.T.C. 839 (1984), Bloomberg decided to air NRIA advertisements for years.

94. Bloomberg knew what it was doing. Even when Bloomberg's counsel voiced concerns about the propriety of the scripts, Bloomberg made the deliberate and knowing decision to disregard their warnings and proceed, at Salzano's direction, to publish falsehoods in furtherance of NRIA's active fraudulent solicitation of investors.

95. These were not the only red flags that Bloomberg should have recognized about NRIA. In 2020, a Bloomberg senior writer/investigative journalist directly contacted NRIA regarding details about NRIA's investment strategy and its unusually high promised returns.

96. On August 14, 2020, David Evans ("Evans"), a Bloomberg senior writer and investigative reporter who specializes in fraud (and who had been with Bloomberg since 1992),[21] emailed NRIA's Investor Relations stating he was "interested in the 10 percent monthly return" - a direct reference to NRIA's so-called "guaranteed" returns.

97. Evans spent five years prosecuting fraud for the U.S. government as a trial attorney for the Commodity Futures Trading Commission before transitioning to journalism.

[21] See David Evans' LinkedIn profile at: David Evans | LinkedIn

98. On August 25, 2020, John Collins ("Collins"), NRIA's Senior VP of Business Development, sent Evans the Fund's PPM and related materials.

99. Later that same day, Katey Kana (NRIA's Director of Advertising and Marketing) warned internally that they should "err on the side of caution" in communicating with Evans, but Collins had already sent the documents:

**From:** Katey Kana <kkana@nria.net>
**Sent:** Tuesday, August 25, 2020 11:01 AM
**To:** Nicholas Salzano <nicholas@nria.net>; Art Scutaro <ascutaro@nria.net>
**Cc:** John Collins <jcollins@nria.net>
**Subject:** Re: Terry Xu assigned you as the Contact owner of the contact "David Evans BLOOMBERG

Good Morning,

David Evans is a former senior journalist for Bloomberg, a pulitzer prize winner and appears to be a commentator for BB still.

I would err on the side of caution because this man appears more to be an investigative journalist who is out to uncover financial ploys as based on the below.

He is the journalist who uncovered:
Evans, who has been with Bloomberg since 1992, won the 2011 John Chancellor Award for Excellence in Journalism from the Columbia University Graduate School of Journalism for revealing how secret profit schemes cheated the families of fallen U.S. soldiers, sickened or killed patients and cost taxpayers billions of dollars.

From: John Collins <jcollins@nria.net>
Date: 8/25/20 11:42 AM (GMT-05:00)
To: Katey Kana <kkana@nria.net>, Art Scutaro <ascutaro@nria.net>, Nicholas Salzano <nicholas@nria.net>
Subject: Re: Terry Xu assigned you as the Contact owner of the contact "David Evans BLOOMBERG

After recieving your email last night and since he messaged us last week. I did make contact and sent him the ppm.
I will try to schedule a call with him and Art.

See **<u>Exhibit M</u>**.

100. For reasons unknown to the Liquidation Trustee, despite Bloomberg having this information/document, which was a clear red flag and indicator of a fraudulent scheme, Evans never wrote any articles related to NRIA, its investment opportunities, or the company's strategy.

101. Bloomberg's role was critical in spreading NRIA's false message to the public and the Investors, and because of these direct advertisements that were intentionally aired by Bloomberg, hundreds, and perhaps thousands, of individuals were fed lies and false information, and ultimately lost millions.

**H. Rule 2004 Discovery and Bloomberg's Lack of Cooperation**

102. The excerpts from the e-mails above come solely from documents obtained from the Debtors themselves. On or about August 22, 2023, the Committee issued a Rule 2004 Subpoena (the "Subpoena") to Bloomberg. See **Exhibit N**.

103. In the ensuing months, counsel to the Liquidation Trust attempted to work with Bloomberg to obtain responses to the Subpoena. After asserting baseless, boilerplate objections to a majority, if not all, of the requests in the Subpoena, on November 21, 2023, Bloomberg produced 49 documents, consisting of audio clips and a single video advertisement for NRIA.

104. Bloomberg's responses were incomplete given that Bloomberg's relationship with NRIA spanned several years. No communications of any kind were provided, including but not limited to communications with NRIA representatives, and perhaps more importantly, internal Bloomberg communications which would provide evidence regarding Bloomberg's assessment of NRIA as a client and decisions that were made in relation to NRIA and its requested advertising services.

105. The Liquidation Trustee expects that an extraordinary amount of documentation supporting its claims will be provided by Bloomberg during the course of extensive discovery.

**COUNT I – AIDING AND ABETTING IN FRAUD**

106. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

107. As established herein, the Insiders fraudulently operated NRIA as a Ponzi scheme which caused millions of dollars of damages to approximately 2,000 individual Investors – many of whom were elderly, and in some instances, invested their life savings with NRIA.

108. Salzano pleaded guilty to operating NRIA and his allocution included the elements of a Ponzi scheme, *see* Plea Agreement filed in *United States of America v. Salzano and Grabato* (D.N.J. Case No. 22-00690, Docket No. 86), and this Court has applied the Ponzi Scheme presumption to NRIA's operations, *see AIRN Liquidation Trust Co., LLC, v. Media Effective LLC et al.*, Adv. Pro. No. 23-01335, Docket No. 19, at *7 (October 11, 2024).

109. By virtue of the acts and omissions described herein, the Insiders demonstrably committed a fraud and were engaged in perpetuating a Ponzi scheme by, among other things, knowingly manipulating and often falsifying NRIA's financial statements, bank statements, and financial information and actively misrepresenting true profitability by concealing the fact that NRIA had little to no revenue to pay Investors the alleged guaranteed 12% or more returns except from other defrauded Investor's money.

110. But the Insiders did not commit their fraud alone. The Insiders' fraud was aided and abetted by others, including Bloomberg. But for Bloomberg's conduct, particularly as it related to direct response advertising and promoting the Insiders' fraud, the Ponzi scheme would not have been as expansive and destructive to thousands of individuals.

111. Bloomberg engaged in a wrongful act that caused the Investors to suffer an injury by losing investments by rendering advertising services to NRIA containing false information.

112. Bloomberg was aware of the role they played in this illegal activity at the time it provided its services to NRIA.

113. Bloomberg knowingly and substantially assisted the Insiders in their fraud.

114. For example, Bloomberg aided and abetted in the Insiders' fraudulent scheme by assisting in the Debtors' misleading advertising to attract new Investors, receiving just under $3.8 million in return from the Debtors.

115. Bloomberg reported in 2010 on the NorVergence fraud involving Salzano and his family.

116. Bloomberg performed due diligence on NRIA and/or Salzano and the advertisements promising guaranteed returns.

117. Bloomberg investigative journalists had initiated an inquiry into NRIA's business model and its promise of guaranteed returns, but this inquiry was mysteriously shut-down.

118. Bloomberg's internal counsel and outside counsel raised warnings about the advertisements that NRIA was demanding be aired, but after pressure and pushback from Salzano, Bloomberg relented.

119. Bloomberg deliberately chose to approve and publish the advertisements, which promoted and advertised the illicit unheard-of guaranteed rates of returns to Investors (up to 21%).

120. These advertisements employed direct calls to action which enticed potential Investors to immediately contact NRIA under the deception that the deal being offered would not last very long.

121. Bloomberg knew of the untruths and omissions made in the countless advertisements it aided the Insiders in airing over the years, and thereby, knowingly and substantially assisted in the fraud.

122. As a result of this advertising, the Investors, and therefore Plaintiff, suffered an injury through funds lost to the Ponzi scheme engaged in by the Insiders and aided and abetted by Bloomberg.

123. Accordingly, Plaintiff is entitled to a judgment that Bloomberg aided and abetted in fraud by the Insiders and is entitled to damages in an amount to be determined at trial but reasonably expected to exceed millions of dollars.

**COUNT II – AIDING, ABETTING, OR PARTICIPATION IN BREACH OF FIDUCIARY DUTY**

124. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

125. As demonstrated by the facts stated herein, Bloomberg substantially assisted NRIA's breaches of fiduciary duty, with knowledge that NRIA was breaching such duty. Such breaches of fiduciary duty would not have been possible but for Bloomberg enabling them through its actions and inaction.

126. NRIA served as the manager of, and adviser to, the Fund and was expressly authorized, among other things, to direct the formulation of investments and strategies for the Fund, use leverage, issue promissory notes, and open, maintain and close accounts with brokers, dealers, and custodians. NRIA was acting as an investment adviser under the Investment Advisers Act of 1940.

127. As an investment adviser, NRIA owed the Fund a fiduciary duty.

128. While NRIA served as investment adviser to the Fund, it simultaneously had a direct relationship with Investors whereby NRIA would provide individualized investment advice. For example, NRIA advised individual Investors to "roll up" their investments into the Fund shortly after its creation in 2018.

129. NRIA also solicited investments from Investors through a nationwide advertising campaign, including radio advertisements and billboards promising returns of 12% to 21%. Investors were also promised guaranteed returns of 12% directly from NRIA employees, who

actively advised Investors regarding NRIA's strong financial performance, falsely claiming NRIA maintained $10,000,000 in reserves at all times.

130. NRIA employees influenced Investors to maintain investments in the Fund, or actively invest more in the Fund, by representing to individual Investors that NRIA was not a Ponzi scheme when news began to spread that NRIA may be a fraudulent enterprise. NRIA employees further advised Investors that NRIA itself had invested $60M into the Fund and did not pay referral fees – more lies.

131. NRIA was an investment adviser to Fund Investors and owed them a fiduciary duty.

132. By coercing Investors to entrust NRIA with their funds pursuant to false statements, advice, solicitations, and offering materials, and by misappropriating, commingling, and otherwise misusing Investor funds for purposes other than those represented or intended, and otherwise acting as alleged herein in violation of its fiduciary duty to Investors, NRIA breached its fiduciary duty owed to Investors.

133. Based on Bloomberg's knowledge of NRIA's business model and activities and due diligence prior to airing NRIA's advertisements, Bloomberg knew that NRIA served as investment advisor to the Fund and Investors, and that NRIA owed a fiduciary duty to Investors.

134. Bloomberg possessed sufficient information to know and/or become aware of the actions described herein that constituted breaches of fiduciary duty by NRIA.

135. Despite such knowledge and/or awareness, Bloomberg continued to assist in the facilitation of the theft of Investor funds, thereby facilitating and substantially assisting NRIA's breaches of fiduciary duty.

136. Bloomberg engaged in such facilitation by airing NRIA's advertisements which it knew were false and misleading to Investors.

137. By the conduct described herein, Bloomberg knowingly aided and abetted NRIA's breach of fiduciary duty.

138. Accordingly, Plaintiff is entitled to a judgment that Bloomberg aided and abetted in NRIA's breach of its fiduciary duty to the Fund and its Investors and is entitled to damages in an amount to be determined at trial but reasonably expected to exceed millions of dollars.

**COUNT III – FRAUD**

139. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

140. As described in detail above, Bloomberg made misrepresentations to the public, including Investors in NRIA and the Fund, regarding NRIA and the Fund.

141. The misrepresentations made by Bloomberg were material.

142. Bloomberg made those material misrepresentations with knowledge of their falsity or with reckless disregard as to the falsity of the statements made with the intent that others would reasonably and justifiably rely upon the misrepresentations and invest in NRIA and/or the Fund, resulting in damages.

143. Bloomberg had knowledge or belief of the false statements contained in advertising.

144. Through its role providing advertising services to NRIA, Bloomberg intended other persons to reasonably rely on the misrepresentations in order to bring new Investors into NRIA's Ponzi- scheme.

145. Bloomberg led others to reasonably rely on the misrepresentations contained in the advertising services it performed for NRIA.

146. The Investors, and therefore Plaintiff, suffered losses, resulting in damages.

147. Accordingly, Plaintiff is entitled to a judgment that Bloomberg committed fraud and the damages resulting therefrom in an amount to be determined at trial but reasonably expected to exceed millions of dollars.

**COUNT IV—ACTUAL FRAUDULENT TRANSFERS**
**Avoidance Pursuant To 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544, and Applicable State Law Including N.J.S.A. § 25:2-25(a)(1) and Recovery and Preservation of Same Pursuant To 11 U.S.C. §§ 550 and 551**

148. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

149. Plaintiff seeks to avoid the Fraudulent Transfers to Bloomberg set forth on **Exhibit A** and to recover and preserve the value thereof.

150. Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors as set forth on **Exhibit A**.

151. The Fraudulent Transfers were made to or for the benefit of Bloomberg, and Bloomberg is either initial, immediate, or mediate transferees of the Fraudulent Transfers as set forth on **Exhibit A**.

152. Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date.

153. As is set forth in detail above, each of the Fraudulent Transfers was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

154. Bloomberg did not take any of the transfers in good faith.

155. At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

156. Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(A) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (2) recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

**COUNT V—CONSTRUCTIVE FRAUDULENT TRANSFERS**
**Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b), and Applicable State Law Including N.J.S.A. 25:2-25(a)(2) and 25:2-27(a) and Recovery and Preservation of Same Pursuant To 11 U.S.C. §§ 550 and 551**

157. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

158. Plaintiff seeks to avoid the Fraudulent Transfers to Bloomberg set forth on **Exhibit A** and to recover and preserve the value thereof.

159. Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors as set forth on **Exhibit A**.

160. The Fraudulent Transfers were made to or for the benefit of Bloomberg, and Bloomberg is either initial, immediate, or mediate transferees of the Fraudulent Transfers as set forth on **Exhibit A**.

161. The Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

162. Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date

163. On the dates that each of the Fraudulent Transfers were made, the Debtors were (1) insolvent or became insolvent as a result of such transfer; (2) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

164. At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

165. Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(B) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(2) and 25:2-27(a), and (2) recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT VI—AIDING AND ABETTING SECURITIES FRAUD
**Violations of Applicable State Law Including N.J.S.A. §§ 49:3-52 and 49:3-71**

166. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

167. Any person violates the New Jersey Uniform Securities Act ("NJUSA") if, for example, they:

a. Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud; or

b. Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

c. Engage in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensations and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of the NJUSA or of any rule or order promulgated pursuant to the NJUSA, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a)(3)-(5).

168. Additionally, N.J.S.A. § 49:3-71(d) provides as follows:

> Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or agent who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser**, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability.

N.J.S.A. § 49:3-71(d) (emphasis added).

169. Bloomberg provided advertising "services" to NRIA and its affiliates since at least 2010, receiving almost $3.8 million in compensation for its services.

170. Bloomberg served as an agent of NRIA.

171. Bloomberg materially aided the sale of securities and conduct of the Insiders in violating the NJUSA through its advertising services and other conduct facilitating the public

dissemination of false and misleading advertisements inducing the public to invest in NRIA's Ponzi scheme.

172. Bloomberg was advertising publications as to the value of securities and the advisability of investing in NRIA in willful violation of the NJUSA. Those advertisements were also deployed as a device and scheme to defraud unknowing Investors to invest in NRIA's Fund.

173. Bloomberg knew or should have known of the untruths and omissions made in the countless advertisements it aided the Debtors in publishing over the years, including but not limited to, that the unheard-of guaranteed rates of returns were false and that guaranteed returns on investments were also false.

174. Bloomberg could have, in the exercise of reasonable care, known of the existence of facts under N.J.S.A. § 49:3-71(a)(1)-(5) giving rise to liability under the NJUSA.

175. As a result of Bloomberg's material promotion and aiding of the Insiders and Debtors in selling securities, for significant compensation, thousands of Investors suffered financial detriment.

176. Accordingly, Plaintiff is entitled damages pursuant to N.J.S.A. § 49:3-71.

**COUNT VII – UNJUST ENRICHMENT**

177. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

178. In the alternative, Plaintiff asserts claim for unjust enrichment against Bloomberg.

179. Bloomberg was enriched and received economic benefits without justification as a result of, but not limited to, the Fraudulent Transfers set forth on **Exhibit A** to this Complaint.

180. Bloomberg has unjustly retained the sums received from NRIA to the detriment of the Debtors' Estate and its creditors.

181. The Debtors were impoverished as a result of the Fraudulent Transfers. Without limitation, the Debtors did not receive a reasonably equivalent value for any of the Fraudulent Transfers. Further, the conduct alleged herein facilitated and perpetuated the Ponzi scheme, which resulted in substantially all of the Debtors' assets being syphoned off and their estates being left with millions of dollars in unpaid claims and other liabilities.

182. There is a direct relationship between the enrichment of Bloomberg and the impoverishment of the Debtors' Estates, as the Fraudulent Transfers were made directly from the Debtors' bank account to or for the benefit of Bloomberg.

183. There is no justification at all for the Fraudulent Transfers, which were the product of misconduct and are not supported by reasonably equivalent value.

184. Accordingly, Plaintiff is entitled to a judgment against Defendant compelling it to disgorge and return the amounts by which they were unjustly enriched.

## COUNT VIII – CONSTRUCTIVE TRUST

185. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

186. A constructive trust is an equitable remedy to redress a wrong. When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.

187. As set forth in detail in this Complaint, Bloomberg engaged in conduct that was fraudulent, unfair, and/or unconscionable and was directly and materially enriched by virtue of such conduct.

188. Bloomberg received the Fraudulent Transfers by fraud.

189. Accordingly, Bloomberg is the voluntary trustee of the Fraudulent Transfers, as applicable, for the benefit of Plaintiff, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust.

190. Accordingly, Plaintiff seeks the entry of a judgment (a) declaring a constructive trust with respect to the Fraudulent Transfers and (b) directing Bloomberg, as applicable, to convey to Plaintiff the Fraudulent Transfers in the amounts set forth on **Exhibit A** to this Complaint.

## COUNT IX – DISALLOWANCE OF ALL CLAIMS PURSUANT TO SECTIONS 502(d) & 502(h) OF THE BANKRUPTCY CODE

191. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

192. Pursuant to sections 502(d) and 502(h) of the Bankruptcy Code, Plaintiff objects to the allowance of any claim filed by or scheduled on behalf of Bloomberg.

193. Pursuant to sections 502(d) and 502(h) of the Bankruptcy Code, to the extent property is recoverable from Bloomberg under sections 522, 544(b), 548, 550, or 553 of the Bankruptcy Code, any and all claims of Bloomberg and/or their assignee against the Debtors must be disallowed until such time as Bloomberg pays Plaintiff the amounts and/or returns the property subject to avoidance. To the extent Bloomberg asserts any right to payment from the Liquidation Trust, such claim must be disallowed.

194. Based upon the foregoing, Plaintiff is entitled to judgment disallowing any and all claims that Bloomberg may assert in these Chapter 11 Cases.

## COUNT X – EQUITABLE SUBORDINATION

195. Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

196. To the extent Bloomberg has filed one or more Proofs of Claim or may otherwise assert a claim in any manner, including but not limited to any claim asserted pursuant to section 502(h) of the Bankruptcy Code, against the Liquidation Trust, such claims should be equitably subordinated to the claims of the Debtors' general unsecured creditors and Investors.

197. As set forth herein, Bloomberg engaged in, and benefitted from, a pattern of misconduct and inequitable conduct at the expense of the Debtors, their estates, and their Investors and creditors.

198. Under the principles of equitable subordination, any claims scheduled in favor of or filed by any of the Defendants are subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

199. Accordingly, Plaintiff is entitled to a judgment finding that any claim of Bloomberg is subject to equitable subordination.

## JURY DEMAND

200. Plaintiff requests a jury trial for any counts for which a trial by jury is permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor and against each of the Defendants as follows:

a. The entry of a judgment in favor of Plaintiff and against Defendant on Plaintiff's aiding and abetting fraud claim and for damages therefore in an amount to be determined at trial;

b. The entry of a judgment in favor of Plaintiff and against Defendant on Plaintiff's fraud claim and for damages therefor in an amount to be determined at trial;

c. The entry of a judgment in favor of Plaintiff and against Defendants on Plaintiff's aiding and abetting breach of fiduciary duty and for damages therefore in an amount to be determined at trial;

d. The entry of a judgment in favor of Plaintiff and against Defendant avoiding and recovering the Fraudulent Transfers, in an amount to be determined at trial;

e. The entry of judgment in favor of Plaintiff against Defendant on Plaintiff's aiding and abetting New Jersey Securities Fraud claim and damages therefor in an amount to be determined at trial;

f. The entry of judgment in favor of Plaintiff against Defendant on Plaintiff's unjust enrichment claim and damages therefor in an amount to be determined at trial;

g. The entry of a judgment imposing a constructive trust upon Defendant with respect to the Fraudulent Transfers, in the amounts set forth in **Exhibit A** to this Complaint;

h. A judgment against Defendant disallowing all filed, scheduled, and/or section 502(h) claims of Defendant;

i. A judgment against Bloomberg equitably subordinating any scheduled claims or claims filed by Bloomberg;

j. An award of reasonable attorneys' fees and costs;

k. An award of pre- and post-judgment interest; and

l. Such additional relief as this Court deems just and equitable.

Dated: March 31, 2026

**ICE MILLER LLP**

*/s/ Louise T. DeLucia*

**ICE MILLER LLP**
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Nathan D. Basalyga, Esq. (admitted *pro hac vice*)
1500 Broadway
Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com
nathan.basalyga@icemiller.com

George A. Gasper, Esq. (admitted *pro hac vice*)
One American Square
Suite 2900
Indianapolis, IN 46282
Phone: 317-236-2100
george.gasper@icemiller.com

Jeremy Grayem (admitted *pro hac vice*)
250 West Street
Suite 700
Columbus, OH 43215
Phone: 614-462-2700
jeremy.grayem@icemiller.com

*Counsel to AIRN Liquidation Trust Co., LLC in its capacity as Liquidation Trustee of the AIRN Liquidation Trust*